IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Mother King, individually and on behalf of her minor children, Son King and Daughter King** (Pseudonyms) c/o The Chandra Law Firm LLC The Chandra Law Building 1265 W. 6th Street, Suite 400 Cleveland, OH 44113-1326<br><br>        Plaintiffs,<br><br>    v.<br><br>**Ursuline High School** 750 Wick Avenue Youngstown, Ohio 44505<br><br>**Matthew Sammartino** Principal, Ursuline High School 1163 Red Tail Hawk Court, Unit 2 Boardman, Ohio 44512<br><br>**Margaret Damore** Assistant Principal, Ursuline High School 6097 Herons Circle Austintown, Ohio 44515<br><br>**Daniel Reardon** Head Football Coach, Ursuline High School 2410 Hunters Ridge Youngstown, Ohio 44512<br><br>**Timothy McGlynn** Assistant Football Coach, Ursuline High School 6885 Winterpark Avenue Youngstown, Ohio 44515<br><br>**Christian Syrianoudis** Assistant Football Coach, Ursuline High School 535 South Hillside Drive | Case No. _____-CV-_____<br><br>Judge _____<br><br>Magistrate _____<br><br>**COMPLAINT WITH JURY DEMAND** |

Canfield, Ohio 44406

**Catholic Diocese of Youngstown**
c/o Bishop David Bonnar
144 West Wood Street
Youngstown, Ohio 44503

Ursuline Player-1 (pseudonym),
minor child, individually; and
Dale & [FNU] Peterman
Parent(s) of Ursuline Player-1,
Individually and on behalf of minor child
461 Gypsy Lane, Apt. 28
Youngstown, Ohio 44504

Ursuline Player-4 (pseudonym),
minor child, individually; and
[FNU] Wilson & [FNU] Wilson
Parent(s) of Ursuline Player-4,
Individually and on behalf of minor child
[Address unknown]

Ursuline Player-5 (pseudonym),
minor child, individually; and
Christopher & Gina Crilley,
Parent(s) of Ursuline Player-5,
Individually and on behalf of minor child
6584 New Castle Road
Lowellville, Ohio 44436

Ursuline Player-8 (pseudonym),
minor child, individually; and
Todd & [FNU] White
Parent(s) of Ursuline Player-8,
Individually and on behalf of minor child
2641 Cooper Street
Youngstown, Ohio 44502

Ursuline Player-9 (pseudonym),
minor child, individually; and
Somer Thomas
Parent(s) of Ursuline Player-9,
Individually and on behalf of minor child
342 Kenmore Ave. SE

Warren, Ohio 44483

Ursuline Player-11 (pseudonym),
minor child, individually; and
Kristen Brown & [FNU] Brown
Parent(s) of Ursuline Player-11,
Individually and on behalf of minor child
2228 Selma Ave.
Youngstown, Ohio 44504

Ursuline Player-12 (pseudonym),
minor child, individually; and
Anthony & Rachel Camuso
Parent(s) of Ursuline Player-12,
Individually and on behalf of minor child
4475 Jannell Court,
Canfield, Ohio 44406

Ursuline Player-13 (pseudonym),
minor child, individually; and
[Names unknown]
Parent(s) of Ursuline Player-13
[Address unknown]

Ursuline Player-20 (pseudonym),
minor child, individually; and
[FNU] Smith
Parent(s) of Ursuline Player-20,
Individually and on behalf of minor child
[Address unknown]

Ursuline Player-21 (pseudonym),
minor child, individually; and
Charlotte Syrianoudis and [FNU] Syrianoudis
Parent(s) of Ursuline Player-21,
Individually and on behalf of minor child
495 Shadydale Drive
Canfield, Ohio 44406

and

Ursuline Player-25 (pseudonym),
minor child, individually; and
David & Gina Brace

| Parent(s) of Ursuline Player-25, Individually and on behalf of minor child 236 Bradford Drive Canfield, Ohio 44406 | |
| --- | --- |
|      Defendants. | |

## COMPLAINT WITH JURY DEMAND

### NATURE OF ACTION

1.      This is a federal civil-rights action brought by a high-school football player and his family against a high school, its officials and coaches, and various football players and their parents. It alleges violations of Title IX of the Education Amendment, as codified under 20 U.S.C. §§ 1681, *et seq.*, with supplemental claims for Ohio, Florida, Alabama, and Tennessee legal violations, including statutes establishing civil liability for criminal acts like hazing, disseminating child porn, tampering with evidence, tampering with records, obstructing justice, culpable negligence, child neglect, and failure to report abuse; and other state-law civil claims for negligent and reckless hiring, training, supervision, and retention; disseminating intimate images, assault; battery; intentional infliction of emotional distress; negligent infliction of emotional distress; and spoliation.

2.      Ursuline High School is a Catholic high school within the Catholic Diocese of Youngstown. Rather than act in accordance with its stated values and motto "*Soli Deo Gloria*" (Latin for "*Glory to God alone*"), Ursuline and several of its administrators, coaches, and students opted to violate those values and acted solely for the glory of its football team alone.

3.      In June 2025, during a school-sanctioned football-camp trip, several football players engaged in criminal activity, including hazing, physical and sexual abuse, kidnapping, production

and dissemination of child pornography, and theft, all of which the three football coaches who attended the trip knew before, during, and after the incidents.

4.      When school administrators, soon after the trip, learned of the misconduct, they engaged in their own misconduct and failed to take the appropriate actions to address the misconduct and protect the victims.

5.      Ursuline's culture of hazing has existed for many years—due, in part, to the school's negligent and reckless hiring, training, supervision, and retention of football coaches who engaged in prior misconduct, and the School's willingness to turn a blind eye to the sexual victimization of students it is entrusted to protect—all because the School elevates the glory of the football team above basic values.

6.      Victims, both named and unnamed, have endured permanent and lasting harm, degradation, humiliation, intimidation, and retaliation—all of which Ursuline, its administrators, and its coaches could and should have prevented.

7.      Now, because of the actions detailed in this *Complaint*, the School must be cleansed.[1] And it must be held accountable.

## PARTIES

8.      Plaintiff Mother King ("Mother") is the mother of two of the victims, Son King and Daughter King. She resides in Trumbull County, Ohio.

---

[1] *See The Holy Bible*, Gospel of Matthew 21:12–13; Gospel of Mark 11:15–17; Gospel of Luke 19:45–46; Gospel of John 2:13–16.

9.     Plaintiff Son King ("Son"), a minor, at the time of filing, was entering his freshman year at Ursuline, but has since transferred to another high school. He resides in Trumbull County, Ohio.

10.    Plaintiff Daughter King ("Daughter"), a minor, at the time of filing, was entering her senior year at Ursuline, but has since transferred to another high school. She resides in Trumbull County, Ohio.

11.    Defendant Ursuline High School ("Ursuline") is a Catholic school under the Catholic Diocese of Youngstown ("Diocese"). Ursuline (with the Diocese's approval) is responsible for its employee's hiring, retention, training, supervising, and termination. That includes its football coaches. Father Richard Murphy is Ursuline's president. Ursuline is in Mahoning County, Ohio. At times relevant, Ursuline received and receives federal funds.

12.    Defendant Matthew Sammartino is Ursuline's principal. He resides in Mahoning County, Ohio.

13.    Defendant Margaret Damore is Ursuline's assistant principal. She resides in Mahoning County, Ohio.

14.    Defendant Daniel Reardon is Ursuline's head football coach. He resides in Mahoning County, Ohio.

15.    Defendant Timothy McGlynn is an Ursuline assistant football coach. He resides in Mahoning County, Ohio.

16.    Defendant Christian Syrianoudis is another Ursuline assistant football coach. He resides in Mahoning County, Ohio.

17.    Defendant Catholic Diocese of Youngstown ("Diocese") is led by the Bishop, currently Bishop David Bonnar, who owns the Diocesan property and is the final decisionmaker for the

Diocese and all entities within it, including Ursuline. His predecessor was the late Bishop George Murry. The Diocese is headquartered in Mahoning County, Ohio.

18.     Defendant Ursuline Player-1 ("Player-1"), a minor, is an Ursuline junior football player. His address is unknown. Despite reasonable and diligent efforts, Plaintiffs could not discover Player-1's address. Upon identification of Player-1's address, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending full discovery.

19.     Defendants Dale Peterman and [FNU] Peterman are the parents of Player-1. Dale Peterman is the father of Player-1. He resides in Mahoning County, Ohio. [FNU] Peterman is Player-1's mother, whose exact identity is unknown, but whose involvement is anticipated by Plaintiffs. Despite reasonable and diligent efforts, Plaintiffs could not discover [FNU] Peterman's name and identity. Upon identification of [FNU] Peterman, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending discovery.

20.     Defendant Ursuline Player-4 ("Player-4"), a minor, is an Ursuline junior football player. His address is unknown. Despite reasonable and diligent efforts, Plaintiffs could not discover Player-4's address. Upon identification of Player-4's address, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending full discovery.

21.     Defendants [FNU] Wilson and [FNU] Wilson are the parents of Player-4, whose exact identities are unknown, but whose involvement is anticipated by Plaintiffs. Despite reasonable and diligent efforts, Plaintiffs could not discover [FNU] Wilson & [FNU] Wilson's names and identities. Upon identification of [FNU] Wilson and [FNU] Wilson, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending full discovery.

22.     Defendant Ursuline Player-5 ("Player-5"), a minor, is an Ursuline sophomore football player. He resides in Mahoning County, Ohio.

23.     Defendant Christopher and Gina Crilley are the parents of Player-5. They reside in Mahoning County, Ohio.

24.     Defendant Ursuline Player-8 ("Player-8"), a minor, at relevant times, was an Ursuline senior football player. Player-8 has since transferred to another high school. He resides in Mahoning County, Ohio.

25.     Defendant Todd White and [FNU] White are the parents of Player-8. Todd White is the father of Player-8. He resides in Mahoning County, Ohio. [FNU] White is Player-8's mother, whose exact identity is unknown, but whose involvement is anticipated by Plaintiffs. Despite reasonable and diligent efforts, Plaintiffs could not discover [FNU] White's name and identity. Upon identification of [FNU] White, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending full discovery.

26.     Defendant Ursuline Player-9 ("Player-9"), a minor, is an Ursuline senior football player. He resides in Trumbull County, Ohio.

27.     Defendant Somer Thomas is the mother of Player-9. She resides in Trumbull County, Ohio.

28.     Defendant Ursuline Player-11 ("Player-11"), a minor, is an Ursuline junior football player. He resides in Mahoning County, Ohio .

29.     Defendant Kristen Brown is the mother of Player-11. She resides in Mahoning County, Ohio. [FNU] Brown is the father of Player-11, whose exact identity is unknown, but whose involvement is anticipated by Plaintiffs. Despite reasonable and diligent efforts, Plaintiffs could not discover [FNU] Brown's name and identity. Upon identification of [FNU] Brown, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending discovery.

30.     Defendant Ursuline Player-12 ("Player-12"), a minor, is an Ursuline sophomore football player. He resides in Mahoning County, Ohio.

31.     Defendant Anthony and Rachel Camuso are the parents of Player-12. They reside in Mahoning County, Ohio.

32.     Defendant Ursuline Player-13 ("Player-11"), a minor, is an Ursuline football player, whose exact identity is unknown. Despite reasonable and diligent efforts, Plaintiffs could not discover Player-13's name and identity. Upon identification of Player-13, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending discovery

33.     Player-13's parents [Names unknown] exact identities are unknown, but their involvement is anticipated by Plaintiffs. Despite reasonable and diligent efforts, Plaintiffs could not discover [Names unknown]'s names and identities. Upon identification of [Name unknown], Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending discovery.

34.     Defendant Ursuline Player-20 ("Player-20"), a minor, is an Ursuline sophomore football player. His address is unknown. Despite reasonable and diligent efforts, Plaintiffs could not discover Player-20's address. Upon identification of Player-20's address, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending full discovery. Defendants [FNU] Smith and [FNU] Smith are the parents of Player-20, whose exact identities are unknown, but whose involvement is anticipated by Plaintiffs. Despite reasonable and diligent efforts, Plaintiffs could not discover [FNU] Smith & [FNU] Smith's names and identities. Upon identification of [FNU] Smith and [FNU] Smith, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending discovery.

35.     Defendant Ursuline Player-21 ("Player-21"), a minor, is an Ursuline sophomore football

player. He resides in Mahoning County, Ohio.

36.     Defendant Charlotte Syrianoudis is the mother of Player-21. She resides in Mahoning County, Ohio. [FNU] Syrianoudis is the father of Player-21, whose exact identity is unknown, but whose involvement is anticipated by Plaintiffs. Despite reasonable and diligent efforts, Plaintiffs could not discover Syrianoudis's name and identity. Upon identification of [FNU] Syrianoudis, Plaintiffs intend to amend this Complaint. Plaintiffs reserve the right to amend this paragraph pending discovery.

37.     Defendant Ursuline Player-25 ("Player-25"), a minor, is an Ursuline freshman football player. He resides in Canfield, Ohio.

38.     Defendants David and Gina Brace are the parents of Player-25. They reside in Canfield, Ohio.

OTHER NON-PARTY INVOLVED INDIVIDUALS

39.     John DeSantis is Ursuline's athletic director and a teacher there. DeSantis is also an assistant football coach but wasn't on the camp trip. DeSantis was present when Sammartino and Damore told the assailant-players that an investigation into the matter was ongoing and instructed them not to talk to anyone about happened. Although he was present, currently available evidence doesn't suggest DeSantis was complicit in the warning and instruction. If discovery yields information about DeSantis's level of involvement, Plaintiffs intend to amend this Complaint to name him as a defendant.

40.     John Does [multiple] (collectively "Ursuline Media Mob") are individuals whose exact identities are unknown, but whose involvement Plaintiffs anticipate. Despite reasonable and diligent efforts, Plaintiffs have not yet identified John Does' names. After identifying them in discovery, Plaintiffs intend to amend this Complaint to name them individually as defendants.

41.     Ursuline player 2 ("Player-2"), a minor (possibly an adult), is an Ursuline senior football player. Aside from witnessing an incident(s), Player-2 is not believed to have been involved in the incidents.

42.     Ursuline player 3 ("Player-3"), a minor, is an Ursuline junior football player. Aside from witnessing an incident(s), Player-3 is not believed to have been involved in the incidents.

43.     Ursuline player 6 ("Player-6"), a minor, is an Ursuline junior football player. Player-6 was involved in the incidents.

44.     Ursuline player 7 ("Player-7"), a minor, is an Ursuline freshman football player. Player-7 was involved in the incidents.

45.     Ursuline player 10 ("Player-10"), a minor, at relevant times, was an Ursuline junior football player. Player-10 was involved in the incidents. Player-10 has since transferred to another high school.

46.     Ursuline player 14 ("Player-14"), a minor (possibly an adult), is an Ursuline senior football player. Player-14 is not believed to have been involved in the incidents. After several nights of hazing and attacks, Player-14 sent the following message to the football team's group Snapchat: "Aye ima be real wit yall, yall actually have to stop like the g*y shit in the rooms cause the coaches know and said that shit better fucking stop." [*Sic.*]



47.     Ursuline player 15 ("Player-15"), a minor, is an Ursuline freshman football player. Aside from being a victim, Player-15 isn't believed to have been involved in the incidents. Based on information and belief, Player-15's father is an Ursuline assistant football coach.

48.     Ursuline player 16 ("Player-16"), a minor, is an Ursuline junior football player. Player-16 is not believed to have been involved in the incidents. Player-16, on learning of the attacks on Son, told the other players not to harm Son anymore. But Son was harmed again.

49.     Ursuline player 17 ("Player-17"), a minor (possibly an adult), is an Ursuline senior

football player. Player-17 is not believed to have been involved in the incidents. Player-17 sent a message to the football team's group Snapchat like the message Player-14 posted, that the other players must stop the hazing and the coaches know what was happening. Yet even after Player-17 sent this message and the coaches knew what was happening, the hazing, attacks, and sexual assaults continued.

50.     Ursuline player 18 ("Player-18"), a minor, is an Ursuline sophomore football player. Player-18 was involved in the incidents.

51.     Ursuline player 19 ("Player-19"), a minor, is an Ursuline freshman football player. Player-19 was involved in the incidents.

52.     Ursuline player 22 ("Player-22"), a minor, is an Ursuline freshman football player. Player-22 is not believed to have been involved in the incidents.

53.     Ursuline player 23 ("Player-23"), a minor, is an Ursuline junior football player. Aside from witnessing an incident(s), Player-23 is not believed to have been involved in the incidents.

54.     Ursuline player 24 ("Player-24"), a minor, is an Ursuline junior football player. Aside from witnessing an incident(s), Player-24 is not believed to have been involved in the incidents.

EVIDENCE DISCLAIMER

55.     Plaintiffs lawfully possess videos, photos, and messages from the football team's group Snapchat, and other documentation supporting the claims. Although these items are incorporated by reference throughout the Complaint, because they contain child pornography, photos and names of minors, and other sensitive materials, they are not attached. These items will be produced during discovery and lodged with the Court or Clerk as needed after the Court enters a protective order.

56.     Defendants Sammartino and Damore already possess many of these items, including the

videos containing child pornography.

JURISDICTION AND VENUE

57.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201, for

federal claims under Title IX of the Education Amendment, as codified under 20 U.S.C.

§§ 1681, *et seq.*, which provide for attorney and expert fees. This Court has supplemental

jurisdiction over the state-law claims under 28 U.S.C. § 1367.

58.     This Court has personal jurisdiction over the Defendants, who reside in and conduct

business in this District.

59.     Venue is proper under 28 U.S.C. § 1391, because the substantial events giving rise to

several of the claims took place within this District.

FACTUAL BACKGROUND

**In 2011, Defendant Daniel Reardon resigned as Ursuline's head football coach under a cloud of
negativity, only to be rehired in 2019.**

60.     In 2004, Ursuline hired Defendant Daniel Reardon as its head football coach. After eight

years at the helm, including several successful seasons and three state titles, Reardon resigned

under a cloud.

61.     The cloud was based on Reardon's recruitment of players who engaged in conduct that

reflected poorly on the school, its academics, and its reputation, coupled with Reardon's

willingness to turn a blind eye to his football players' misconduct.

62.     But because of Ursuline's obsession with winning football games, it was willing to

overlook Reardon and his players' transgressions.

63.     After Reardon's departure, Ursuline hired a new coach, Larry Kempe, hoping to maintain

a winning program without the negativity. Kempe was an assistant coach under Reardon.

Page 14 of 200

64.     To try to restore order, Ursuline curtailed Kempe's ability to recruit and bring in students who did not meet the school's traditional standards and could not handle its curriculum—unlike Reardon who was permitted to recruit such players.

65.     Under Kempe, Ursuline tightened the scholastic requirements—something not done under Reardon.

66.     Although Kempe had some successful years, he didn't enjoy the same winning success as Reardon. In 2018, after three consecutive losing seasons, Ursuline did not renew Kempe's contract.

67.     In 2019, despite knowing of the issues with Reardon's first tenure as head coach, Ursuline wanted to rehire Reardon to try to return to a winning program—even with the known risk and potential for the cloud to return.

68.     It did.

69.     Ursuline forwarded Reardon's name to the Diocese and recommended he be hired.

70.     At the time, the Diocese had such decision-making authority, with the Bishop (then-Bishop George Murry (now deceased) and current-Bishop David Bonnar) having final authority.

71.     The Diocesan official(s), whose duties included overseeing the athletic programs and the hiring, retention, and firing of coaches, recommended that Reardon **not** be hired because of a history of dishonesty, turning a blind eye to his players' misconduct, and general negativity that followed.

72.     Reardon's dishonesty occurred not only during his first stint at Ursuline, but while he coached at Canton McKinley and made false allegations about a coach from a rival high school. Reardon made the false allegation to a Diocesan official, who investigated the matter and determined Reardon was untruthful.

73.     After the Diocesan official(s) declined Ursuline's efforts to rehire Reardon, Father

Richard Murphy, Ursuline's president, met with then-Bishop George Murry (now deceased) and

urged him to overrule the Diocesan official(s)' decision and rehire Reardon.

74.     The Bishop ultimately sided with Ursuline and Father Murphy, and rehired Reardon as

its head football coach, despite his dubious background.

75.     Within years of Reardon's hiring, the Ohio High School Athletic Association

("OHSAA") sanctioned Ursuline for violations involving improper recruiting techniques.[2]

76.     In other instances, an assistant football coach's son actively tried to recruit players from

other schools.

77.     In another instance, based on information and belief, a player who was considering

transferring to Ursuline was told he would receive money after games if he played for Ursuline.

78.     Reardon and Ursuline knew of OHSAA's prohibition on certain forms of recruiting yet

disobeyed and flouted these rules—for the glory of its football team alone.

79.     Ursuline, the Diocese, and the Bishop have continued to renew Reardon's coaching and

teaching contracts.

---

[2] Dana Balash, *Ursuline, Austintown Fitch & Liberty face penalties from OHSAA*, WFMJ Channel 21 (Sept. 1, 2022, 11:59 AM), https://www.wfmj.com/story/47204688/ursuline-austintown-fitch-and-liberty-face-penalties-from-ohsaa.

**In 2020, within days of being accused of abuse, threats, and hazing, Defendant Timothy McGlynn resigned as Champion High School's head football coach—only to have Ursuline embrace and hire him as an assistant football coach.**

80.     In 2017, Champion High School hired Defendant Timothy McGlynn as its head football coach.[3]

81.     In October 2020, midway through the season, Champion High School placed McGlynn on administrative leave while it investigated allegations of misconduct by McGlynn, including physically abusing and threatening players, and irregularities with booster funds.[4]

82.     A letter dated October 21, 2020, from the Champion superintendent to McGlynn, stated that McGlynn was being placed on administrative leave for the remainder of the season and was to have no contact with the team.[5]

83.     McGlynn's leave was prompted by allegations from several players, coaches, and boosters, including that McGlynn threatened to "kill another coach" and "firebomb" someone's house.[6]

84.     According to one player, "When coach [McGlynn] hits you, it puts you into a place where you're like, wow, my head coach just hit me. And then he goes on to cuss at you as he's hitting you. And it's not a fun thing, it's not. It's degrading."[7]

85.     According to another player, "All of us talk about hushed tones about it. We all talk quietly because if he overhears us talking about how he screamed at us yesterday or he made fun

---

[3] Mike Gauntner & J. Breen Mitchell, *Champion football coach resigns amid allegations of threats, abuse*, WFMJ Channel 21 (Oct. 27, 2020, 1:47 PM), https://www.wfmj.com/story/42825039/champion-football-coach-resigns-amid-allegations-of-threats-abuse.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

of our families or he said he was going to burn our houses down, then we would face 30 times the amount of anger than we faced the day before."[8]

86.     The letter further states, "The nature of these allegations has required an extensive and thorough investigation to protect the students and staff that are involved."[9]

87.     Rather than waiting for the results of the investigation, McGlynn resigned a few days later without challenging the allegations.

88.     Despite the plethora of allegations of misconduct—from which McGlynn choose to resign rather than face an investigation—Ursuline readily hired him as an assistant football coach to be the defensive coordinator.

89.     Ursuline should have conducted a background check on McGlynn before hiring him and, if it did, Ursuline should not have hired someone with such a background—but it did.

90.     The information was open and notorious in published reports for Ursuline's leadership to see, and if they did a cursory background check or Google search they would have seen it. If they failed to, they were negligent.

91.     But in any case, they didn't care and hired McGlynn anyway.

92.     Ursuline's duty to protect its student-athletes took a backseat to its lust for winning football games.

93.     McGlynn's physical abuse of players didn't end when he was jettisoned from Champion but continued at Ursuline.

---

[8] *Id.*

[9] *Id.*

94.     Based on information and belief, as recently as the 2024 season, McGlynn physically abused at least one Ursuline football player, which Reardon and Ursuline administrators knew— yet still did nothing.

95.     Before long, McGlynn began engaging in his own recruiting violations, too—following in Reardon's footsteps and blueprint.

96.     In February 2025, Ursuline was desperately trying to recruit a player from another school.

97.     McGlynn contacted Mother, who was friendly with this other player's family, and asked Mother to help recruit the player to attend Ursuline.

98.     McGlynn texted Mother the following:

   (a)     "Hey do you remember [player's nickname] that played with us. Can you see if your kid has his number and if so text him about Ursuline."

   (b)     "We need to get him if we can."

   (c)     "Chaney I can't talk to him." Texted in response to Mother asking what school this other player was currently attending. McGlynn further acknowledged the recruiting violation by admitting, "I can't talk to him."



99.     McGlynn then texted Mother the other player's actual name and his mother's social-media accounts.

100.    Mother felt pressured to please McGlynn, who made it clear this was how Ursuline operated, and who would be Son's coach in the upcoming years; so Mother acquiesced to McGlynn's mounting pressure and tried to recruit the player to Ursuline.

101.   In response, McGlynn texted Mother the following:

(a)  "Hehe yes go get him girl you will get a night out on us."

(b)  "Not joking." In response to Mother texting "Hahahah."

(c)  "Anywhere u want."

(d)  "You might get a vacation out of this."

(e)  With who ever u want. All payed." [*Sic.*]

(f)  "Dan [Reardon] wants him bad."

(g)  "We will get him there tell her [other player's mother]."



102.    When Mother asked McGlynn for some information on this other player and how

Ursuline came into contact with him, McGlynn texted back:

(a)  "Hahah coach JV he was his little league coach."

(b)  "Just don't say my name."

McGlynn, again, acknowledged the recruiting violation.



103.    Mother was able to contact the other player's mother, but the mother informed Mother that her son received a full scholarship to attend a rival high school.

104.    When Mother informed McGlynn, McGlynn became even more aggressive in the illegal recruitment and instructed Mother to *lie* to the other player's mother, "Please tell her there are no scholarships [at the rival high school] so if I was you look into Ursuline."



105.    McGlynn then texted Mother further instructions, "Can we get her on the phone and talk her Thur it." [*Sic.*] Not wanting the other player to attend a rival high school, McGlynn opted to now speak directly to the mother.

106.    To further entice the other player's mother to send him to Ursuline, McGlynn texted Mother, "Right and remember wins get scouts"—meaning college football scouts will look at him. McGlynn then texted Mother Ursuline's record for the past five years.



107.    McGlynn violated OHSAA's rules and regulations by engaging in such illegal recruiting tactics.

108.    These texts also show Reardon, too, was involved in the scheme.

109.    Despite being sanctioned only a few years earlier, McGlynn and Ursuline—again—disregarded OHSAA's rules and regulations and engaged in further illegal recruiting tactics—for the glory of its football team alone.

**Ursuline's football team attends nine-day, out-of-state camp trip taking 41 players under the supervision of only three coaches.**

110.    Ursuline's football team attended a nine-day bus trip from June 12 to June 20, 2025. The trip included visits to Auburn University, the University of Alabama, Florida State University, the University of Florida, Disney Springs and water park, the University of South Florida, and the University of Tennessee.

111.    Ursuline approved of the trip.

112.    Upon information and belief, Ursuline, at all relevant times, received federal funding as contemplated by Title IX, 20 U.S.C. §§ 1681 *et seq.*

113.    Ursuline is responsible for ensuring that its employees are properly trained and supervised and that its students, including Son, are safe. This responsibility extends beyond the four walls of the school to extracurricular activities including school-sponsored, sports-related trips.

114.    Defendants head coach Reardon, assistant coach McGlynn, and assistant coach Christian Syrianoudis were the only adults on the trip and were responsible for supervising the 41 football players in attendance.

115.    Ursuline, through Defendants Reardon, McGlynn, and Syrianoudis, have the actual authority to prevent and respond to hazing, assaults, and their players' Title IX violations.

116.    Defendants' failures to properly plan for and supervise were contributing factors in the harm caused to Son (and the other victims) on the trip.

117.    As part of some claimed "comradery"-building idea, Reardon had the players room with different players each night, including housing freshmen, sophomores, juniors, and seniors in the same hotel rooms.

118.    Although Reardon's son, a freshman, was on the trip, he did not participate in the "comradery"–building rooming arrangement, instead he roomed with his father most nights, if not every, night. Because Reardon's son stayed with him at night, his son managed to escape the hazing, physical and sexual abuse, and humiliation to which other players were soon subjected.

119.    Soon after departing from Ursuline (while still in Ohio)—and throughout the entire trip—several of the upperclassmen players openly discussed the hazing and "initiations" that would take place during the trip, including "taking butts," stripping fellow players, and other forms of abuse.

120.    The phrase "taking butts" refers to the stripping, degradation, and humiliation of players.

121.    The upperclassmen players also openly discussed, as part of the "initiations," having players fight each other—with the loser "getting his butt taken."

122.    This initiation is akin to the "jumping in" initiation done by criminal gangs in which prospective members must be beaten and assaulted by other gang members before gaining gang membership.

123.    The players' discussions of hazing, "initiations," and "taking butts" occurred in the presence of Reardon, McGlynn, and Syrianoudis.

124.    While still on the bus to the first destination, Syrianoudis even said, "Don't say that stuff to me, I don't want to hear it."

125.    Yet the discussions continued throughout the trip and in the coaches' presence.

126.    The hazing-initiation-butt-taking talk was not just idle talk or boasting—it soon became a reality or, more fittingly for Son and other victims, a nightmare.

127.    Despite the hazing-initiation-butt-taking-discussions occurring in the presence of Reardon, McGlynn, and Syrianoudis, who heard and were aware of what was about to occur, the coaches failed to take any appropriate steps to stop or prevent the hazing and violent attacks on the victims.

128.    As the trip continued, it became even more obvious that the hazing, degradation, humiliation, and abuse was not a random or one-time ordeal, but a years-long culture of the Ursuline football program—a culture Defendants knew well and accepted.

129.    The hazing was not limited to the football players, but included obtaining nude photos of female students, posting the photos on the football team's group Snapchat, and "rating" the females, as well as stories of female students being sexually assaulted.

130.    In addition to the illegal recruiting, hazing, and creation and dissemination of child pornography, it is also known throughout the school that Ursuline "pays" its players to attend the school and play football.

131.    The school itself has also become rotten with violence and drugs.

132.    According to at least one former Ursuline student, assaults and fighting are regular occurrences, often resulting in serious injuries; yet Ursuline administrators rarely held the combating students appropriately accountable, with most, if not all, of them returning to school within days at most. (Some of these fights were recorded by Ursuline students and shared on social media.)

133.    According to at least one former Ursuline student, the selling and use of drugs, especially marijuana, were rampant throughout the school. Students regularly smoked marijuana in the bathrooms and other secreted locations during school hours, and openly in the parking lots and around the outside of the school. Yet, Ursuline failed to take appropriate measures to limit and prevent the drug use.

134.    Ursuline routinely and regularly covered up the misconduct to keep a clean image, knowing the devastating effects if the public knew what really happened within its doors.

135.    Yet over the past few years, Ursuline has promulgated the nickname "the U."

136.    "The U" was a nickname given to the University of Miami back in the 1980s–'90s, when Miami football players engaged in flamboyant behavior and misconduct, and even criminal behavior.[10]

**Day 1 (June 12, 2025: Travel day to the State of Alabama)**
**Son learns that Ursuline football has a years-long history of hazing as part of its initiation onto the team or for players who talk smack—thereby establishing its hazing culture.**

137.    When the bus arrived at its destination on Day 1 (June 12, 2025, Alabama), the coaches assigned players to their rooms for the night.

138.    Son roomed with Player-1, Player-2, and Player-3 on Day 1. Player-23 was also in the room.

---

[10] "The U" and the backstory led to the creation of the "Catholic vs Convicts" shirt produced by University of Notre Dame students for Notre Dame's (Catholics) game against Miami (Convicts) in 1988, in which Notre Dame prevailed 31-30 leading to them winning the national title. This era of Miami football inspired the production of two ESPN *30 for 30* shows, "*The U*" (documentary 2009) and "*Catholic vs Convicts*" (2016).

139.    Player-1 told Son that, during the football camp trips, the football players did "initiations" on the freshmen and any other player who "talks smack."

140.    Player-1 then showed Son three to four videos from prior years. The videos showed Ursuline football players stripping, choking, slamming, and assaulting other players as part of the "initiations."

141.    The videos were saved to the Ursuline football team's group Snapchat from which all the members of the group could view, download, and share. Only players were members of the team's group Snapchat, not coaches.

142.    Son was later added to team's group Snapchat. Because he was added later, Son lacked access to videos, photos, and messages posted before his inclusion in the team's group Snapchat.

143.    Player-1 told Son that he was lucky last year's seniors were not still there because they were "a lot worse" than this year's seniors.

144.    Based on these videos and Player-1 comments, it was obvious that the hazing, degradation, humiliation, and abuse were not a one-time occurrence, but was the culture of the Ursuline football team—a culture that Defendants knew and failed to rectify, prevent, or stop.

145.    Later that night, Player-4 and Player-5 came to Son's room for his "initiation."

146.    Terrified of the abuse that was about to occur, Son hid in a closet.

147.    Player-5 opened the closet, grabbed Son by the throat, and pulled him out of the closet.

148.    Player-4 grabbed Son and threw him on the bed face up; then, Player-4 grabbed Son's shorts and tried to pull them off.

149.    Son grabbed his shorts to prevent Player-4 from pulling them off. While Son was on his back, Player-4 lifted Son's legs in the air.

150.     With his penis erect and visible through his clothes, Player-4, with a repeated thrusting motion, ground into and "humped" Son's buttocks over Son's shorts.

151.     To his horror, Son could feel Player-4's penis.

152.     Player-1 videorecorded the attack and posted it onto the team's group Snapchat, causing an interstate wiring and communication.

153.     Player-4 and Player-5 left the room following the attack.

**Day 2 (June 13, 2025: State of Alabama)**
**Son is ridiculed by several players for attack and video.**

154.     On Day 2 (June 13, 2025, Alabama), the team attended a 7-on-7 football camp at Auburn University.

155.     Throughout the day, in front of Defendant-Coaches Reardon, McGlynn, and Syrianoudis, several players ridiculed Son for the prior night's attack and the video.

156.     Several other players repeatedly hit Son in the head and told him that he was "going to get his butt took" again that night back at the hotel. This phrase meant that Son was going to be stripped naked, assaulted, and videorecorded, with the video being posted on the team's group Snapchat.

157.     That night, Son lay in bed in terror. But that night, at least, he was not targeted for another attack.

158.     Based on information and belief, other players were also attacked that night.

159.     That night, Player-4 posted videos to the team's group Snapchat of Player-8 issuing a warning and instructing several other players in the hotel room, "You know what happens when [inaudible] talk shit. Do not."

160.    At 11:44 PM that night, Reardon sent the following text message to the "2025 Camp

Trip" group message (that is, the players and coaches on the trip):

> The manager of the hotel just told me that he got a complaint of too much noise.
> This is the ONLY warning you will get. The whole team will be punished if I get
> another complaint.
>
> The specific complaint came from the 3rd floor.



161.    Lights-out was supposed to be 10:00 PM.

162.    Reardon never went and personally checked on the disturbances or complaint.

163.    Nor did McGlynn or Syrianoudis.

164.    While at the Auburn University camp, several players also stole clothing and accessories

from the camp.

165.  The players openly discussed the thefts and showed the items.

**Day 3 (June 14, 2025: State of Alabama)**
**Son is again ridiculed by several other players.**

166.  On Day 3 (June 14, 2025, Alabama), the team attended a football camp at the University of Alabama.

167.  Throughout the day, as with the prior day, several players continued to ridicule Son, hit him in the head, and threaten him that he was "going to get his butt took" that night back at the hotel.

168.  Again, Reardon, McGlynn, and Syrianoudis were present and heard the threats, yet did nothing.

169.  Fortunately, Son was not targeted that night for another attack. But Player-5 was.

170.  Player-6, along with several other players, held down Player-5 and "ripped" off Player-5's clothes.

171.  Son started videorecording, but when he realized what was happening, he "abandoned" (Snapchat lingo for not saving a video) and did not post it to the team's group Snapchat.

172.  But several other players videorecorded the attack on Player-5 and posted it to the team's group Snapchat.

**Day 4 (June 15, 2025: Travel day to the State of Florida)**
**Son is attacked, assaulted, and stripped by several other players.**

173.  On Day 4 (June 15, 2025, Florida), the team travelled from Alabama to Florida to attend a football camp at Florida State University.

174.  Throughout the day, as in the previous days, several players continued to talk about the prior attacks and their plans to "take butts" that night. Again, Reardon, McGlynn, and Syrianoudis were present and heard the discussion and threats yet did nothing.

175.    While Son was in his hotel room with Player-7, Player-8 came in.

176.    Player-8 took Son's cellphone from him and sent out Son's room number on the team's group Snapchat to alert the players to Son's location.

177.    Son, knowing he was about to attacked again, locked himself in the bathroom.

178.    When several other players arrived at Son's hotel room, they forced open the bathroom door, injuring Son's foot in the process. (The injury to Son's foot was still visible days later when he returned home.)

179.    Player-8, Player-9, Player-10, and Player-11 pulled Son out of the bathroom.

180.    Player-9 forcibly lifted Son off the ground by his shirt and arms, while Player-8, Player-10, and Player-11 forcibly tried to strip Son's pants and underwear off him.

181.    Son shook his head and pleaded, "No!" while holding the sides of his pants. Son, who tried to appear strong, wanly smiled in an obvious effort to hold back his tears.

182.    This portion of the attack was videorecorded and posted to the team's group Snapchat.[11]

183.    Before Player-8, Player-9, Player-10, and Player-11 could completely remove Son's pants and underwear, someone yelled "the coaches are in the hallway" prompting them to run away.

184.    Player-12, who was present for the attack, stayed in Son's room when the other players ran off.

185.    Player-12 told Son that he could go to Player-12's room to avoid the other players coming back because they knew Son's room number.

186.    Son went with Player-12 to his room thinking Player-12 was trying to protect him.

---

[11] Plaintiffs lawfully possess these videos, which are incorporated by reference, but they are not attached. *See* Evidence Disclaimer above.

187.   But Player-12 was not trying to protect Son. Player-12 had lied to Son and lured him into another attack.

188.   When Player-12 led Son into his room, Player-4, Player-8, Player-9, Player-10, Player-11, and Player-13 were waiting for Son. Player-24 was also in the room.

189.   Son said, "Heck no, I'm leaving," and tried to leave the room.

190.   But Player-12 stood in the doorway to prevent Son from leaving and said, "You're not leaving now."

191.   Son protested and tried to leave, but Player-12 prevented him and said, "It's too late, you're not leaving."

192.   Player-8, Player-9, Player-10, and Player-11 immediately attacked Son, carried him into the bedroom, and slammed him onto the bed.

193.   Player-12 stood guard in the other room and watched.

194.   Player-10 forcibly grabbed and restrained Son's left arm and covered Son's mouth to prevent him from screaming for help.

195.   At the same time, Player-11 forcibly grabbed and restrained Son's right arm; Player-9 forcibly grabbed and restrained Son's left leg; and Player-8 forcibly grabbed and restrained Son's right leg.

196.   Player-13 forcibly grabbed and restrained Son's right leg, as Player-8 grabbed Son's pants.

197.   Player-8, Player-9, Player-10, Player-11, and Player-13 tried to strip off Son's clothes, but as Son was trying to defend himself, he fell off the bed.

198.   While Son was on the ground, Player-8, Player-9, Player-10, Player-11, and Player-13 continued to assault him and eventually pulled off Son's pants and underwear revealing his nude buttocks and genitals.

199.    Son covered his now-exposed genitals with his hands, but the Players pulled Son's arms to fully expose him for the videorecording.

200.    As Player-10 grabbed and held Son's arm, exposing Son's nude buttocks and genitals, Player-9 smacked Son's bare buttocks twice.

201.    As Son stood up, Player-8 threw Son back on the ground.

202.    Son crawled to the corner and covered his genitals with his hands.

203.    One of the Players threw a washcloth at Son to cover himself, while Player-11 smacked him in the head/face.

204.    As with the earlier attack, Son was pleading "No!" while trying to fend off the attack. Son tried to appear to be strong but was holding back his tears.

205.    Player-4 videorecorded the attack and posted the videos to the team's group Snapchat.[12]

206.    Player-12, Player-20, and Player-25 saved and transferred the videos in Snapchat.

207.    The videos were disseminated over state lines to other Ursuline football players and students in Ohio.

208.    The videos were further disseminated throughout the surrounding community.

209.    Player-11 took Son's underwear and said they were keeping as a "trophy."

210.    Criminals, like serial killers and serial rapists, commonly take trophies to commemorate and remind them of their criminal achievements.

---

[12] Plaintiffs lawfully possess these videos, which are incorporated but not attached. *See* Evidence Disclaimer above.

211.    One of the players threw Son's underwear down a stairwell. Player-12 (the one who lured

Son into the attack) posted a photo of Son's underwear on the team's group Snapchat with the

message "Rip [Son]" (meaning "rest in peace").



212.    Son stayed in the room shaking, terrified, and humiliated.

213.    Within minutes, several other players, who had seen the video posted on the team's

Snapchat, entered the room and ridiculed Son. Son fled to his room in humiliation.

### Day 5 (June 16, 2025: State of Florida)
### Son informs Mother of the attacks; Mother informs Defendant-Assistant Coach Timothy McGlynn.

214.    On Day 5 (June 16, 2025, Florida), the team attended a football camp at the University of Florida.

215.    Throughout the day, in front of Defendant-Coaches Reardon, McGlynn, and Syrianoudis, several other players ridiculed Son for the prior night's attacks and videos.

216.    Reardon, McGlynn, and Syrianoudis, again, did nothing to rectify, prevent, or stop the attacks and hazing.

217.    Around 5:33 PM, Son texted Mother about the attacks, but, frightened, pleaded with her not to say anything to anyone.

218.    Mother told Son to tell McGlynn, but Son refused and pleaded with Mother not to tell anyone.

219.    Son knew and legitimately feared that, if Mother told the coaches, the other players would find out that Son talked about what happened and would retaliate against him and attack him even more viciously than before.

220.    Given the warnings other players had given, his fears were well founded.

221.    Later, Son and another player went to Target to get away and hide from the other players.

222.    Around 8:34 PM, McGlynn called Mother because he could not get in touch with Son.

223.    At 8:45 PM, Mother called McGlynn back.

224.    During the call, Mother informed McGlynn of the hazing, assault, and attack on Son.

225.    McGlynn expressed neither surprise nor dismay that hazing was happening. And he expressed no sympathy or remorse.

226. Rather, he tried to *downplay* what occurred and made excuses, like there being 41 players on the trip and only three coaches.

227. This did not excuse Defendants' failures and what occurred.

228. McGlynn even went so far as pronounce, "It's just boys being boys." So in McGlynn's view, multiple players assaulting, holding down, and stripping another player naked, while another player videorecords the attack and posts it to the team's group Snapchat (production and dissemination of child pornography) is normal and just "boys being boys."

229. In McGlynn's view, multiple players threatening to "take butts" and then "taking butts" of fellow male players is just "boys being boys."

230. In McGlynn's view, compelled fighting by multiple players is just "boys being boys."

231. In McGlynn's view, multiple players "humping" each other over their clothes is just "boys being boys."

232. McGlynn's pronouncement was wrong.

233. And absurd.[13]

234. This is the same McGlynn who thought it was normal to physically abuse his players, threaten to kill another coach, and threaten to firebomb someone's house when he was head coach at Champion High School.

235. He was wrong there and then, and he was wrong here and now.

236. Mother responded to McGlynn's obtuse "boys being boys" comment, "Need I remind you that hazing is highly illegal and dangerous."

---

[13] Hari Kondabolu, "Boys will be boys," Mainstream American Comic, https://youtu.be/TgAKR-zna-8.

237.    McGlynn responded angrily that they do not condone hazing—a false statement because the hazing has been occurring for years and is still occurring with the coaches being fully aware, yet failing to rectify, prevent, or stop it.

238.    McGlynn then claimed (falsely) that he would take care of it.

239.    Mother said that, when she would go to the school to pick Son up from the returning bus, she was going to confront the players that hazed and attacked Son. And she was going to report what happened to school leadership.

240.    McGlynn retorted that Mother going to the school was "crazy" and that "they'll just tell her to go back to where she's from."

241.    In McGlynn's world, a mother protecting her child is somehow crazy.

242.    But his statement displayed his and Ursuline's conscious disregard for wrongdoing by its players. McGlynn knew that the school's leadership wouldn't *care*.

243.    (He was right.)

244.    McGlynn's statements confirmed that going and reporting to Ursuline would accomplish nothing.

245.    McGlynn was speaking from his Ursuline experience—in contrast to Champion High School, which takes hazing and abuse seriously.

246.    After the conversation, in a failed effort to calm down Mother, to encourage her not to report what occurred to the school, and to cover for his offensive and arrogant remarks, McGlynn texted Mother the following:

    (a) "I'm not saying anything." (8:55 PM).

    (b) "My issues is your brought it to my attention so I have to address it some how." [*Sic.*]
       (9:05 PM).

(c) "I am but it happens behind close doors there 41 kids on 3 different floors." [*Sic.*]
(9:07 PM). (This did not just happen behind closed doors. The players openly talked
about it front of the coaches on the bus and throughout the camps. The players
posted in social media for all to see.)

(d) "Yes thanks you I'll be on it don't worry." [*Sic.*] (9:10 PM). (McGlynn and the other
coaches were not on it. They were aware both before, during, and after, yet failed to
rectify, prevent, or stop the hazing and attacks, which continued.)

(e) "No body else just from you everything is handled should not happen again if it does
please let me know. [*Sic.*] (10:25 PM). (It did happen again—many more times. And
it is not Mother's responsibility to let the coaches know when it happened—it is the
coaches' duty and responsibility—which they failed.)

(f) "I put word out that it will be me and a ticket back to Ohio on a bus if it continues."
[*Sic.*] (10:28 PM). (It did continue, and no one was given a ticket back to Ohio—nor
were they later held accountable.)

(g) "Just so you know I have to tell the head coach cause if something does happen I can
get in big trouble." (10:30 PM). (So Reardon knew—beyond him being present on
the bus and during the camps when the players openly talked about the hazing and
attacks. And something did happen and continued to happen.)







247.    At some point during the trip, McGlynn said to some players, in essence, "You guys better delete that shit" (meaning the videos). Neither McGlynn, Reardon, nor Syrianoudis took any further steps to ensure that the players deleted the videos. The players did not delete the videos or the team's group Snapchat at that time; instead, the players continued to disseminate the videos containing child pornography even across state lines.

248.    Neither McGlynn, Reardon, nor Syrianoudis contacted law enforcement or children

services to report the attacks, even though they were required to make such a report under

Florida Statute Title V Chapter 39.201, Alabama Code § 26-14-3, and Ohio Rev. Code §

2151.421.

249.    That night, the team went swimming until around 8:30–9:00 PM and, afterward, Player-

14 posted the following message on the team's group Snapchat, "Aye ima be real wit yall, yall

actually have to stop like the g*y shit in the rooms cause the coaches know and said that shit

better fucking stop."



250.    Despite Player-14's attempt to stop the attacks, the other players disrespected him and

continued their illicit behavior. Reardon, McGlynn, and Syrianoudis failed to act and stop the

attacks themselves.

251.    Around 10:06 PM, Son texted Mother, "Somebody on the team was up next to get hazed

basically and told his brother and his brother told his dad and his dad told the coach."

252.    The player that Son was referring to in the text message was Player-15, whose father, based on information and belief, is an Ursuline assistant football coach who wasn't on the trip.

253.    While at the University of Florida camp, several players also stole clothing and accessories from the camp. The players openly discussed the thefts and showed the items.

**Day 6 (June 17, 2025: State of Florida)**
**Despite Defendant-Coaches Reardon, McGlynn, and Syrianoudis being fully aware of the hazing and assaults, the attacks continue.**

254.    On Day 6 (June 17, 2025, Florida), the team went to a water park.

255.    Throughout the day, as with the earlier days, several players continued to issue threats that they were "going to take butts" that night.

256.    Again, Reardon, McGlynn, and Syrianoudis were present and heard the threats, yet did nothing.

257.    Son, again, was one of the intended targets. Several players threatened Son—in front of coaches Reardon, McGlynn, and Syrianoudis—that "tonight, your hoodie comes off too" (meaning they were going to forcibly strip Son completely naked unlike the earlier attack when they were only able to rip off Son's pants and underwear but not his hoodie).

258.    Fortunately, Player-16 told the other players that Son was with him (meaning he and Son were friends) and that they were not to touch Son anymore.

259.    That night, Player-17 posted a message to the team's group Snapchat—like Player-14's message the previous night—that the other players had to stop the hazing because the coaches knew what was happening.

260.    But the other players ignored Player-17's admonition and attempt to stop the attacks.

261.    Later that night, other players attacked and stripped Player-15 in retaliation for "talking

smack." Player-15 is the player who, the night before, told his brother (also a player), who told

his father (an assistant Ursuline football coach), who told the coaches about the hazing.

262.     No one posted videos of the attack on Player-15 on the team's group Snapchat.

263.    But a photo of Player-15's ripped underwear in the hallway was posted on the team's

group Snapchat.

264.    Throughout the night, several players went to different hotel rooms and **humped** each

other over their clothes.

265.    Also that night, McGlynn texted Mother the following:

    (a) "I think he is fine." (8:17 PM). (Son was not fine—he was terrified of being hazed

       and attacked again.)

    (b) "Just had ice cream with him he good to go." [*Sic.*] (10:02 PM). (McGlynn lied to

       Mother. He did *not* have ice cream with Son. McGlynn did tell Son that he knew

       what happened and, if it happens again, Son should tell him. But McGlynn took no

       other rectifying or preventive measures.)

266.    At 11:34 PM, Reardon sent the following text message to the "2025 Camp Trip" group

message:

Warning for the team;

If [Player-8's] girlfriend (or anyone else's) is in our hotel tonight, the entire team will be
running tomorrow.

    If [Player-8] (or anyone else) leaves the hotel tonight, the entire team will be running
tomorrow.



267.    Reardon, again, failed to physically check on the players, despite being fully aware of what was occurring at the hotel each night.

**Day 7 (June 18, 2025: State of Florida)**
**Despite Defendant Coaches Reardon, McGlynn, and Syrianoudis being fully aware of the hazing and assaults, the attacks continue.**

268.    On Day 7 (June 18, 2025, Florida), the team attended a football camp at the University of South Florida and went to Disney Springs later that day.

269.   As had been occurring throughout the trip and as part of the hazing and initiation, several players forced other players, typically underclassmen, to fight each other—with the loser "getting his butt taken," as they yelled during the fights.

270.   The players openly discussed the fighting in front of Reardon, McGlynn, and Syrianoudis.

271.   But no coach did anything to prevent or stop it.

272.   The prior night, Player-7 accidentally clogged the toilet in a hotel room but, when it was discovered that morning, Player-7 denied doing so even though he had just been in the bathroom.

273.   Son also denied clogging the toilet and pointed out that he had not even gone into the bathroom.

274.   Player-18 and Player-19—the other two hotel-room occupants—compelled Son and Player-7 to follow them to Player-20's room.

275.   Player-18, Player-19, and Player-20 told Son and Player-7 that the dispute over the clogged toilet would be settled with a push-up contest—with the loser "getting his butt taken."

276.   Son and Player-7 started doing push-ups and did not stop.

277.   Finally, Player 20 announced that Son and Player-7 would have to "fight" it out.

278.   Player-7 immediately tackled Son and they started fighting.

279.   Son was able to put Player-7 in a headlock and just held him, refusing to let go.

280.   Eventually, the other players stopped the fight.

281.   Neither Son nor Player-7 had their "butt taken" that night.

282.    One of the players videorecorded the fight and posted it on the team's group Snapchat.[14]

283.    While at the University of South Florida camp, several players also stole clothing and accessories from the camp. The players openly discussed the thefts and showed the items.

**Day 8 (June 19, 2025: Travel day to the State of Tennessee)**
**A player lied about Son causing several other players to hunt for Son to harm him.**

284.    On Day 8 (June 19, 2025, Tennessee), the team travelled from Florida to Tennessee and attended a football camp at the University of Tennessee.

285.    Throughout the day, as with the prior days, several players continued to openly discuss the prior hazing and issued threats that they were "going to take butts" that night.

286.    Again, Reardon, McGlynn, and Syrianoudis were present and heard the threats, yet did nothing.

287.    During the day, Player-21 lied and falsely accused Son of making a negative comment about another player.

288.    Son denied making the negative comment, but Player-21 persisted with his lies.

289.    Player-21 is Defendant-Coach Syrianoudis's nephew and, based on information and belief, lied about Son in retaliation and to try to unjustly smear Son.

290.    Because of Player-21's lies, several other players went looking for Son that night to hurt and haze him for "talking smack."

291.    Son hid for the entire night in his room with the door double-locked and deadbolted to avoid getting attacked and assaulted—again. Son refused to leave his room the entire night fearful that he would be unjustly and viciously attacked—again.

---

[14] Plaintiffs lawfully possess these videos, which are incorporated by reference but not attached. *See* Evidence Disclaimer above.

292.    Meanwhile, the assailant-players enjoyed the final night of the trip without fear of any repercussions or discipline.

293.    At 9:52 PM, Reardon sent the following text message to the "2025 Camp Trip" group message:

> ROOM 318:
> [Player-22]
> [Player-20]
> [Player-15]
> [Player-19]
>
> WE ALREADY GOT A COMPLAINT ABOUT THE NOISE COMING FROM YOUR ROOM.
>
> FIGURE IT OUT.



294. Reardon, again, failed to physically check on the players, despite knowing what was occurring at the hotel each night.

### Day 9 (June 20, 2025: Travel day back home to State of Ohio)
### Son's nine-day trip from hell was finally over.

295. On Day 9 (June 20, 2025, Ohio), the team travelled back home from Tennessee to Ohio.

296. On the bus trip home, Son got sick and was puking.

297. Earlier in the camp, Son's leg swelled up.

298. When Mother told McGlynn about Son's swollen leg days earlier, McGlynn blew it off as a bug bite, claiming that it was the "south" and they have a lot of bugs "down there."

299. McGlynn is not a medical doctor or trained medical professional.

300. Rather than take Son for medical treatment, McGlynn gave Son itch-cream to put on his swollen leg, even though Son's leg continued to swell up and cause him pain.



**After enduring several days of abuse, Son finally returns home.**

301.    After getting home that night, Son broke down and told Mother everything that happened on the trip. He showed her all the team's group Snapchat videos, photos, and messages.

302.    Mother immediately recorded many of the videos from the team's group Snapchat to preserve them as evidence.

303.    The next day, June 21, Mother took Son to urgent care for his swollen leg, where he was diagnosed as having a staph infection and prescribed an antibiotic. Because Son was forced to sleep on the floor several nights, it is believed that he contracted the staph infection from the dirty floors.



304.    Son's condition worsened over the next few hours, so Mother took him to the hospital emergency room. ER doctors had to lance Son's leg to remove the infection.

**Mother meets with Principal Sammartino and Assistant Principal Margaret Damore and tells them what happened during the trip.**

305.     On June 22 at about 10:39 PM, Mother emailed Ursuline's Principal, Defendant

Matthew Sammartino, requesting an immediate meeting.[15]

1 / 1

**Subject:** Request for Immediate Meeting Regarding Serious Football Trip Concerns

Dear Mr. Sammartino,

I am writing to request an immediate meeting regarding serious incidents that occurred during a recent football trip that my son, ███SON KING███, attended with the team. I have become aware of multiple deeply concerning events that took place during this trip, involving issues of student safety, bullying, and inappropriate behaviors.

While I will provide the full details in person, I want to emphasize that I have substantial evidence, including recorded material, and I am fully prepared to escalate this to the Diocese and legal counsel if necessary. However, I believe it is appropriate to first address this directly with you to ensure that immediate and appropriate action is taken.

Due to the severity of this matter, I am requesting to meet with you as soon as possible. My son will not be attending practice or any football activities until this issue is properly addressed.

Please let me know your earliest availability for this meeting.

Thank you for your urgent attention to this matter.

Sincerely,

███MOTHER KING███

███(XXX) XXX-XXXX███

306.     On June 23, at about 7:46 AM, Sammartino responded and set up a meeting for that day at 12:00 PM.

307.   At about 7:51 AM, Player-22's mother texted Mother that the team's group Snapchat was deleted, or that maybe her son was removed from the list. (The team's group Snapchat was not deleted at this time.)

308.   At about 9:20 AM (before Mother met with the administrators), Player-22's mother sent another text to Mother:



309. So even before Mother met with Sammartino and Damore, Defendants contacted parents and issued their warnings about suspending the season—even though Defendants never took any such action.

310. Mother and her youngest son's father ("Stepfather") met with Ursuline Principal Matthew Sammartino and Assistant Principal Margaret Damore.

311. Mother never went to the school before to complaint about anything and, although she had previously met both Sammartino and Damore, this was the first time she actually had a conversation with them.

312. Until that point, Sammartino and Damore claimed not to know what had happened on the trip because Reardon, McGlynn, and Syrianoudis did not tell them what occurred—even though the coaches knew and had a duty to report such things.

313. During the meeting, Mother provided explicit details of the hazing, degradation, humiliation, and abuse that several players inflicted on Son.

314. Mother questioned why freshmen roomed with seniors, juniors, and sophomores, to which Sammartino retorted, "That's how we've always done it."

315. Mother explained to Sammartino and Damore that she has the videos, photos, and messages from the team's group Snapchat depicting the hazing, abuse, assaults, and child pornography.

316. Sammartino and Damore never asked to see the messages; nor did they ask to see the videos and photos.

317. Sammartino and Damore just sat there and listened showing no regret, remorse, or compassion, and offering no sympathy.

318.    Mother, sensing Sammartino and Damore's disinterest in the matter, finally said, "Do you want to see the videos?"

319.    Sammartino said she should just email the videos to him.

320.    She tried. When the emails wouldn't transmit to Sammartino's emails, Mother said, "How about if I just show you."

321.    Mother had Son's cellphone with her during the meeting. Mother opened the actual team's group Snapchat on Son's cellphone and scrolled through the entire team group Snapchat.

322.    When Mother started scrolling through the team's group Snapchat, and played the videos, Damore got out of her chair and walked over to get a better view; Sammartino just sat in his chair, uninterested and uncaring.

323.    The assailant-players' faces are easily recognizable on the videos, photos, and messages—Sammartino and Damore knew who they were.

324.    Mother said, "These are your top players who represent your school. Doesn't that bother you?"

325.    Sammartino continued to just sit there and said nothing; showing no interest in the matter.

326.    Stepfather said to Sammartino, "Aren't you going to say something or are you just going to sit there?" Sammartino responded, "I'm just listening."

327.    In reaction to seeing the videos, photos, and messages, Sammartino and Damore sat quietly, again showing no compassion or sympathy.

328.    Stepfather, sensing Sammartino and Damore's disinterest, said, "Don't you have anything to say about this? What if this were your child?"

329.    Damore, finally showing some emotion, confessed and acknowledged, "**this is bad**."

330.   Damore videorecorded the entire team group Snapchat, including the videos, photos, and messages, on her own personal cellphone.

331.   Other football-team players downloaded and shared the team's group Snapchat videos, photos, and messages beyond the football team.

332.   From the videos, photos, and messages, Sammartino and Damore knew full well which players were involved and exactly what they did. The players' identities and actions were clearly visible on the videos, photos, and messages.

333.   Sammartino and Damore also knew what Reardon, McGlynn, and Syrianoudis knew and about their failure to rectify, prevent, and stop the hazing, abuse, assaults, and creation and dissemination of child pornography.

334.   Mother asked, "So where do we go from here?"

335.   Damore said that the football team had practice that night, so they would have to wait and see.

336.   Stepfather, astonished that nothing was going to be done, questioned why the football team was still going to practice.

337.   Principal Sammartino finally spoke and told Mother that he was going to suspend all football activities and investigate the matter.

338.   Sammartino told Mother that he would tell the Diocese and law enforcement.

339.   Sammartino, later, notified children services, which in turn notified Youngstown Police. But merely notifying children services of Mother's complaint did not free Ursuline of its obligation to conduct an internal investigation into the hazing, abuse, assaults, and child pornography suffered by the children it must protect.

340.     On becoming aware of the hazing, attacks, assaults, and child pornography Son suffered, Sammartino and Damore, as Ursuline administrators, had the authority to prevent and respond to these Title IX violations.

341.     Damore wanted to interview Son the following day, but Mother declined to meet with Damore—it was obvious that Ursuline, Sammartino, and Damore were not interested in conducting a real investigation and handing out any real discipline.

342.     Mother instead took Son to the Youngstown Police Department to be interviewed.

343.     Based on information and belief, Sammartino refused to turn over the team's group Snapchat videos, photos, and messages to Youngstown Police without first being served with a subpoena.

344.     Based on information and belief, foot-dragging Principal Sammartino has yet to provide the videos, photos, and messages to law enforcement.

345.     At about 3:20 PM, on returning from the meeting, Mother took additional videos and photos of the team's group Snapchat to preserve as evidence.

**The football team learns that the season may be suspended because of Mother's reporting of the illicit activities on the trip.**

346.     When the players arrived for practice that afternoon (June 23, 2025), they were informed the non-mandatory conditioning session that night was cancelled.

347.     Reardon instructed several players that they had to meet with Sammartino, Damore, and Athletic Director John DeSantis ("DeSantis"), who is also an assistant football coach.

348.     When the players met with Sammartino, Damore, and DeSantis, they were told that there was an ongoing investigation.

349.    Sammartino, Damore, and DeSantis further instructed the players not to talk to anyone about what occurred.

350.    Sammartino, Damore, and DeSantis, despite having an opportunity right then and there to interview the players and investigate the matter, did nothing.

351.    After informing the players of the investigation and directing them not to talk about what occurred without anyone, Sammartino, Damore, and DeSantis sent them on their way and let them rejoin the team shortly after.

352.    These assailant-players were many of Ursuline's top players. Their absence from the team would have crippled the team's chances at success and been publicly known. Ursuline could not and would not let that happen—despite the players being an ongoing threat to other players and students.

353.    A few of the players were suspended for the next week's non-mandatory sessions, but once mandatory practices began, these players were allowed to fully participate with the football team.

354.    The next day, June 24, the football team returned to its regularly scheduled non-mandatory conditioning sessions.

355.    Player-10, not wanting to be a part of such a program, transferred—on his own—from Ursuline to another shortly after.

356.    Weeks later, Player-8 also transferred from Ursuline to another school.

357.    Ursuline, Sammartino, and Damore have had all this information for over two months but have failed to take meaningful steps to address and rectify the atrocities.

358.    Even before Mother informed Sammartino and Damore of what occurred during the trip, Sammartino, Damore, DeSantis, Reardon, McGlynn, and/or Syrianoudis notified the football team that the season was in jeopardy and may be suspended.

359.    The players learned that Son had told Mother what occurred and that she told Sammartino and Damore.

360.    Defendants and the players were also aware that a criminal investigation was occurring or about to occur.

361.    Within hours of Mother meeting with Sammartino and Damore, several players posted on the team's group Snapchat that Son was a "snitch" and "rat." The players then removed Son from the team's group Snapchat at 8:45 PM on June 23. This retaliation was a reasonable and foreseeable consequence of the Defendants' actions, failures to act, and attempts to cover up the illicit activities.

362.    McGlynn, also previously, ordered the players to delete the videos and the team's group Snapchat.

363.    Knowing that Sammartino, Damore, and DeSantis were aware of what occurred during the trip, coupled with the threat of losing their season, and knowledge of the looming criminal investigation, the players deleted the team's group Snapchat that day (June 23) as well. That caused the destruction of evidence—another reasonable and foreseeable consequence of the Defendants' actions, failures to act, and attempts to cover up the illicit activities.

364.    Ursuline, Sammartino, Damore, and DeSantis likewise removed videos, photos, and posts from Ursuline's Facebook page and deleted other Ursuline football social-media accounts, all of which contained valuable evidence for the criminal investigation, resulting in even more evidence destruction.

365.    After destroying evidence of the crimes and instructing the players not to talk to anyone about what occurred, Sammartino, Damore, and DeSantis took no further action. They did not suspend the football season. They did not investigate. They did not interview all the players on the trip. They did not suspend Reardon, McGlynn, or Syrianoudis even though they were on the trip; were aware of what was going to occur and what did occur; failed to rectify, prevent, or stop the hazing, attacks, assaults, and child pornography—all of which are criminal acts—and then failed to report it to Sammartino, Damore, DeSantis or any other appropriate person.

366.    Reardon, McGlynn, or Syrianoudis likewise failed to take any appropriate steps to address and rectify the situation.

367.    Similarly, the Diocese has failed to take any appropriate action against Ursuline, the football players, the coaches, or the football team.

368.    (By contrast, Champion's superintendent, on hearing allegations of abuse by then-head football coach McGlynn, immediately placed on McGlynn on administrative leave and ordered him to have no contact with the players or the team. The superintendent then started his own investigation.)

369.    Defendants' simple referral of the matter to children services or law enforcement, and doing nothing more, is insufficient.

370.    Defendants' inaction permitted Reardon, McGlynn, and Syrianoudis, as well as the assailant-players, to have full and unfettered access to the victims and other innocent players. What type of leadership allows the accused to have such access to the victims and witnesses? What type of leadership allows the jackals to have such access to the sheep? Defendants were acting for the glory of the Ursuline football alone—**not the child victims who they are dutybound to protect**.

371.     Based on information and belief, one or more Defendants warned the players that the football season was in jeopardy of being suspended/cancelled and instructed them not to say anything to anyone about what had occurred, affectively, obstructing the investigation of the matter.

372.     Based on information and belief, because of Defendants' actions, law enforcement has been inhibited in its investigation of the matter, including multiple players (and their parents), even the innocent ones, refusing to speak to law enforcement for fear of the football team being suspended and the season halted. Yet another reasonable and foreseeable consequence of the Defendants' actions, failures to act, and attempts to cover up the illicit activities.

**Defendants Ursuline, Principal Matthew Sammartino, and Assistant Principal Margaret Damore failed to following Ursuline's Code of Conduct in handling this matter.**

373.     Despite the overwhelming evidence of misconduct by the football players, who were easily identified in the team's group Snapchat, Ursuline, Sammartino, and Damore failed to follow the school's Code of Conduct in handling the matter.

374.     The *Ursuline High School Student Handbook* contains the *Code of Conduct*, which sets forth the following "STUDENT RESPONSIBILITIES":

> All Ursuline High School students are expected:
> . To conduct themselves in a manner that will guarantee their own well-being and the well-being of others. Their behavior should reflect positively on Ursuline High School, their families, and the community as a whole;
> . To treat administrators, teachers, staff members, parents, guests and other students and third parties with courtesy and respect;
> . To know and adhere to the rules and regulations established by their teachers and school administrators;
> . To strive for academic excellence;
> . To refrain from libelous/slanderous remarks and obscene/vulgar language in written and/or verbal expression;
> . To adhere to policies relating to chemical/alcohol abuse;
> . To be punctual in attending school and class;

. To refrain from misbehavior that disrupts the educational process for themselves and others;

. To respect the reasonable and necessary exercise of authority by school administrators and staff to maintain discipline at school and at school-sponsored activities.

375.    The *Code of Conduct* specifically sets forth provisions addressing "Fighting," "Anti-Bullying, Harassment, and Intimidation," "Hazing," "Sexual Harassment and Sexual Violence," and "Student Threats." Commission of any of these acts is a violation of the *Code of Conduct*.

376.    By the *Code of Conduct's* own definitions, the assailant players engaged in each of these acts and violated the *Code of Conduct*.

377.    The *Code of Conduct's* "EXCLUSION FROM SCHOOL" provision provides, in relevant part:

> Exclusion from school means that a student cannot attend school until further notice for one of the following reasons.
> …
> 4. During the investigation of a disciplinary matter
>
> The administration may exclude a student for any other reason deemed sufficiently serious.

378.    Despite the ongoing investigation of a disciplinary matter, here, Ursuline, Sammartino, and Damore excluded no players from school.

379.    The *Code of Conduct's* "SUSPENSION" provision provides, in relevant part:

> A student may be suspended from Ursuline High School when he/she seriously violates the Code of Conduct or for any reason deemed sufficiently serious by the Administrative Team.
> …
> Students on suspension may not participate in or attend any school functions or extra-curricular activities, including practice. Students given an out of school suspension are not permitted to be on school grounds during the time of the suspension.
> …
> Students on in-school suspension may not participate in or attend any school functions or extra-curricular activities, including practice.

380. Despite the players seriously violating the Code of Conduct, Ursuline, Sammartino, and

Damore suspended no players as discipline.

381. The Code of Conduct's "EXPULSION" provision provides, in relevant part:

> Expulsion may be used as the most serious and final disciplinary action for serious
> misbehavior, when public immorality affects school morale, when public misbehavior
> results in court proceedings, or when the student fails to respond to regular and routine
> disciplinary measures and remains incorrigible, and/or for any other reason deemed
> sufficiently serious by the Principal.
> …
> The following are grounds for expulsion in all diocesan schools:
> …
> 2. The use of physical violence, force, threat, coercion, or other aggressive behavior that
> threatens the safety and well-being of others at school or at a school-related activity.
> …
> 5. Involvement in an asserted felonious act or other criminal behavior that causes public
> scandal and/or adversely affects the reputation of the school, the morale and/or safety of
> the students and staff.
> …
> 8. Other disruptive behaviors and/or for any other reason deemed sufficiently serious by
> the Principal, in consultation with the Superintendent, to warrant the student's
> permanent removal from the school.

382. Despite the players engaging in all this conduct and these violations, including sexual

assault, the Superintendent, Ursuline, Sammartino, and Damore expelled no players from school.

**When Ursuline could no longer cover up the illicit and grotesque incidents from the trip and the
public became aware of what occurred, Defendants Ursuline and Principal Matthew
Sammartino issued a false and fraudulent public statement to corrupt the investigation's
outcome.**

383. Despite Defendants' attempts to cover up the illicit and grotesque incidents from public

view, the public soon learned of what happened on the fateful trip.

384. On June 30, 2025—over a week after learning of what happened on the trip—Ursuline

and Sammartino finally emailed a statement to "Ursuline Parents" and, possibly, the media.

385. Ursuline and Sammartino's statement contained false and fraudulent statements.

386. Further, the statement wasn't issued to alert the parents of what occurred and to show concern for the victims and other students. Rather, it was issued in response to the public becoming aware of attacks and demanding answers and accountability.

387. The statement was issued because Defendants' attempt to cover up the illicit and grotesque behavior was now known, and Defendants desperately needed to downplay the facts and deflect the truth from its parents and the public.

388. The false and fraudulent statement also served a further purpose of threatening and intimidating witnesses from speaking out about what occurred to corrupt the outcome of the criminal investigation.

389. The false and fraudulent statement read:

> At Ursuline High School, the safety, well-being, and character development of our students are our highest priorities.
>
> We are currently investigating a report of inappropriate behavior involving members of the football team during a recent team trip. As always, we take concerns about student conduct very seriously and are committed to addressing them in alignment with our school's code of conduct and the values we strive to instill in every student. Parents of the students directly involved have been contacted, and we are working with the appropriate authorities to ensure a thorough and fair review of the situation.
>
> In recent days, there has been increased attention on social media, including the sharing of blatant misinformation and speculation. We understand how difficult it can be when questions arise and answers are limited due to the need to protect student confidentiality during an active investigation. We respectfully ask for your support in speaking with your child about the importance of avoiding rumors, maintaining the respect for others, and demonstrating leadership during challenging times.
>
> We are committed to transparency and accountability and will provide updates when we are able to do so appropriately.
>
> Thank you for your continued partnership and understanding.



390.    Examples of the false and fraudulent statements include, but are not limited to, the

following:

    (a) "At Ursuline High School, the safety… of our students are our highest priorities."
        [*Sic.*] If the safety of its students was its highest priority, Ursuline would not have
        hired Reardon and McGlynn as football coaches.

    (b) "At Ursuline High School, the … well-being… of our students are our highest
        priorities." If students' well-being were among its highest priorities, Ursuline would
        have acted immediately upon learning of the attacks; Reardon, McGlynn, and
        Syrianoudis would have rectified, prevented, and stopped the attacks. Indeed, the
        attacks would have never happened.

    (c) "At Ursuline High School, the … character development of our students are our
        highest priorities." [*Sic.*] If student character development were among its highest
        priorities, Ursuline would not have allowed the hazing culture to develop, exist, and
        flourish over several years; Ursuline would not itself covered up its coaches' and
        players' illegal activities; It also wouldn't have turned its back on the victims and
        ignored their pleas for help.

(d) "We are currently investigating a report of inappropriate behavior involving members of the football team during a recent team trip." Ursuline conducted no appropriate investigation.

(e) "As always, we take concerns about student conduct very seriously and are committed to addressing them in alignment with our school's code of conduct and the values we strive to instill in every student." Ursuline failed to hold any of the assailant-players accountable. Ursuline had also failed to hold those students accountable for prior incidents.

(f) "… we are working with the appropriate authorities to ensure a thorough and fair review of the situation." Sammartino refused to turn over the videos to Youngstown Police without a subpoena even though the video contained child pornography. Sammartino disciplined no coaches during the so-called investigation, thus allowing the accused to have unfettered access to the victims and witnesses. Nor did Sammartino discipline the assailant-players.

(g) "In recent days, there has been increased attention on social media, including the sharing of blatant misinformation and speculation." There was no blatant misinformation—the videos are damning evidence of illegal and grotesque behavior. Videos are not speculative—they are fact. Ursuline is trying to downplay and deflect the truth to try to protect itself and its precious football team. There is no speculation as to what happened and who is responsible—there are videos, photos, messages, and victims' statements.

(h) "We understand how difficult it can be when questions arise and answers are limited due to the need to protect student confidentiality during an active investigation." Ursuline did not care to protect student confidentiality—the child-pornography videos had already been disseminated by the football team and throughout the school and the community at-large. And Ursuline was not conducting an appropriate investigation.

(i) "We respectfully ask for your support in speaking with your child about the importance of avoiding rumors…" In other words, Ursuline was instructing the parents to tell their kids to keep their mouths shut and not talk about what happened. Ursuline did not want the truth to come out. Again, these were not rumors, these were truths—confirmed by the video, photos, messages, and victims' statements.

(j) "We respectfully ask for your support in speaking with your child about the importance of … maintaining the respect for others…" Ursuline's purported insistence on respect for others doesn't apply to the assailant-players and coaches Reardon, McGlynn, and Syrianoudis.

(k) "We are committed to transparency…" Ursuline is not committed to transparency, it has covered up and lied throughout.

(l)  "We are committed to … accountability…" Ursuline is not committed to accountability. Nor has it shown such commitment previously.

(m) "We …will provide updates when we are able to do so appropriately." Ursuline has provided no updates—except on the upcoming football season.

**While Ursuline, Sammartino, Damore, and the Diocese have failed to investigate, rectify and address the wrongdoing, and hold those responsible for the illegal criminal behavior, Ursuline's football program has proceeded as if nothing happened—nor will happen—because its coaches and players have never been held accountable.**

391.  Despite overwhelming evidence of criminal wrongdoing by Reardon, McGlynn, Syrianoudis, and many of its players, Ursuline, Sammartino, Damore, and the Diocese have turned a blind eye to the misconduct and ignored the victims.

392.  So the football team continued onward toward and launched its fall 2025 season with no repercussions.

393.  The football team has even participated in several media stories and a "media day," both of which highlighted and spotlighted several of the assailant players.

394.  Ursuline proceeds for the glory of the football team alone.

**After the media and public questioned why nothing has been done, Defendants Ursuline and Principal Matthew Sammartino issued *another* false and fraudulent public statement to corrupt the investigation's outcome**

395.  On Monday, August 18, 2025, local news channel WFMJ ran a story questioning why there have been no answers regarding any investigation of Ursuline's football team, even though the investigation supposedly has been ongoing for two months.[16]

---

[16] Madison Tromler, *Two months after alleged Ursuline football incident, investigation remains active*, WFMJ Channel 21 (Aug. 18, 2025, 7:05 PM), https://www.wfmj.com/story/53013085/two-months-after-alleged-ursuline-football-incident-investigation-remains-active.

396.    The WFMJ article notes that Ursuline deleted from its Facebook page posts about the trip.[17]

397.    According to the WFMJ article, "the Catholic Diocese of Youngstown confirmed the school was investigating the allegations."[18]

398.    This is false. Ursuline was not investigating.

399.    According to the WFMJ article, "At that time, a diocesan spokesperson said no employees were placed on leave while the review was underway."[19] Of course, Ursuline was not going to place Reardon, McGlynn, and Syrianoudis on leave during the investigation—football season was nearing and Ursuline just wanted to win football games.

400.    The WFMJ article sparked further public outrage and Defendants needed to cover up their cover up.

401.    On Friday, August 22, 2025, Ursuline and Sammartino finally emailed to "Ursuline Parents" a statement and, moments later, released the statement to the media.

402.    Ursuline and Sammartino's newest statement contained false and fraudulent statements—just like their first one.

403.    And the statement was not issued to update anyone because nothing new was disclosed— there was no update.

404.    Just like the first false and fraudulent statement, the second false and fraudulent statement served the additional purpose of threatening and intimidating witnesses from speaking out about what occurred, to corrupt the criminal investigation's outcome.

_____

[17] *Id.*

[18] *Id.*

[19] *Id.*

405.    The false and fraudulent statement read:





406.    Examples of the false and fraudulent statements include, but are not limited to, the

following:

(a)   "At Ursuline High School, the safety… of our students are our highest priorities."
      [*Sic.*] Were student safety among Ursuline's highest priorities, it would not have hired
      Reardon and McGlynn as football coaches. This statement was regurgitated from the
      first statement.

(b) "At Ursuline High School, the … well-being… of our students are our highest priorities." Were student well-being among its highest priorities, Ursuline administrators would have acted immediately on learning of the attacks; and Reardon, McGlynn, and Syrianoudis would have rectified, prevented, and stopped the attacks—indeed, the attacks would have never occurred. This statement is regurgitated from the first statement.

(c) "At Ursuline High School, the … character development of our students are our highest priorities." If character development of its students were among its highest priorities, Ursuline would not have allowed the hazing culture to develop, exist, and flourish over several years; Ursuline would not itself covered up its coaches and players' illegal activities; Ursuline would not have turned its back on the victims and ignored their pleas for help. This statement is regurgitated from the first statement.

(d) "Earlier this summer, we shared a message regarding a report of inappropriate behavior involving a **limited number of members of the football team** during a June team trip." (Emphasis added.) The claim that the inappropriate behavior involved a "limited number of members of the football team" is false and fraudulent. There were at least 21 players involved, victims, or knowledgeable of what occurred—21 is not limited, but expansive. The statement also implies (falsely) that the inappropriate behavior involved only players. This is again false and fraudulent—the three coaches Reardon, McGlynn, and Syrianoudis were likewise involved, but the statement doesn't mention them.

(e) "The **isolated incident**…" (Emphasis added.) This is again grossly false and fraudulent. This was not an isolated incident; but was a series of, at a minimum, at least 12–15 separate incidents, spanning four states, and nine days. And there were many prior hazing incidents in earlier years. (A list of potential criminal charges is listed below, beyond those contained in the *Claims* section below.)

(f) "The isolated incident was **immediately** reported to the police and the Diocese of Youngstown by school personnel." This is false and fraudulent. Reardon, McGlynn, and Syrianoudis knew of the hazing from the initial bus trip and daily during the trip, yet any purported report to the police and Diocese was not made until days after the trip was over—hardly immediate.

(g) "There has never been and will never be an attempt to cover up the incident." Defendants destroyed evidence by deleting the camp posts from the Ursuline Facebook page after knowing that a criminal investigation began or was beginning. Defendant destroyed evidence by deleting the Ursuline football team's social-media accounts. To corrupt the criminal investigation's outcome, Defendants issued the first false and fraudulent statement, which threatened and intimidated witnesses from speaking out about what occurred. Defendants withheld evidence from law enforcement. Defendants withheld evidence from the Diocese. The Ursuline Media Mob disseminated false information to the public to defend Ursuline. The football

players destroyed evidence by deleting the football team's Snapchat account. This shows a cover up. Just because Defendants were inept at cover-up attempts doesn't mean didn't occur.

(h) "We continue to work with the appropriate authorities to ensure a thorough and fair review of the situation." Sammartino refused to turn over the videos to Youngstown Police without a subpoena even though the video contained child pornography. Sammartino suspended no coaches during the so-called investigation, thus allowing the accused to have unfettered access to the victims and witnesses. Nor did Sammartino suspend, as discipline, the assailant-players, much less for any meaningful period. This was another regurgitated statement from the first statement.

(i) "… any concerns related to help prevent to student behavior were addressed in accordance with the Ursuline High School Code of Conduct…" That's false. Ursuline did not follow its own Code of Conduct as stated above.

(j) "We understand that this situation has continued to draw attention on mass media and social media, **including the spread of misinformation and speculation**." (Emphasis added.) The only misinformation being spread is from Defendants and the Ursuline Media Mob. And this is not speculation—this is truth, supported by videos, photos, messages, victims' statements, and witnesses' statements. Ursuline's gaslighting was calculated to harm Plaintiffs' reputations.

(k) "We also recognize how difficult it can be when answers are limited due to the need to protect student confidentiality." Ursuline did not care to protect student confidentiality—football players had already disseminated the child-pornography videos throughout the school and the broader community. Sammartino wanted to keep confidentiality to keep the assailant-players (many of whom Ursuline publicly praised) on the field, winning football games, and the coaches at the helm. This was another regurgitated statement from the first statement.

(l) "We appreciate your support in encouraging your child to steer clear of rumors…" [*Sic*.] That is, Ursuline was thanking parents for telling their kids to keep their mouths shut and not talk about what happened. Ursuline did not want the truth to come out. Again, these were not *rumors*, these were truths—confirmed by the video, photos, messages, and victims' statements.

(m) "We appreciate your support in encouraging your child to… show respect for others…" Again, Ursuline's purported insistence on respect for others doesn't apply to the assailant-players and coaches Reardon, McGlynn, and Syrianoudis.

407.     WFMJ ran an article within minutes of Ursuline releasing the second statement.[20]

408.     When the article was initially posted, the article was titled "Diocese releases statement on 'inappropriate behavior' allegations against football team" and the article attributed the statements in the release to the "Diocese" and "Diocesan officials." But within the hour, the title was changed to "Ursuline releases statement on 'inappropriate behavior' allegations against football team" and further attributed the statements to "Ursuline." The Diocese was not a part of Ursuline's release and was not going to be associated with it.

**The Ursuline Media Mob spreads disinformation and lies about the hazing and attacks, a foreseeable reputational-harm-exacerbation consequence of Defendants' conduct.**

409.     The Ursuline Media Mob is a conglomeration of individuals closely associated with Ursuline, whether as employees, students, parents/family/friends of students, alumni, donors, or other supporters. Their fervor for Ursuline's football program is extreme.

410.     The Ursuline Media Mob has a history of not only promoting Ursuline with truthful accolades, but, often, with false claims to denigrate its rivals, including fabricating stories about other rival high schools and the rivals' students.

411.     One such fabrication involved a cheerleader at one of Ursuline's rivals.

412.     The Ursuline Media Mob fabricated a story that this cheerleader was not wearing underwear during the rival's basketball game against Ursuline.

---

[20] Zach Mosca, *Ursuline releases statement on 'inappropriate behavior' allegations against football team*, WFMJ Channel 21 (Aug. 22, 2025, approx. 1:45 PM), https://www.wfmj.com/story/53024089/ursuline-releases-statement-on-hazing-allegations-against-football-team.

413.    According to one of the rival's cheer coaches, based on the type of cheerleader uniform and coach oversight, that could not and did not happen. The allegation was false and wholly manufactured.

414.    But truth did not stop the Ursuline Media Mob from retelling the story. One Ursuline Media Mob member, who was an Ursuline student's mother, repeated the story to a group of grade schoolers' mothers to denigrate the rival and humiliate the innocent cheerleader.

415.    The incident was coined "Pantygate."

416.    When news of the hazing and attacks became more widely known, in keeping with their pattern of conduct, the Ursuline Media Mob took to social media to defend Ursuline.

417.    The Ursuline Media Mob posted messages that were fraudulent, false, and humiliating to Son, Daughter, and Mother.

418.    Defendants knew their inaction and messaging would lead to the Ursuline Media Mob rising to their defense. It was reasonably foreseeable given the Ursuline Media Mob's previous pattern of zealotry and conduct.

419.    Not coincidentally, some of the Ursuline Media Mob's posts contained similar verbiage to Defendants' wording, and contained details only Defendants would have known. That is, the information could have only come, and came, from Defendants.

420.    The ignorance the Ursuline Media Mob displayed was dispassionate and downright cruel to Son—the actual victim here.

421.    The Ursuline Media Mob adheres to Ursuline's new motto—for the glory of the football team alone.

422.     Consider the social-media post of Randy Daniels—a parent of two Ursuline football

players (at least one of whom may have been on the trip)—who posted shortly after Ursuline and

Sammartino issued its first email to the parents and media:



423.    Randy Daniels's post was chock-full of lies and, not coincidentally, reiterates comments Defendants had made. Consider the following statements from Daniels's post:

(a) "…the investigation is over and the kids are back…been back for a week now." This was a lie. Defendants never truly investigated to begin with, but the law-enforcement investigation is ongoing. Mother met with Sammartino and Damore on Monday, June 23; Ursuline and Sammartino issued their false and fraudulent email on Monday, June 30; Daniels posted this message within a couple days. According to Daniels, the so-called investigation was completed the week before, or within a couple of days of the June 23 meeting. Hence, there was no real investigation and the players were already back.

(b) "There only was a [*sic.*] email sent out that got sent to you guys and wkdn to quiet down all the non sense [*sic.*] being said by 15-18yr Olds on Facebook n Instagram. Some very very disgusting things that never ever even close to happened…" [*Sic.*] This was another lie. Ursuline and Sammartino sent the email to try to cover up what occurred, and lied in the process. Also, the information transmitted through social media was accurate—videos confirmed it. Considering Randy Daniels's children play football for Ursuline, they likely were on the team's group Snapchat and saw the videos.

(c) "There wasn't a call home for help or any of thay [*sic*] because said kid was also joining in the teenage boys antics." More lies. First, Son did contact Mother to inform her what happened, and Mother contacted McGlynn—who did nothing to rectify, prevent, or stop the attacks. Second, Son did not join in the attacks—he was the victim. Third, the attacks were not "teenage-boy antics." Forcibly attacking,

assaulting, and restraining a child, while forcibly stripping off his clothes; then smacking and thrusting and grinding a groin against his buttocks, while videotaping the ordeal, posting it to social media, then spreading the child pornography throughout the school and community at-large are **not** teenage-boy antics. Those are criminal actions. Forcing children to fight each other with the loser being forced to endure an attack (that is, "jumping in") is **not** a teenage-boy antic. It is a criminal act like criminal gangs' "jumping in" process. The players' acts of non-consensually "humping" each other are **not** teenage-boy antics—it is criminal assault.

(d) "Boys will be boys is what it boils down to…" More lies. Defendant McGlynn have used that **exact** phrase when trying to downplay to Mother what happened. **Both** Daniels and McGlynn offered the same excuse. This was no coincidence.

(e) "… and there's always especially now soft ass Parents that want to cry about their baby being picked on…this generation of kids and parents are soft period…" More lies. Mother is not being soft—Son was viciously and criminally attacked. The degrading and humiliating video was sent to the entire team, school, and throughout the community. Perhaps Randy Daniels would feel differently if his sons were victims and they appeared in child pornography.

(f) "…nothing got swept any where [*sic.*]…there was never anything to be swept…" More lies. Defendants tried, and failed, to sweep what occurred under the rug. Defendants destroyed evidence by deleting the camp videos, photos, and posts from Ursuline's Facebook page and deleting Ursuline football team's social-media accounts? The football team destroyed evidence by deleting its group Snapchat. Ursuline and Sammartino send out false and fraudulent emails to the Ursuline parents

and media? Videos, photos, and messages confirm what happened. And there a

criminal investigation. Because it did happen.

424.     When the MLO Bros—local podcasters known for their bold and unfiltered approach to

community news—responded to Randy Daniels's post with facts and information, specifically

that two Ursuline players had already transferred, Daniels responded, in part, "they left back to

home school because they didn't want to miss any football…" If nothing happened and the

investigation were over, as Randy Daniels claimed moments earlier in his post/rant, these players

would have missed no time.

425.     Then, after the MLO Bros hit Randy Daniels with a dose of truth, Daniels decided to

take aim and lie about Mother's posting, "In a nutshell the mom was looking for a payday and no

one will tell.me [*sic.*] different…she ran right to the top."

426.     Randy Daniels discussed with more than one Defendant that he was trying to advocate

on their behalf. The Ursuline and Sammartino email, which Daniels references, doesn't mention

Mother.

427.     And Randy Daniels was lying, again, about Mother. Mother did not run "right to the

top." She first notified McGlynn, who did nothing. Considering Reardon knew and did nothing,

there would be no reason to go to him. So, Mother went to the next people in the chain of

command—principal Sammartino and assistant principal Damore, who also did nothing.

428.     Similarly, presuming Sammartino and Damore informed the Diocese of what really

happened on the trip and showed the Superintendent and Bishop the videos and evidence, the

Diocese would have acted, but it did not. So there was no use going to the Diocese (which would

be even further on top).

429.    Mother was looking for Defendants to do the right thing and hold accountable those responsible for the hazing, assaults, and attacks on Son, and their creation and dissemination of the child pornography.

430.    Now Mother is forced to take matters into her own hands—legally—to secure justice for Son and accountability for the evildoers, because Defendants aren't going to do so.

431.    This is what good parents are supposed to do. Apparently, Randy Daniels is unaware of what responsible parents are supposed to do because his sons were not attacked and victimized.

432.    Consider also several posts from the Yappi.com chat forum "Ursuline & Cardinal Mooney prospects for 2025" following news of the incidents.

433.    On Yappi.com's *Ursuline & Cardinal Mooney prospects for 2025* chat forum, "Jaws31," an obvious Ursuline supporter given his photo is the Ursuline football seal and his claim that "I do know the truth… I will say that it is nowhere close to what some of the rumors are…", as posted on July 2, 2025:[21]



---

[21] Yappi.com, *Ursuline & Cardinal Mooney prospects for 2025* chat forum (July 2, 2025), https://yappi.com/forum/index.php?threads/ursuline-cardinal-mooney-prospects-for-2025.380395/page-13.

434.     "Jaws31" continued his defense of Ursuline in two more posts on the same Yappi.com

chat forum on July 14, 2025, when more commenters began questioning what happened:[22]



435.     Following Ursuline and Sammartino's second false and fraudulent statement, WFMJ ran

a news article and posted it to WJFM's Facebook page. One commenter named "Jerry Sweet"

posted "The entire story and situation was fabricated from the start." Sweet's post was in

[22] Yappi.com, *Ursuline & Cardinal Mooney prospects for 2025* chat forum (July 14, 2025),
https://yappi.com/forum/index.php?threads/ursuline-cardinal-mooney-prospects-for-
2025.380395/page-15.

response to the slew of negative comments about Ursuline and mishandling of the situation and cover up.

436.    The same night Ursuline and Sammartino issued the second false and fraudulent statement, the Ursuline football team won its season opener.

437.    John Riley, an Ursuline supporter, posted on the MLO Bros Facebook page:



438.    John Riley's post was met with swift criticism from other commenters, prompting Riley
to retort:



439.    The foreseeable harm done by the Ursuline Media Mob at Defendants' effective
instigation cannot be undone.

440.    The social-media attacks on Son and Mother are a reasonable and foreseeable
consequence of Defendants' actions, failure to act, and attempts to cover up the illicit activities.

And with Randy Daniels and the others, it seems they were acting at Defendants'
encouragement and direction.

**The assailant players committed multiple criminal acts, yet Defendants failed to hold them accountable.**

441.     The evidence of criminal behavior is overwhelming.

442.     Sammartino and Damore have had this evidence since June 23—over nine weeks—yet
have done nothing to hold the players or the coaches accountable.

443.     Although the civil claims for criminal acts against Ursuline, Sammartino, Damore,
Reardon, McGlynn, and Syrianoudis are contained in the *Claims* section below, it is important
to state the criminal acts by the players, which Defendants permitted, overlooked, and are trying
to cover up.

444.     The players committed the following criminal acts, among others:

(a)     **Multiple players committed Hazing**, in violation of Ohio Rev. Code
§ 2903.31(B)(1), which provides, "No person shall recklessly participate in the
hazing of another."[23] The violation of which is a misdemeanor of the second degree.

(b)     **Player-4, Player-5, and Player-6 committed Hazing**, in violation of Alabama Code
§ 16-1-23(b), which provides, "No person shall engage in what is commonly known
and recognized as hazing, or encourage, aid, or assist any other person thus
offending." Under subsection (c), "No person shall knowingly permit, encourage,

---

[23] **Hazing**, under Ohio Rev. Code § 2903.31(A)(1), "means doing any act or coercing another,
including the victim, to do any act of initiation into any student or other organization or any act
to continue or reinstate membership in or affiliation with any student or other organization that
causes or creates a substantial risk of causing mental or physical harm to any person, including
coercing another to consume alcohol or a drug of abuse, as defined in section 3719.0111 of the
Revised Code.

aid, or assist any person in committing the offense of hazing, or willfully acquiesce in the commission of such offense, or fail to report promptly his knowledge or any reasonable information within his knowledge of the presence and practice of hazing in this state to the chief executive officer of the appropriate school, college, university, or other educational institution in this state. Any act of omission or commission shall be deemed hazing under the provisions of this section."[24] Hazing is a Class C misdemeanor.

(c) **Player-4, Player-8, Player-9, Player-10, Player-11, Player-12, Player-13, Player-18, Player-19, Player-20, and Player-7 committed Hazing**, in violation of Florida Statute Title XLVIII Chapter 1006.135, which

means any action or situation that endangers the mental or physical health or safety of a student at a school with any of grades 6 through 12 for purposes including, but not limited to, initiation or admission into or affiliation with any organization

---

[24] Hazing, under Alabama Code Title 16 Chapter 1 § 16-1-23(a), is defined as:

(1) Any willful action taken or situation created, whether on or off any school, college, university, or other educational premises, which recklessly or intentionally endangers the mental or physical health of any student, or

(2) Any willful act on or off any school, college, university, or other educational premises by any person alone or acting with others in striking, beating, bruising, or maiming; or seriously offering, threatening, or attempting to strike, beat, bruise, or maim, or to do or seriously offer, threaten, or attempt to do physical violence to any student of any such educational institution or any assault upon any such students made for the purpose of committing any of the acts, or producing any of the results to such student as defined in this section.

(3) The term hazing as defined in this section does not include customary athletic events or similar contests or competitions, and is limited to those actions taken and situations created in connection with initiation into or affiliation with any organization. The term hazing does not include corporal punishment administered by officials or employees of public schools when in accordance with policies adopted by local boards of education.

operating under the sanction of a school with any of grades 6 through 12. 'Hazing'

includes, but is not limited to:

(a) Pressuring, coercing, or forcing a student into:

1. Violating state or federal law;

2. Consuming any food, liquor, or other substance; or

3. Participating in physical activity that could adversely affect the health or

safety of the student.

(b) Any brutality of a physical nature, such as whipping, beating, branding, or
exposure to the elements. Hazing does not include customary athletic events
or other similar contests or competitions or any activity or conduct that
furthers a legal and legitimate objective.

Hazing is a misdemeanor of the first degree, but could be elevated to a third-degree

felony under certain circumstances.

(d) **Player-21 and multiple other players committed Hazing**, in violation of Tennessee

Code § 49-2-120, which "means any intentional or reckless act in this state, on or

off LEA property, by one (1) student acting alone or with others, that is directed

against any other student, that endangers the mental or physical health or safety of

that student or that induces or coerces a student to endanger that student's mental

or physical health or safety. 'Hazing' does not include customary athletic events or

similar contests or competitions and is limited to those actions taken and situations

created in connection with initiation into or affiliation with any organization."

Hazing may be a criminal offense in Tennessee under certain circumstances.

(e) **Player-4 and Player-5 committed Assault in the third degree**, in violation of

Alabama Code § 13A-6-22(a), which provides, in relevant part, "A person commits

the crime of assault in the third degree if: (1) With intent to cause physical injury to another person, he causes physical injury to any person; or (2) He recklessly causes physical injury to another person…" Assault in the third degree is a Class A misdemeanor.

(f)   **Player-4 committed Sexual abuse in the first degree**, in violation of Alabama Code § 13A-6-66(a), which provides, in relevant part, "A person commits the crime of sexual abuse in the first degree if he or she… (1) Subjects another person to sexual contact by forcible compulsion."[25] Sexual abuse in the first degree is a Class C felony.

(g)   **Multiple players committed Theft**, in violation of Alabama Code § 13A-8-5(a), which provides, in relevant part, "The theft of property which does not exceed five hundred dollars ($500) in value and which is not taken from the person of another constitutes theft of property in the fourth degree." Theft in the third degree is a Class A misdemeanor, but may be elevated to a felony depending on the value of items stolen and other factors.

(h)   **Multiple players committed Theft**, in violation of Florida Statute Title XLVI Chapter 812.014(1)(a), which provides, in relevant part, "A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently…(a) Deprive the other person of a right to the property or a benefit from the property." Theft is a

---

[25] Alabama Code § 13A-6-60 defines "sexual contact" as "Any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party. The term does not require skin to skin contact."

misdemeanor of the second degree, but may be elevated to a felony depending on the value of items stolen and other factors.

(i) **Player-4, Player-8, Player-9, Player-10, Player-11, Player-12, and Player-13 committed Kidnapping**, in violation of Florida Statute Title XLVI Chapter 787.01(1)(a), which "means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to…(2) Commit or facilitate commission of any felony; (3) Inflict bodily harm upon or terrorize the victim of another person." Kidnapping is a felony of first degree.

(j) **Player-4, Player-8, Player-9, Player-10, Player-11, Player-12, and Player-13 committed False imprisonment**, in violation of Florida Statute Title XLVI Chapter 787.02(1)(a), which "means forcibly, by threat, or secretly confining, abducting, imprisoning, or restraining another person without lawful authority and against her or his will." False imprisonment is a felony of third degree.

(k) **Player-4, Player-8, Player-9, Player-10, Player-11, Player-12, and Player-13 committed Assault**, in violation of Florida Statute Title XLVI Chapter 784.011(1), which "is an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Assault is a misdemeanor of second degree.

(l) **Player-4, Player-8, Player-9, Player-10, Player-11, Player-12, and Player-13 committed Aggravated assault**, in violation of Florida Statute Title XLVI Chapter

784.021(1), which "is an assault…(b) With intent to commit a felony." Aggravated assault is a felony of third degree.

(m) **Player-4, Player-8, Player-9, Player-10, Player-11, Player-12, and Player-13 committed Battery**, in violation of Florida Statute Title XLVI Chapter 784.03(1)(a), which "occur when a person: 1. Actually and intentionally touches or strikes another person against the will of the other; or 2. Intentionally causes bodily harm to another person." Battery is a misdemeanor of first degree.

(n) **Player-4, Player-8, Player-9, Player-10, Player-11, Player-12, Player-13, and multiple other players committed Stalking**, in violation of Florida Statute Title XLVI Chapter 784.048(2), which occurs when "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking, a misdemeanor of the first degree." **Stalking**, under Florida Statute Title XVLI Chapter 784.048(3), occurs when "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person and makes a credible threat to that person commits the offense of aggravated stalking, a felony of the third degree." **Stalking**, under Florida Statute Title XVLI Chapter 784.048(5), occurs when "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks a child under 16 years of age commits the offense of aggravated stalking, a felony of the third degree."

(o) **Multiple players committed Sexual cyberharassment**, in violation of Florida Statute Title XLVI Chapter 784.049(3)(a), which occurs when "a person who willfully and

maliciously sexually cyberharasses another person commits a misdemeanor of the first degree."[26]

(p) **Player-4, Player-8, Player-9, Player-10, Player-11, Player-12, Player-13, and multiple other players committed Mob intimidation**, in violation of Florida Statute Title XLVI Chapter 784.0495, which provides, "It is unlawful for a person, assembled with two or more other persons and acting with a common intent, to use force or threaten to use imminent force, to compel or induce, or attempt to compel or induce, another person to do or refrain from doing any act or to assume,

---

[26] Florida Statute XLVI Chapter 784.049 [Sexual cyberharassment] provides:

(2) As used in this section, the term:

(a) "Image" includes, but is not limited to, any photograph, picture, motion picture, film, video, or representation.

(b) "Personal identification information" means any information that identifies an individual, and includes, but is not limited to, any name, postal or electronic mail address, telephone number, social security number, date of birth, or any unique physical representation.

(b) "Sexually cyberharass" means to publish to an Internet website or disseminate through electronic means to another person a sexually explicit image of a person that contains or conveys the personal identification information of the depicted person without the depicted person's consent, contrary to the depicted person's reasonable expectation that the image would remain private, for no legitimate purpose, with the intent of causing substantial emotional distress to the depicted person. Evidence that the depicted person sent a sexually explicit image to another person does not, on its own, remove his or her reasonable expectation of privacy for that image.

(d) "Sexually explicit image" means any image depicting nudity, as defined in s. 847.001, or depicting a person engaging in sexual conduct, as defined in s. 847.001.

abandon, or maintain a particular viewpoint against his or her will." Mob

intimidation is a misdemeanor of first degree.

(q)   **Multiple players committed Child pornography**, in violation of Florida Statute

Title XLVI Chapter 827.071(4), which provides, in relevant part, "It is unlawful for

any person to possess with the intent to promote any photograph, motion picture,

exhibition, show, representation, or other presentation which, in whole or in part,

includes child pornography… A person who violates this subsection commits a

felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s.

775.084."

(r)   **Multiple players committed Child pornography**, in violation of Florida Statute

Title XLVI Chapter 827.071(5), which provides, in relevant part, "It is unlawful for

any person to knowingly possess, control, or intentionally view a photograph,

motion picture, exhibition, show, representation, image, data, computer depiction,

or other presentation which, in whole or in part, he or she knows to include child

pornography… A person who violates this paragraph commits a felony of the third

degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(s)   **Multiple players committed Prohibition of certain acts in connection with obscene,**

**lewd, etc., materials**, in violation of Florida Statute Title XLVI Chapter

847.011(1)(a), which provides, "any person who knowingly sells, lends, gives away,

distributes, transmits, shows, or transmutes, or offers to sell, lend, give away,

distribute, transmit, show, or transmute, or has in his or her possession, custody, or

control with intent to sell, lend, give away, distribute, transmit, show, transmute, or

advertise in any manner, any obscene book, magazine, periodical, pamphlet,

newspaper, comic book, story paper, written or printed story or article, writing, paper, card, picture, drawing, photograph, motion picture film, figure, image, phonograph record, or wire or tape or other recording, or any written, printed, or recorded matter of any such character which may or may not require mechanical or other means to be transmuted into auditory, visual, or sensory representations of such character, or any article or instrument for obscene use, or purporting to be for obscene use or purpose; or who knowingly designs, copies, draws, photographs, poses for, writes, prints, publishes, or in any manner whatsoever manufactures or prepares any such material, matter, article, or thing of any such character; or who knowingly writes, prints, publishes, or utters, or causes to be written, printed, published, or uttered, any advertisement or notice of any kind, giving information, directly or indirectly, stating, or purporting to state, where, how, of whom, or by what means any, or what purports to be any, such material, matter, article, or thing of any such character can be purchased, obtained, or had; or who in any manner knowingly hires, employs, uses, or permits any person knowingly to do or assist in doing any act or thing mentioned above, commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083."[27] Under subsection

---

[27] Florida Statute Title XLVI Chapter 847.001 provides:

(12)  "Obscene" means the status of material which:

(a)  The average person, applying contemporary community standards, would find, taken as a whole, appeals to the prurient interest;

(b)  Depicts or describes, in a patently offensive way, sexual conduct as specifically defined herein; and

(1)(c), if the violation "is based on materials that depict a minor engaged in any act or conduct that is harmful to minors commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."

(t) **Multiple players committed Prohibition of certain acts in connection with obscene, lewd, etc., materials**, in violation of Florida Statute Title XLVI Chapter 847.011(2), which provides, "a person who knowingly has in his or her possession, custody, or control any obscene book, magazine, periodical, pamphlet, newspaper, comic book, story paper, written or printed story or article, writing, paper, card, picture, drawing, photograph, motion picture film, film, any sticker, decal, emblem or other device attached to a motor vehicle containing obscene descriptions, photographs, or depictions, any figure, image, phonograph record, or wire or tape or other recording, or any written, printed, or recorded matter of any such character which may or may not require mechanical or other means to be transmuted into

---

(c)   Taken as a whole, lacks serious literary, artistic, political, or scientific value. A mother's breastfeeding of her baby is not under any circumstance "obscene."

\*\*\*

(19)   "Sexual conduct" means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed. A mother's breastfeeding of her baby does not under any circumstance constitute "sexual conduct."

auditory, visual, or sensory representations of such character, or any article or instrument for obscene use, or purporting to be for obscene use or purpose, without intent to sell, lend, give away, distribute, transmit, show, transmute, or advertise the same, commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083." Under subsection (1)(c), if the violation "is based on materials that depict a minor engaged in any act or conduct that is harmful to minors commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."[28]

(u) **Multiple players committed Protection of minors; prohibition of certain acts in connection with obscenity**, in violation of Florida Statute Title XLVI Chapter 847.0133(1), which provides, in relevant part, "A person may not knowingly sell, rent, loan, give away, distribute, transmit, or show any obscene material to a minor."[29] Protection of minors; prohibition of certain acts in connection with obscenity is a felony of third degree.

(v) **Multiple players committed Transmission of pornography by electronic device or equipment prohibited**, in violation of Florida Statute Title XLVI Chapter 847.0137(2), which provides, in relevant part, "any person in this state who knew or reasonably should have known that he or she was transmitting child pornography, as defined in s. 847.001, to another person in this state or in another jurisdiction commits a felony of the third degree, punishable as provided in s. 775.082, s.

---

[28] *Id.*

[29] *Id.*

775.083, or s. 775.084."[30] Under subsection (1), "the term 'transmit' means the act of sending and causing to be delivered, including the act of providing access for receiving and causing to be delivered, any image, information, or data over or through any medium, including the Internet or an interconnected network, by use of any electronic equipment or other device."

(w) **Multiple players committed Transmission of material harmful to minors to a minor by electronic device or equipment prohibited**, in violation of Florida Statute Title XLVI Chapter 847.0138(2), which provides, in relevant part, "any person who knew or believed that he or she was transmitting an image, information, or data that is harmful to minors, as defined in s. 847.001, to a specific individual known by the defendant to be a minor commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."[31] Transmission of material

---

[30] Florida Statute Title XLVI Chapter 874.001 provides:

(3)  "Child pornography" means:
(a)  Any image depicting a minor engaged in sexual conduct; or
(b)  Any image that has been created, altered, adapted, or modified by electronic, mechanical, or other means, to portray an identifiable minor engaged in sexual conduct.
(19)  "Sexual conduct" means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed. A mother's breastfeeding of her baby does not under any circumstance constitute "sexual conduct."

[31] Florida Statute Title XLVI Chapter 847.001 provides:

(7)  "Harmful to minors" means any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:
(a)  Predominantly appeals to a prurient, shameful, or morbid interest;

harmful to minors to a minor by electronic device or equipment prohibited is a misdemeanor of first degree.

(x)  **Multiple players committed Sexting**, in violation of Florida Statute Title XLVI Chapter 847.0141(1), which provides, "A minor commits the offense of sexting if he or she knowingly: (a) Uses a computer, or any other device capable of electronic data transmission or distribution, to transmit or distribute to another minor any photograph or video of any person which depicts nudity, as defined in s. 847.001, and is harmful to minors, as defined in s. 847.001 Uses a computer, or any other device capable of electronic data transmission or distribution, to transmit or distribute to another minor any photograph or video of any person which depicts nudity, as defined in s. 847.001, and is harmful to minors, as defined in s. 847.001.

(b) Possesses a photograph or video of any person that was transmitted or distributed by another minor which depicts nudity, as defined in s. 847.001, and is harmful to minors, as defined in s. 847.001. A minor does not violate this paragraph if all of the following apply: 1. The minor did not solicit the photograph or video. 2. The minor took reasonable steps to report the photograph or video to the minor's legal guardian or to a school or law enforcement official. 3. The minor

---

(b)  Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; and
(c)  Taken as a whole, is without serious literary, artistic, political, or scientific value for minors.
A mother's breastfeeding of her baby is not under any circumstance "harmful to minors."

did not transmit or distribute the photograph or video to a third party."[32] Under

subsection (3)(a) sexting is a noncriminal violation for a first violation.

(y) **Player-4, Player-8, Player-9, Player-10, Player-11, Player-12, Player-13, and multiple other players committed Breach of the peace; disorderly conduct**, in violation of Florida Statute Title XLVI Chapter 877.03, which provides, "Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083."

(z) **Player-21 and multiple other players committed Assault**, in violation of Tennessee Code § 39-13-101(a), which provides, in relevant part, "A person commits assault who… (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury…" Assault is a Class A misdemeanor.

(aa) **Multiple players (and possibly other Ursuline students) committed Illegal use of minor or impaired person in nudity-oriented material or performance**, in violation

---

[32] Florida Statute Title XLVI Chapter 874.001 provides:

(11) "Nudity" means the showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering; or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple; or the depiction of covered male genitals in a discernibly turgid state. A mother's breastfeeding of her baby does not under any circumstance constitute "nudity," irrespective of whether or not the nipple is covered during or incidental to feeding.

of Ohio Rev. Code § 2907.323(A), which provides, in relevant part, "No person

shall do any of the following: (1) Photograph any minor or impaired person who is

not the person's child or ward in a state of nudity, or create, direct, produce, or

transfer any material or performance that shows the minor or impaired person in a

state of nudity… (3) Possess or view any material or performance that shows a

minor or impaired person who is not the person's child or ward in a state of nudity."

Illegal use of minor or impaired person in nudity-oriented material or performance,

under subsection (1), is a felony of the second degree; and, under subsection (3), a

felony of the fifth degree.

(bb) **Multiple players (and possibly other Ursuline students) committed**

**Telecommunications harassment**, in violation of Ohio Rev. Code § 2917.21(B)(1),

which provides, "No person shall make or cause to be made a telecommunication,

or permit a telecommunication to be made from a telecommunications device under

the person's control, with purpose to abuse, threaten, or harass another person."

Under subsection (2), "No person shall knowingly post a text or audio statement or

an image on an internet web site or web page for the purpose of abusing,

threatening, or harassing another person." Telecommunications harassment, under

subsection (B), is a misdemeanor of the first degree.

(cc) **Player-9 and multiple other players committed Intimidation of attorney, victim or**

**witness in criminal action or delinquent child action proceedings**, in violation of

Ohio Rev. Code § 2921.04(A), which provides, "No person shall knowingly

attempt to intimidate or hinder the victim of a crime or delinquent act in the filing

or prosecution of criminal charges or a delinquent child action or proceeding, and

no person shall knowingly attempt to intimidate a witness to a criminal or delinquent act by reason of the person being a witness to that act." Intimidation of attorney, victim or witness in criminal action or delinquent child action proceedings, as stated in subsection (A) is a misdemeanor of the first degree.

(dd) **Multiple players committed Tampering with evidence**, in violation of Ohio Rev. Code § 2921.12(A), which provides, in relevant part, "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall… (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation…" Tampering with evidence is a felony of the third degree.

(ee) **Multiple players committed Obstructing justice**, in violation of Ohio Rev. Code § 2921.32(A), which provides, in relevant part, "No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime, and no person, with purpose to hinder the discovery, apprehension, prosecution, adjudication as a delinquent child, or disposition of a child for an act that if committed by an adult would be a crime or to assist a child to benefit from the commission of an act that if committed by an adult would be a crime, shall… (4) Destroy or conceal physical evidence of the crime or act, or induce any person to withhold testimony or information or to elude legal process summoning the person to testify or supply evidence…" If the crime being obstructed is a misdemeanor, obstructing justice is the same misdemeanor degree as the crime being obstructed. If the crime being obstructed is a felony, obstructing justice is a felony of the fifth degree. If the crime

being obstructed is a felony of the first or second degree and the offender knows or has reason to believe the crime being obstructed is a felony of the first or second degree, obstructing justice is a felony of the third degree.

**Defendants and players engaged in a course of conduct, including the commission of conspiracy to commit, attempt to commit, or complicity to commit multiple offenses, that began in Ohio and continued through Alabama, Florida, and Tennessee, and back in Ohio.**

445.    The years-long culture of hazing and abuse occurred in Ohio.

446.    Here, the hazing discussion, planning, and conspiracy began soon after the bus departed Ursuline and while still in the Ohio, including substantial overt acts. The hazing discussion, planning, and conspiracy continued throughout the trip and across Alabama, Florida, and Tennessee.

447.    During the trip, Defendants and players engaged in a course of conduct, including the commission of, conspiracy to commit, attempt to commit, or complicity in the commission of multiple offenses.

448.    Defendants and players' course of conduct continued through Alabama, Florida, and Tennessee.

449.    Even upon returning from the trip, Defendants and players' course of conduct continued in Ohio.

450.    While outside Ohio, Defendants omitted performance of a legal duty imposed by the laws of Ohio, the omission of which affected a legitimate interest of Ohio in protecting, governing, or regulating any person, property, thing, transaction, or activity in Ohio.

451.    The players, by means of a computer, computer system, computer network, telecommunication, telecommunications device, telecommunications service, or information

service, caused or knowingly permitted any writing, data, image, or other telecommunication to be disseminated or transmitted into Ohio in violation of Ohio law.

452.    The course of conduct involved the same victims, including Son; and the offenses were committed by the same offenders in the same capacity or relationship, in furtherance of the same, conspiracy, and involved the same or similar modus operandi.

453.    For these reasons, under Ohio Rev. Code §§ 2901.11 and 2901.12, the jurisdiction and venue over all the offenses rests in Ohio, as well as the other states.

454.    Also, the Ohio Supreme Court has held that Ohio Rev. Code § 2307.60 "creates a civil cause of action for damages resulting from *any* criminal act…"[33] (Emphasis added.) So Ohio Rev. Code § 2307.60 is not limited to only those criminal acts committed in Ohio, but those committed in Alabama, Florida, and Tennessee.

**Son has faced continued humiliation, intimidation, retaliation, and reputational harm because of Defendants' actions, failures to act, and attempts to cover up and gaslight over the illicit activities.**

455.    After returning home, Son has faced continued humiliation, retaliation, and harm.

456.    Son has been compelled to transfer from Ursuline to another school. Even at a new school, Son's victimization is well known. But *this* school and its administrators, employees, coaches, players, and parents support Son and his family, even holding private prayer groups for Son. This new school is acting the way a school is supposed to act—a stark contrast from Ursuline and the Defendants, who act for the glory of the football team alone.

457.    Son has lost friendships with kids that he has been known since grade school.

---

[33] *Jacobson v. Kaforey*, 149 Ohio St.3d 398, ¶ 13, 75 N.E.3d 203, 2016-Ohio-8434.

458.     Player-16, Player-18, and Player-20, saw several of Son's other friends at the Trumbull County Fair recently.

459.     Son was not there.

460.     The players told Son's friends to tell him they were "looking for him."

461.     The videos containing the hazing, abuse, assaults, and child pornography have been disseminated throughout the community.

462.     Son has also been diagnosed with anxiety, necessitating medical attention and prolonged psychiatric treatment, including counseling and medication

463.     This was a reasonable and foreseeable consequence of the Defendants' actions, failures to act, and attempts to cover up the illicit activities.

**Daughter has faced humiliation, intimidation, retaliation, and harm because of Defendants' actions, failures to act, and attempts to cover up the illicit activities.**

464.     Daughter has faced continued humiliation, retaliation, and harm because of Defendants' actions, failures to act, and attempts to cover up the illicit activities.

465.     Daughter, who was a rising senior at Ursuline, has been compelled to transfer to another school for her senior year.

466.     Mother called Daughter the day Son returned from the trip and told her what had happened.

467.     Daughter drove straight home to console Son, who broke down and told her everything that happened in explicit detail and showed her the team's group Snapchat with the videos, photos, and messages.

468.     The following week, while attending an Ursuline summer-school class, a classmate approached Daughter and blamed Son for what occurred.

469.    An Ursuline teacher saw this confrontation. But the teacher did nothing in response.

470.    Another classmate told Daughter that the players were forced to give each other oral sex on the trip.

471.    By this time, the videos from the team's group Snapchat had been disseminated throughout the school and the students.

472.    In June 2025, Daughter began working nearly every day at a local fast-food establishment—a fact not well-known at the time.

473.    In early July, Player-9 started appearing at Daughter's work almost every day. Before July, Daughter does not recall ever seeing Player-9 at her work.

474.    Even Daughter's co-workers noticed Player-9 showing up almost every day.

475.    Daughter knows Player-9 from going to school together, but they are not friends.

476.    Player-9 would come inside at Daughter's work around 8:30 PM. The inside closed at 9:00 PM and the drive-thru closed at 10:00 PM.

477.    Daughter could not see if Player-9 ever actually purchased food.

478.    Player-9 would then go outside and wait in his car but would leave when Daughter did not come out.

479.    Player-9 went to her work to intimidate her.

480.    Sometimes, after the workday ended, Daughter would go to eat with her co-workers to another local fast-food establishment. This other establishment stayed open later.

481.    On July 29, Player-9 again showed up at Daughter's workplace, came inside, then left.

482.    After work, Daughter went to this other fast-food establishment with her co-workers to eat.

483.    Player-9 showed up at this other establishment and parked right next Daughter's car.

484.    Player-9 was with several other individuals, who are neither Ursuline students nor known to Daughter.

485.    Some of those with Player-9 entered the establishment and greeted Daughter, even though she doesn't know them.

486.    Another individual with Player-9 walked over to the window next to where Daughter was sitting with her co-workers, knocked on the window, and stared at her in an intimidating fashion.

487.    Daughter, fearing that Player-9 and these individuals were going to damage her car, walked outside with her co-workers and, while looking at Player-9, said loudly that Player-9 was a "pedophile" and has "no backbone."

488.    Player-9 and these individuals got into Player-9's car and left.

489.    As they were leaving, one of Player-9's friends put two of his fingers up to eyes and then pointed at Daughter—meaning they were watching her.

490.    Player-9 continued showing up at Daughter's work on an almost-daily basis.

491.    On August 4, Player-9 again showed up at Daughter's work and waited outside in his car for Daughter to leave.

492.    Fearful of what would happen, Daughter called Mother.

493.    Mother immediately went to Daughter's work to protect her.

494.    As soon as Mother arrived, Player-9 left.

495.    Daughter, fearing her own safety, has now transferred from Ursuline to another school.

496.    Intimidation, hazing, and bullying was a reasonably foreseeable consequence of Defendants' actions, failures to act, and attempts to cover up the illicit activities.

**Mother has faced continued humiliation, retaliation, and harm because of Defendants' actions, failures to act, and attempts to cover up the illicit activities.**

497.    In addition to Mother's grief and pain (bystander harm) for the harm inflicted on Son and Daughter, Mother herself has been victimized from this ordeal—a reasonable and foreseeable consequence of the Defendants' actions, failures to act, and attempts to cover up the illicit activities.

498.    Mother has faced a backlash from several of her friends, whose sons are Ursuline football players.

499.    Their once close relationship has come to a halt resulting in Mother being alienated from those she cared for and trusted.

500.    When their sons were still on the trip and they learned of the hazing, humiliation, abuse, and attacks, Mother and two other mothers exchanged several texts and discussed on the phone what was happening.

501.    One of the mothers (the mother of Player-16) texted Mother that her son (Player-16) was going to protect Son.



502.    Another mother texted Mother the following:

(a)    "I wanna know who it is! I'm pissed"

(b)    "Ummmm…. We pulling up cause I'm ready!"

(c)    "I know [her son's name] can handle his own but please don't make me have his brother pull up on them kids."

503.    But after the trip, on learning the football season was in jeopardy, this mother changed her tune. She knew what occurred on the trip because of her discussions with own son and Mother. But she sent a text to Mother feigning empathy for Son, while issuing Mother a threat.

504.    The text stated, "I just got a call. With everything that you said in the email. The whole season is going to be cancelled. I understand your frustration and I am empathetic to it. If I were you, I would really think about what you want to come out of this meeting. I would hate to see other kids who were innocent lose playing a whole season because of a few bad apples." Apparently, this mother—like the Defendants—cares more for the glory of the football team than the victims.



505.   The ruination and harm from the loss of these friendships was a reasonable and

foreseeable consequence of Defendants' actions, failures to act, and attempts to cover up the

illicit activities.

506.   While Plaintiffs do not want to see innocent players punished, the assailant-players and

all Defendants need to be held accountable. Perhaps if Defendants had taken the appropriate

actions when they learned of the misconduct back in June, these innocent players would not also

be victims of the Defendants' failure to act. Perhaps these innocent players could have transferred

schools and had a season (one without hazing, humiliation, abuse, and assaults). Instead,

Defendants' actions, failures to act, and attempts to cover up the illicit activities, and deliberately false assurances have victimized the innocent players and jeopardized their futures as well.

507.    Beyond the loss of these friendships, Mother has received retaliatory and extortionist threatening texts from a cellphone number unknown to her—"+1 (234) 401-0165." Mother's attempts to verify the owner of the number have revealed that it is a "burner" account.

508.    The threatening texts contain photos of Son from the trip, which originated from team's group Snapchat—meaning whoever sent this text was associated with the players and the Defendants.

509.    Upon receiving the threatening text, Mother immediately contacted Assistant Principal Damore, advised her of what occurred, and provided her the cellphone number.

510.    Damore failed to address the situation.

511.    Such retaliatory and extortionist threats are a reasonable and foreseeable consequence of Defendants' actions, failures to act, and attempts to cover up the illicit activities.

**Player-9 continued to harass and intimidate Son, Daughter, and Mother because of Defendants' actions, failures to act, and attempts to cover up the illicit activities.**

512.    In the past few weeks, Player-9 showed up at several sporting and extracurricular events at Son's new school.

513.    Player-9 has no legitimate reason to attend these events and, up until this matter arose, did not attend this other school's events.

514.    Each time, parents from the new school have told Player-9 that he is welcomed at their events and to leave; yet Player-9 continues to show up.

515.    On August 28, 2025, Player showed up at Son's football game, even though it was an away game on a school night.

516.     Mother approached Player-9 and said, "You can either leave or I'm calling the police."

517.     Player-9 said he would leave and left. Player-9 offered no reason why he should not leave or protest about the police.

## CLAIMS

### CLAIM 1
## VIOLATION OF TITLE IX OF THE CIVIL RIGHTS ACT (EDUCATION AMENDMENTS OF 1972), 20 U.S.C. § 1681, *ET SEQ.*

### (BY PLAINTIFF SON KING AGAINST DEFENDANT URSULINE HIGH SCHOOL)

518.     Plaintiffs incorporate all previous allegations.

519.     Ursuline High School, as a recipient of federal funding, is subject to Title IX, which prohibits discrimination based on sex in educational programs and activities. 20 U.S.C. §§ 1681, *et seq.*

520.     Religious schools that receive federal funding are only excluded from Title IX's requirements "if the application of [the requirements] would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

521.     These religious exemptions are commonly known to include the exclusion from sports teams based on gender identity, the ability to expel pregnant students, and to have policies denying LGBTQ+ rights.

522.     Ursuline has not requested Title IX–exemption regarding the sexual-harassment and assault of athletes on the basis that preventing these assaults would not be consistent with its religious tenets.

523.     Nor would it—unless it wants people to believe that Catholic teaching embraces sexual harassment and sexual assaults.

524. The harassment, hazing, and abuse Son endured included:

(a) Threats by upperclassmen football players, in front of Reardon, McGlynn, and Syrianoudis, that Son would have his "butt taken."

(b) Upperclassmen football players forcing younger players to fight each other while threatening that the loser would "get his butt took."

(c) Player-4 holding Son down on Son's hotel bed, attempting to remove Son's shorts, and when the attempt failed repeatedly thrusting—with an erect penis—against Son's buttocks over his shorts.

(d) Player-1 videotaping and disseminating this assault across state lines to other football players and the Ursuline community.

(e) Player-12 tricking Son into entering Player-12's room so Player-8, Player-9, Player-10, Player-11, and Player-13 could assault Son. This assault included Player-9, Player-10, Player-11, and Player-13 each grabbing one of Son's limbs, so he was unable to protect himself. As Son was completely vulnerable and unable to prevent the oncoming assault, the five players forcibly stripped Son of his pants and underwear, then when Son was finally able to partially cover himself, they pulled Son's arms away from his body to completely expose his genitals while slapping his bare buttocks.

(f) Player-4 videorecording this assault—creating child pornography in the process—and disseminating it across state lines to other football players and the Ursuline community.

(g) Player-11 taking Son's underwear and saying it was being kept as a "trophy" then Player-12 sharing images of Son's underwear with the caption "Rip [Son]."

525.    These acts targeted Son's male identity, involved sexual misconduct, and were rooted in gendered expectations of masculinity and male identity within the football program.

526.    The harassment, hazing, and abuse Son suffered was severe, pervasive, and objectively offensive, and deprived Son of access to educational opportunities or benefits.

527.    Ursuline, through its football program and administrators, including Defendants Reardon, McGlynn, Syrianoudis, Sammartino, and Damore, had actual knowledge of the severe, pervasive, and objectively offensive harassment, hazing, and abuse Son suffered.

528.    Upon information and belief, Ursuline, through the same defendants, had actual knowledge of the culture of hazing historically involved in the school's football program.

529.    Despite this knowledge, Ursuline maintained a policy and practice of responding with deliberate indifference to the hazing of underclassmen football players, including Son. The football program has known of the hazing Son endured since June 16, 2025, when Mother made her first complaint to McGlynn. Yet the program and School failed to take prompt and effective action to investigate, discipline the perpetrators, or remedy the hostile environment.

530.    Ursuline's deliberate indifference is further evidenced by its failure to train coaches, including Reardon, McGlynn, and Syrianoudis on recognizing and preventing gender-based hazing, despite known risks in the football program; implement effective anti-hazing policies, procedures, or oversight mechanisms for the football team; and investigate or sanction the football program despite prior complaints of misconduct.

531.    Under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), Ursuline created, tolerated, and subjected Son to a hostile educational environment because Son was treated disparately based upon his gender; suffered gender-based hazing, assault, and other

harassment; and Ursuline lacked adequate policies, training, and procedures and deliberately failed to take appropriate preventative or remedial measures.

532. Because of Ursuline's discriminatory policy and practice, Son was denied equal access to the educational and athletic opportunities of the football program and school, forced to endure a hostile environment, and ultimately forced to transfer schools to escape the harassment and retaliation.

533. As a direct and proximate result of Ursuline's failures, Son suffered and will continue to suffer economic and non-economic damages including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

### CLAIM 2
### CIVIL LIABILITY FOR HAZING UNDER OHIO REV. CODE § 2307.44

**(BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL, MATTHEW SAMMARTINO, MARGARET DAMORE, DANIEL REARDON, TIMOTHY MCGLYNN, CHRISTIAN SYRIANOUDIS, PLAYER-1, PLAYER-4, PLAYER-5, PLAYER-8, PLAYER-9, PLAYER-11, PLAYER-12, PLAYER-13, PLAYER-20, PLAYER-21, AND PLAYER-25)**

534. Ohio Rev. Code § 2307.44 [Hazing civil liability] provides:

> Any person who is subjected to hazing, as defined in division (A) of section 2903.31 of the Revised Code, may commence a civil action for injury or damages, including mental and physical pain and suffering, that result from the hazing. The action may be brought against any participants in the hazing, any organization whose local or national directors, trustees, or officers authorized, requested, commanded, or tolerated the hazing, and any local or national director, trustee, or officer of the organization who authorized, requested, commanded, or tolerated the hazing. If the hazing involves students in a primary, secondary, or post-secondary school, university, college, or any other educational institution, an action may also be brought against any administrator, employee, or faculty member of the school, university, college, or other educational institution who knew or reasonably should have known of the hazing and who did not make reasonable attempts to prevent it and against the school, university, college, or other educational institution. If an administrator, employee, or faculty member is found liable in a civil action for hazing, then notwithstanding Chapter 2743. of the Revised Code, the school, university, college, or other educational institution that employed the administrator, employee, or faculty member may also be held liable.

535.    The named Defendants engaged in hazing against Son, as further detailed above and below.

536.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

537.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 3
### CIVIL LIABILITY FOR CRIMINAL ACTS (HAZING) UNDER OHIO REV. CODE §§ 2307.60 AND 2903.31

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL, MATTHEW SAMMARTINO, MARGARET DAMORE, DANIEL REARDON, TIMOTHY MCGLYNN, AND CHRISTIAN SYRIANOUDIS)

538.    Plaintiffs incorporate all previous allegations.

539.    Under Ohio Rev. Code § 2903.31(B)(2), "No administrator, employee, faculty member, teacher, consultant, alumnus, or volunteer of any organization, including any primary, secondary, or post-secondary school or any other educational institution, public or private, shall recklessly permit the hazing of any person associated with the organization."

540.    Under the relevant part of Ohio Rev. Code § 2903.31(A)(1):

"'Hazing' means doing any act or coercing another, including the victim, to do any act of initiation into any student or other organization or any act to continue or reinstate membership in or affiliation with any student or other organization that causes or creates a substantial risk of causing mental or physical harm to any person…

541.   Under Ohio Rev. Code § 2901.22(C):

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

542.   Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2903.31(B)(2) are criminal acts, indeed misdemeanors, under § 2903.31(D).

543.   Defendants Ursuline High School (organization; private educational institution), principal Sammartino, assistant principal Damore, head coach Reardon, assistant coach McGlynn, and assistant coach Syrianoudis (each of whom is at least an administrator, employee, faculty member, teacher, consultant, alumnus, or volunteer of Ursuline) recklessly permitted the hazing of Son, a student associated with Ursuline.

544.   The named Defendants' reckless permitting of the hazing included, but were not limited to:

(a) On the bus trip (while still in Ohio), Reardon, McGlynn, and Syrianoudis were present and heard the Ursuline players openly discuss the hazing and "initiations" that would take place during the trip, including "taking butts," stripping fellow players, and other forms of abuse, including having players fight each other—with the loser "getting his butt taken." Syrianoudis even said, "don't say that stuff to me, I don't want to hear it." Reardon, McGlynn, and Syrianoudis did nothing to prevent the hazing. From the discussions, it was obvious the hazing had occurred in prior years but were never stopped.

(b) Within days of the coaches, players, and team returning home (to Ohio) after the trip, Sammartino and Damore learned of the hazing and failed to take appropriate steps to prevent further hazing.

(c) The named Defendants recklessly permitted the hazing to continue in Ohio, caused by and including the videos' further dissemination, which depicted the hazing and contained child pornography, all calculated to further cause substantial risk of causing mental harm.

(d) The named Defendants recklessly permitted the present-day hazing to occur because the hazing of other player-students had occurred for years, and they failed to prevent it.

545.   The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

546.   As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

547.   Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

CLAIM 4
CIVIL LIABILITY FOR CRIMINAL ACTS (HAZING) UNDER OHIO REV. CODE
§§ 2307.60 AND ALABAMA § 16-1-23

(BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL,
MATTHEW SAMMARTINO, MARGARET DAMORE, DANIEL REARDON, TIMOTHY
MCGLYNN, AND CHRISTIAN SYRIANOUDIS)

548.    Plaintiffs incorporate all previous allegations.

549.    Under Alabama Code § 16-1-23(c):

No person shall knowingly permit, encourage, aid, or assist any person in committing the offense of hazing, or willfully acquiesce in the commission of such offense, or fail to report promptly his knowledge or any reasonable information within his knowledge of the presence and practice of hazing in this state to the chief executive officer of the appropriate school, college, university, or other educational institution in this state. Any act of omission or commission shall be deemed hazing under the provisions of this section.

550.    Under the relevant part of Alabama Code § 16-1-23(a):

Hazing is defined as follows: (1) Any willful action taken or situation created, whether on or off any school, college, university, or other educational premises, which recklessly or intentionally endangers the mental or physical health of any student, or (2) Any willful act on or off any school, college, university, or other educational premises by any person alone or acting with others in striking, beating, bruising, or maiming; or seriously offering, threatening, or attempting to strike, beat, bruise, or maim, or to do or seriously offer, threaten, or attempt to do physical violence to any student of any such educational institution or any assault upon any such students made for the purpose of committing any of the acts, or producing any of the results to such student as defined in this section.

551.    Under Alabama Code § 13A-2-2(1), "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct."

552.    Under subsection 2(2), "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists."

553.    Under subsection 2(3):

A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication, as defined in subdivision (e)(2) of Section 13A-3-2, acts recklessly with respect thereto.

554.    Under Alabama Code § 13A-2-1(2), a voluntary act is "An act performed consciously as a result of effort or determination."

555.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Alabama Code § 16-1-13(b) are criminal acts, indeed misdemeanors, under Alabama Code § 16-1-13(d).

556.    Defendants Ursuline High School (organization; private educational institution), principal Sammartino, assistant principal Damore, coach Reardon, assistant coach McGlynn, and assistant coach Syrianoudis (all of whom are an administrator, employee, faculty member, teacher, consultant, alumnus, or volunteer of Ursuline) knowingly permitted the hazing of Son; or willfully acquiesced in the hazing of Son; and/or failed to report promptly their knowledge or any reasonable information within their knowledge of the presence and practice of hazing to the Diocese.

557.    The named Defendants actions constituting hazing included, but were not limited to:

(a)    On the bus trip (while still in Alabama), Reardon, McGlynn, and Syrianoudis were present and heard the Ursuline players openly discuss the hazing and "initiations" that would take place during the trip, including "taking butts," stripping fellow players, and other forms of abuse, including having players fight each other—with the loser "getting his butt taken." Syrianoudis even said, "don't say that stuff to me, I don't

want to hear it." Reardon, McGlynn, and Syrianoudis did nothing to prevent the hazing. From the discussions, it was obvious the hazing had occurred in prior years but were never stopped.

(b) On Day 2, in the presence of Defendant-Coaches Reardon, McGlynn, and Syrianoudis, several other players ridiculed Son for the prior night's attack and video. Several other players repeatedly hit Son in the head and told him that he was "going to get his butt took" that night back at the hotel. Reardon, McGlynn, and Syrianoudis did not take any appropriate actions to address the prior night's hazing of Son, nor did they take any appropriate steps to prevent the future hazing of Son.

(c) On Day 3, as with the prior day, several players continued to ridicule Son, hit him in the head, and threatened him that he was "going to get his butt took" that night back at the hotel. Again, Reardon, McGlynn, and Syrianoudis were present and heard the threats, yet did not take any appropriate actions to address the prior night's hazing of Son, nor did they take any appropriate steps to prevent the future hazing of Son. Although Son was not hazed that night, another player was hazed.

(d) Reardon, McGlynn, and Syrianoudis failed to report promptly their knowledge or any information within their knowledge of the hazing to Sammartino, Damore, or the Diocese. Based on information and belief, any report by Reardon, McGlynn, and Syrianoudis was false and meant to downplay the severity of what the victims suffered.

(e) Sammartino and Damore failed to report promptly their knowledge or any reasonable information within their knowledge of the hazing to the Diocese. Based on information and belief, any report by Sammartino and Damore was false.

(f) The named Defendants permitted the present-day hazing to occur because the hazing of other players-students had occurred for years, and they failed to prevent it.

558. The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

559. The conduct complained of above constitutes criminal acts by Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

560. The crimes include, but are not limited to,

(a) hazing under Ohio Rev. Code § 2901.31;

(b) hazing under Alabama Code § 16-1-23(c);

(c) hazing under Florida Statute Title XLVIII Chapter 1006.135;

(d) hazing under Tennessee Code § 49-2-120;

(e) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(f) reporting of child abuse under Florida Statute Title V Chapter 39.205;

(g) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h) tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i) tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l) tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

561.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

562.    Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

563.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b) They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

564.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

565.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

CLAIM 5
CIVIL LIABILITY FOR CRIMINAL ACTS (HAZING) UNDER OHIO REV. CODE
§§ 2307.60 AND FLORIDA STATUTE TITLE XLVIII CHAPTER 1006.135

(BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL,
MATTHEW SAMMARTINO, MARGARET DAMORE, DANIEL REARDON, TIMOTHY
MCGLYNN, AND CHRISTIAN SYRIANOUDIS)

566.    Plaintiffs incorporate all previous allegations.

567.    Under the relevant part of Florida Statute Title XLVIII Chapter 1006.135(3)(a)(2),

applicable to students in any grades 9–12:

> A person who commits an act of hazing upon another person who is a member of or an
> applicant to any type of student organization commits a misdemeanor of the first
> degree… if the person knew or should have known the act would create a potential risk of
> physical injury or death to such other person and the act creates a potential risk of
> physical injury or death to such other person.

568.    Under Florida Statute Title XLVIII Chapter 1006.135(1):

> 'hazing' means any action or situation that endangers the mental or physical health or
> safety of a student at a school with any of grades 6 through 12 for purposes including, but
> not limited to, initiation or admission into or affiliation with any organization operating
> under the sanction of a school with any of grades 6 through 12. 'Hazing' includes, but is
> not limited to:
>
> (a)  Pressuring, coercing, or forcing a student into:
>
>      1. Violating state or federal law;
>      2. Consuming any food, liquor, drug, or other substance; or
>      3. Participating in physical activity that could adversely affect the health or
>         safety of the student.
>
> (b)  Any brutality of a physical nature, such as whipping, beating, branding, or
>      exposure to the elements. Hazing does not include customary athletic events
>      or other similar contests or competitions or any activity or conduct that
>      furthers a legal and legitimate objective.

569.    Under Florida Statute Title XXXIX Chapter 671.209(2), "'Knowledge' means actual

knowledge. 'Knows' has a corresponding meaning."

570.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Title XLVIII Chapter 1006.135 are criminal acts, indeed misdemeanors, under Chapter 1006.135(2)(a).

571.    Defendants Ursuline High School (organization; private educational institution), principal Sammartino, assistant principal Damore, coach Reardon, assistant coach McGlynn, and assistant coach Syrianoudis (every one of whom is at least an Ursuline administrator, employee, faculty member, teacher, consultant, alumnus, or volunteer) engaged in actions or situations that endangered the mental or physical health or safety Son, a 9th-grade Ursuline student for purposes including, but not limited to, initiation or admission into or affiliated with the Ursuline football team. Their actions or situations resulted in the hazing of Son, namely: one or more players committed an act of hazing Son, who is a member of the football team in which the player(s) knew or should have known the act would create a potential risk of physical injury to Son and the act created a potential risk of physical injury to Son.

572.    The named Defendants engaged in acts or situations that permitted the hazing that included, but were not limited to:

(a) On Day 4, as with the prior days, several players continued to talk about the prior attacks and their plans to "take butts" that night. Again, Reardon, McGlynn, and Syrianoudis were present and heard the discussion and threats yet took no appropriate actions to address the prior night's hazing, nor did they take any appropriate steps to prevent the future hazing of Son. Because of this, multiple players engaged in at least two separate acts of hazing against Son.

(b) On Day 5, in the presence of Reardon, McGlynn, and Syrianoudis, several other players ridiculed Son for the prior night's attacks and videos. Reardon, McGlynn, and

Syrianoudis were present and heard the discussions, yet took no appropriate actions to address the prior night's hazing; nor did they take any appropriate steps to prevent the future hazing of Son.

(c) On Day 6, as with the prior days, several players continued to issue threats that they were "going to take butts" that night. Son, again, was one of the intended targets. Several players threatened Son—in the presence of coaches Reardon, McGlynn, and Syrianoudis—that "tonight, your hoodie comes off too" (meaning they were going to forcibly trip Son completely naked, as opposed to the earlier attack when they were only able to rip off Son's pants and underwear but not his hoodie). Again, Reardon, McGlynn, and Syrianoudis were present and heard the threats, yet took no appropriate steps to prevent the future hazing of Son. Although Son was not hazed that night, another player was hazed.

(d) On Day 7, as had been occurring throughout the trip, several players forced other players, generally underclassmen, to fight each other—with the loser "getting his butt taken" as they yelled during the fights and then acted upon, as part of the hazing and initiations. The players openly talked about the fighting in the presence of Reardon, McGlynn, and Syrianoudis, yet the coaches took no appropriate steps to prevent the future hazing of Son. That night, Son was hazed again by being forced to fight another player while being threatened that the loser would "get his butt taken."

(e) The named Defendants engaged in acts or situations that permitted the present-day hazing to occur because the hazing of other players-students had occurred for years, and they failed to prevent it.

573. The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

574. The conduct complained of above constitutes criminal acts by Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

575. The crimes include, but are not limited to,

   (a) hazing under Ohio Rev. Code § 2901.31;

   (b) hazing under Alabama Code § 16-1-23(c);

   (c) hazing under Florida Statute Title XLVIII Chapter 1006.135;

   (d) hazing under Tennessee Code § 49-2-120;

   (e) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

   (f) reporting of child abuse under Florida Statute Title V Chapter 39.205;

   (g) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

   (h) tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

   (i) tampering with records under Ohio Rev. Code § 2913.42(A)(1);

   (j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

   (k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

   (l) tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

   (m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

   (n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

576.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

577.    Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

578.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b) They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

579.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

580.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

CLAIM 6
CIVIL LIABILITY FOR CRIMINAL ACTS (HAZING) UNDER OHIO REV. CODE
§§ 2307.60 AND TENNESSEE CODE § 49-2-120

(BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL,
MATTHEW SAMMARTINO, MARGARET DAMORE, DANIEL REARDON, TIMOTHY
MCGLYNN, AND CHRISTIAN SYRIANOUDIS)

581.    Plaintiffs incorporate all previous allegations.

582.    Under the relevant part of Tennessee Code § 49-2-120:

'hazing' means any intentional or reckless act in this state, on or off LEA property, by
one (1) student acting alone or with others, that is directed against any other student, that
endangers the mental or physical health or safety of that student or that induces or
coerces a student to endanger that student's mental or physical health or safety. 'Hazing'
does not include customary athletic events or similar contests or competitions and is
limited to those actions taken and situations created in connection with initiation into or
affiliation with any organization.

583.    Under Tennessee Code § 39-11-302(a), "'Intentional' refers to a person who acts

intentionally with respect to the nature of the conduct or to a result of the conduct when it is the

person's conscious objective or desire to engage in the conduct or cause the result."

584.    Under Tennessee Code § 39-11-302(c):

'Reckless' refers to a person who acts recklessly with respect to circumstances surrounding
the conduct or the result of the conduct when the person is aware of but consciously
disregards a substantial and unjustifiable risk that the circumstances exist or the result will
occur. The risk must be of such a nature and degree that its disregard constitutes a gross
deviation from the standard of care that an ordinary person would exercise under all the
circumstances as viewed from the accused person's standpoint.

585.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act

may recover full damages in a civil action. Violations of Tennessee Code § 49-2-120 may be

deemed criminal acts.

586.    Defendants Ursuline High School (organization; private educational institution),

principal Sammartino, assistant principal Damore, coach Reardon, assistant coach McGlynn,

and assistant coach Syrianoudis (each of whom is at least an administrator, employee, faculty member, teacher, consultant, alumnus, or volunteer of Ursuline) intentionally or recklessly engaged in acts (actions taken and situations created in connection with initiation into or affiliation with any organization) resulting in the hazing endangering Son's mental or physical health and safety.

587.     The named Defendants' intentional or reckless acts (actions taken and situations created in connection with initiation into or affiliation with any organization) permitting the hazing included, but were not limited to:

  (a) On Day 8, as with the prior days, several players continued to discuss the prior hazing and issued threats that they were "going to take butts" that night. Another player falsely accused Son of making a negative comment, which Son adamantly denied. That night, several players went looking for Son to retaliate and haze him. Again, Reardon, McGlynn, and Syrianoudis were present and heard the threats, yet they did took no appropriate steps to prevent the threatened hazing of Son.

  (b) The named Defendants recklessly permitted the present-day hazing to occur because the hazing of other student players had happened for years, and they failed to prevent it.

588.     The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

589.     The conduct complained of above constitutes criminal acts by Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

590.    The crimes include, but are not limited to, hazing under Ohio Rev. Code § 2901.31;

(a) hazing under Alabama Code § 16-1-23(c);

(b) hazing under Florida Statute Title XLVIII Chapter 1006.135;

(c) hazing under Tennessee Code § 49-2-120;

(d) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(e) reporting of child abuse under Florida Statute Title V Chapter 39.205;

(f) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(g) tampering with evidence under Ohio Rev. Code 2921.12(A)(1);

(h) tampering with records under Ohio Rev. Code 2913.42(A)(1);

(i) obstructing justice under Ohio Rev. Code 2921.32(A)(4);

(j) tampering with evidence under Ohio Rev. Code 2921.12(A)(2);

(k) tampering with records under Ohio Rev. Code 2913.42(A)(1)(2);

(l) obstructing justice under Ohio Rev. Code 2921.32(A)(5); and

(m) obstructing justice under Ohio Rev. Code 2921.32(A)(5).

591.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

592.    Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

593.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and

acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b) They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

594.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

595.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

CLAIM 7
CIVIL LIABILITY FOR CRIMINAL ACTS (REPORTING OF CHILD ABUSE, ABANDONMENT, OR NEGLECT) UNDER OHIO REV. CODE §§ 2307.60 AND ALABAMA CODE § 26-14-3

(BY PLAINTIFF SON KING AGAINST DEFENDANTS DANIEL REARDON, TIMOTHY MCGLYNN, AND CHRISTIAN SYRIANOUDIS)

596.    Plaintiffs incorporate all previous allegations.

597.    Under the relevant part of Alabama Code § 26-14-3(a):

All… public and private K-12 employees, school teachers and officials… when the child is known or suspected to be a victim of child abuse… shall be required to report orally, either by telephone or direct communication immediately, and shall be followed by a written report, to a duly constituted authority.

598.    Alabama Code § 26-14-1(1) defines "Abuse" as:

Harm or threatened harm to a child's health or welfare. Harm or threatened harm to a child's health or welfare can occur through nonaccidental physical or mental injury, sexual abuse or attempted sexual abuse, or sexual exploitation or attempted sexual exploitation. Sexual abuse includes the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or having a child assist any other person to engage in, any sexually explicit conduct or any simulation of the conduct for the purpose of producing any visual depiction of the conduct; or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children as those acts are defined by Alabama law. Sexual exploitation includes allowing, permitting, or encouraging a child to engage in prostitution and allowing, permitting, encouraging, or engaging in the obscene or pornographic photographing, filming, or depicting of a child for commercial purposes.

599.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Alabama Code § 26-14-3 are criminal acts, indeed misdemeanors, under Alabama Code § 25-14-13.

600.    Defendants Reardon, McGlynn, and Syrianoudis, who are mandatory reporters, failed to report the abuse of Son to the appropriate authorities.

601.    The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

602.    The conduct complained of above constitutes criminal acts by Defendants Reardon, McGlynn, and Syrianoudis individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

603.    The crimes include, but are not limited to,

(a)  hazing under Ohio Rev. Code § 2901.31;

(b)  hazing under Alabama Code § 16-1-23(c);

(c)  hazing under Florida Statute Title XLVIII Chapter 1006.135;

(d)  hazing under Tennessee Code § 49-2-120;

(e)  reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(f)  reporting of child abuse under Florida Statute Title V Chapter 39.205;

(g)  culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h)  tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i)  tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j)  obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k)  tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l)  tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n)  obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

604.    Defendants Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

605.    Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

606.    Defendants Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a)  In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b) They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

607.  As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

608.  Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 8
### CIVIL LIABILITY FOR CRIMINAL ACTS (REPORTING OF CHILD ABUSE, ABANDONMENT, OR NEGLECT) UNDER OHIO REV. CODE §§ 2307.60 AND FLORIDA STATUTE TITLE V CHAPTER 39.205

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS DANIEL REARDON, TIMOTHY MCGLYNN, AND CHRISTIAN SYRIANOUDIS)

609.  Plaintiffs incorporate all previous allegations.

610.  Under the relevant part of Florida Statute Title V Chapter 39.201(1)(a)(1)(a), "A person is required to report immediately to the central abuse hotline established in s. 39.101, in writing, through a call to the toll-free telephone number, or through electronic reporting, if he or she knows, or has reasonable cause to suspect, that any of the following has occurred…child abuse…"

611.  Under the relevant part of Florida Statute Title V Chapter 39.201(1)(a)(2), "Any person who knows, or has reasonable cause to suspect, that a child is the victim of sexual abuse or juvenile sexual abuse shall report such knowledge or suspicion to the central abuse hotline…"

612.    Under the relevant part of Florida Statute Title V Chapter 39.201(1)(b)(2)(d), "A person making a report to the central abuse hotline whose occupation is in any of the following categories is required to provide his or her name to the central abuse hotline counselors… School teacher or other school official or personnel…"

613.    Under the relevant part of Florida Statute Title V Chapter 39.201(41), "'Juvenile sexual abuse' means any sexual behavior by a child which occurs without consent, without equality, or as a result of coercion."

614.    Under subsection (41)(a), "'Coercion' means the exploitation of authority or the use of bribes, threats of force, or intimidation to gain cooperation or compliance."

615.    Under subsection 41(b):

"Consent" means an agreement, including all of the following:

1. Understanding what is proposed based on age, maturity, developmental level, functioning, and experience.
2. Knowledge of societal standards for what is being proposed.
3. Awareness of potential consequences and alternatives.
4. Assumption that agreement or disagreement will be accepted equally.
5. Voluntary decision.
6. Mental competence.

616.    Under subsection 41(c), "'Equality' means two participants operating with the same level of power in a relationship, neither being controlled nor coerced by the other."

617.    Under subsection (41), "Juvenile sexual behavior ranges from noncontact sexual behavior such as making obscene phone calls, exhibitionism, voyeurism, and the showing or taking of lewd photographs to varying degrees of direct sexual contact, such as frottage, fondling, digital penetration, rape, fellatio, sodomy, and various other sexually aggressive acts."

618.    Under the relevant part of Florida Statute Title V Chapter 39.205(1), "A person who knowingly and willfully fails to report to the central abuse hotline known or suspected child abuse… commits a felony of the third degree…"

619.    Under the relevant part of Florida Statute Title V Chapter 39.01(2), "'Abuse' means any willful act or threatened act that results in any physical, mental, or sexual abuse, injury, or harm that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired…"

620.    Under Florida Statute Title XXXIX Chapter 671.209(2), "'Knowledge' means actual knowledge. 'Knows' has a corresponding meaning."

621.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Florida Statute Title V Chapter 39.205 are criminal acts, indeed felonies, under Chapter 39.205(1).

622.    Defendants Reardon, McGlynn, and Syrianoudis, who are mandatory reporters, failed to report the abuse of Son to the appropriate authorities.

623.    The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

624.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

625.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**CLAIM 9**
**CIVIL LIABILITY FOR CRIMINAL ACTS (CULPABLE NEGLIGENCE) UNDER OHIO REV.**
**CODE §§ 2307.60 AND FLORIDA STATUTE TITLE XLVI CHAPTER 784.05**

**(BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL,**
**MATTHEW SAMMARTINO, MARGARET DAMORE, DANIEL REARDON, TIMOTHY**
**MCGLYNN, AND CHRISTIAN SYRIANOUDIS)**

626.    Plaintiffs incorporate all previous allegations.

627.    Under the relevant part of Florida Statute Title XLVI Chapter 784.05(1), "Whoever, through culpable negligence, exposes another person to personal injury commits a misdemeanor of the second degree…"

628.    "Culpable negligence" is defined as a course of conduct that demonstrates a wanton or reckless disregard for human life and safety, leading to injury or exposing another person to injury. *State v. Greene*, 348 So.2d 3 (Fla. 1977).

629.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Title XLVI Chapter 784.05(1) are criminal acts, indeed misdemeanors, under Chapter 784.05(1).

630.    Defendants Ursuline High School, Reardon, McGlynn, and Syrianoudis committed culpable negligence, which exposed Son to personal injury, by engaging in a course of conduct that demonstrated a wanton or reckless disregard for human life and safety, leading to injury or exposing Son to injury.

631.    The named Defendants committed culpable negligence that included, but were not limited to:

(a) Throughout the entire trip, several players repeatedly discussed their plans to "initiate," "take butts," force players to fight, and haze their fellow players. Reardon,

McGlynn, and Syrianoudis were present and heard these discussions, yet did not take any appropriate actions to prevent the attacks.

(b) Throughout the entire trip, several players repeatedly discussed the prior night(s)'s actual initiations, "taking butts," fights, and hazing of their fellow players. Reardon, McGlynn, and Syrianoudis were present and heard these discussions, yet did not take any appropriate actions to address and rectify these prior the attacks.

(c) Even after Mother alerted McGlynn to the hazing, neither McGlynn, Reardon, nor Syrianoudis took any appropriate actions to rectify, prevent, or stop the attacks.

(d) Even after another father (who was also an assistant football coach) alerted Reardon, McGlynn, and Syrianoudis to the hazing, none of them took any appropriate actions to rectify, prevent, or stop the attacks.

(e) Even after two innocent players alerted the team that the coaches knew about the hazing, McGlynn, Reardon, and Syrianoudis took no appropriate actions to rectify, prevent, or stop the attacks.

(f) When Son's leg swelled up, and the coaches became aware, McGlynn brushed it off as a "bug bite" and gave Son itch-cream. When the itch-cream failed to improve Son's condition, not Reardon, McGlynn, or Syrianoudis ever took Son for medical treatment. The "bug bite" was actually a very serious staph infection.

(g) The named Defendants engaged in a course of conduct that demonstrated a wanton or reckless disregard for human life and safety, leading to injury or exposing Son to injury because the hazing of other player-students had occurred for years, and they failed to prevent it.

(h) The named Defendants engaged in a course of conduct that demonstrated a wanton or reckless disregard for human life and safety, leading to injury or exposing Son to injury because they sanctioned a nine-day, out-of-state trip for 41 players with only three coaches to supervise. Then, the named Defendants housed the players unattended in rooms on three separate floors and failed to strict enforce the curfew.

632. The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

633. The conduct complained of above constitutes criminal acts by Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

634. The crimes include, but are not limited to,

(a) hazing under Ohio Rev. Code § 2901.31;

(b) hazing under Alabama Code § 16-1-23(c);

(c) hazing under Florida Statute Title XLVIII Chapter 1006.135;

(d) hazing under Tennessee Code § 49-2-120;

(e) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(f) reporting of child abuse under Florida Statute Title V Chapter 39.205;

(g) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h) tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i) tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l)  tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

635.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

636.    Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

637.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a)  In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b)  They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

638.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

639.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 10
### CIVIL LIABILITY FOR CRIMINAL ACTS (NEGLECT OF A CHILD) UNDER OHIO REV. CODE §§ 2307.60 AND FLORIDA STATUTE TITLE XLVI CHAPTER 827.03

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS DANIEL REARDON, TIMOTHY MCGLYNN, AND CHRISTIAN SYRIANOUDIS)

640.    Plaintiffs incorporate all previous allegations.

641.    Under the relevant part of Florida Statute Title XLVI Chapter 827.03(2)(d), "A person who willfully or by culpable negligence neglects a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the third degree…"

642.    "Culpable negligence" is defined as a course of conduct that demonstrates a wanton or reckless disregard for human life and safety, leading to injury or exposing another person to injury. *State v. Greene*, 348 So.2d 3 (Fla. 1977).

643.    Under the relevant part of Florida Statute Title XLVI Chapter 827.03(1)(e)(2), "'Neglect of a child' means… A caregiver's failure to make a reasonable effort to protect a child from abuse, neglect, or exploitation by another person…"

644.    Under the relevant part of Florida Statute Title XLVI Chapter 827.01(1), "'Caregiver' means a parent, adult household member, or other person responsible for a child's welfare."

645.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Title XLVI Chapter 827.03 are criminal acts, indeed felonies, under Chapter 827.03(2)(d).

646. Defendants Reardon, McGlynn, and Syrianoudis, in the position of caregivers, willfully or by culpable negligence neglected Son by failing to make a reasonable effort to protect Son from abuse, neglect, or exploitation by another person.

647. The named-Defendants committed culpable negligence that included, but was not limited to:

(a) Throughout the entire trip, several players repeatedly discussed their plans to "initiate," "take butts," force players to fight, and haze their fellow players. Reardon, McGlynn, and Syrianoudis were present and heard these discussions, yet did not take any appropriate actions to prevent the attacks.

(b) Throughout the entire trip, several players repeatedly discussed the prior night(s)'s actual initiations, "taking butts," fights, and hazing of their fellow players. Reardon, McGlynn, and Syrianoudis were present and heard these discussions, yet did not take any appropriate actions to address and rectify these prior the attacks.

(c) Even after Mother alerted McGlynn to the hazing, neither McGlynn, Reardon, nor Syrianoudis took any appropriate actions to rectify, prevent, or stop the attacks.

(d) Even after another father (who was also an assisted football coach) alerted Reardon, McGlynn, and Syrianoudis to the hazing, none of them took any appropriate actions to rectify, prevent, or stop the attacks.

(e) Even after two innocent players alerted the team that the coaches knew about the hazing, McGlynn, Reardon, and Syrianoudis took no appropriate actions to rectify, prevent, or stop the attacks.

(f) When Son's leg swelled up, and the coaches became aware, McGlynn brushed it off as a "bug bite" and gave Son itch-cream. When the itch-cream failed to improve

Son's condition, not Reardon, McGlynn, nor Syrianoudis ever took Son for medical

treatment. The "bug bite" was actually a very serious staph infection.

(g) The named Defendants engaged in a course of conduct that demonstrated a wanton

or reckless disregard for human life and safety, leading to injury or exposing Son to

injury because the hazing of other players-students had occurred for years, and they

failed to prevent it.

(h) The named Defendants engaged in a course of conduct that demonstrated a wanton

or reckless disregard for human life and safety, leading to injury or exposing Son to

injury because they sanctioned a nine-day, out-of-state trip for 41 players with only

three coaches to supervise. Then, the named Defendants housed the players

unattended in rooms on three separate floors and failed to strictly enforce the curfew.

648.    The named Defendants are culpable as principal offenders, complicitors, and/or

conspirators for the criminal act and are civilly liable.

649.    As a direct and proximate result of these actions, Son has suffered and will continue to

suffer economic and non-economic damages for which the named Defendants are liable,

including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional

distress.

650.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless

manner, willful, egregious, and worthy of substantial sanction to punish and deter them and

others from engaging in this type of unlawful conduct.

CLAIM 11
CIVIL LIABILITY FOR CRIMINAL ACTS (TAMPERING WITH EVIDENCE) UNDER OHIO
REV. CODE §§ 2307.60 AND 2921.12(A)(1)

(BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL,
MATTHEW SAMMARTINO, AND MARGARET DAMORE)

651.    Plaintiffs incorporate all previous allegations.

652.    Under Ohio Rev. Code § 2921.12(A)(1), "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall… Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

653.    Under Ohio Rev. Code § 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

654.    Under Ohio Rev. Code § 2901.22(A), "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

655.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2921.12(A)(1) are criminal acts, indeed felonies, under § 2921.12(B).

656.    Defendants Ursuline High School, Sammartino, and Damore, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted (Sammartino reported the matter to children services and Youngstown Police were/about to/likely to investigating the matter), altered, destroyed, concealed, or removed any record, document, or thing (they removed/deleted the posts/photos from the camp trip from the Ursuline Facebook account and other social media accounts, and deleted the football team's social-media account), with purpose to impair its value or availability as evidence in such proceeding or investigation.

657.    The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

658.    The conduct complained of above constitutes criminal acts by Defendants Sammartino and Damore individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

659.    The crimes include, but are not limited to,

    (a)  hazing under Ohio Rev. Code § 2901.31;

    (b)  hazing under Alabama Code § 16-1-23(c);

    (c)  hazing under Florida Statute Title XLVIII Chapter 1006.135;

    (d)  hazing under Tennessee Code § 49-2-120;

    (e)  reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

    (f)  reporting of child abuse under Florida Statute Title V Chapter 39.205;

    (g)  culpable negligence under Florida Statute Title XLVI Chapter 784.05;

    (h)  tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

    (i)  tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l) tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

660. Defendants Sammartino and Damore were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

661. Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

662. Defendants Sammartino and Damore were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b) They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

663. As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

664.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 12
### CIVIL LIABILITY FOR CRIMINAL ACTS (TAMPERING WITH RECORDS) UNDER OHIO REV. CODE §§ 2307.60 AND 2913.42(A)(1)

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL, MATTHEW SAMMARTINO, AND MARGARET DAMORE)

665.    Plaintiffs incorporate all previous allegations.

666.    Under Ohio Rev. Code § 2913.42(A)(1), "No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall… Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record."

667.    Under Ohio Rev. Code § 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

668.    Under Ohio Rev. Code § 2901.22(A), "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

669.     Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2921.12(A)(1) are criminal acts, indeed felonies, under § 2921.12(B).

670.     Defendants Ursuline High School, Sammartino, and Damore, knowing they had no privilege to do so, and with purpose to defraud or knowing they were facilitating a fraud (they were covering-up what occurred on the trip), destroyed, removed, concealed, or altered, any writing, computer software, data, or record (they destroyed/removed/concealed/altered the posts/photos from the camp trip from the Ursuline Facebook account and other social media accounts, and deleted the football team's social media account).

671.     The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

672.     The conduct complained of above constitutes criminal acts by Defendants Sammartino and Damore individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

673.     The crimes include, but are not limited to,

    (a) hazing under Ohio Rev. Code § 2901.31;

    (b) hazing under Alabama Code § 16-1-23(c);

    (c) hazing under Florida Statute Title XLVIII Chapter 1006.135;

    (d) hazing under Tennessee Code § 49-2-120;

    (e) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

    (f) reporting of child abuse under Florida Statute Title V Chapter 39.205;

    (g) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h) tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i) tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l) tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

674.    Defendants Sammartino and Damore were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

675.    Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

676.    Defendants Sammartino and Damore were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b) They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

677.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable,

including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

678.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 13
### CIVIL LIABILITY FOR CRIMINAL ACTS (OBSTRUCTING JUSTICE) UNDER OHIO REV. CODE §§ 2307.60 AND 2921.32(A)(4)

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL, MATTHEW SAMMARTINO, AND MARGARET DAMORE)

679.    Plaintiffs incorporate all previous allegations.

680.    Under Ohio Rev. Code § 2921.32(A)(4), "No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime, and no person, with purpose to hinder the discovery, apprehension, prosecution, adjudication as a delinquent child, or disposition of a child for an act that if committed by an adult would be a crime or to assist a child to benefit from the commission of an act that if committed by an adult would be a crime, shall… Destroy or conceal physical evidence of the crime or act, or induce any person to withhold testimony or information or to elude legal process summoning the person to testify or supply evidence."

681.    Under Ohio Rev. Code § 2901.22(A), "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

682.     Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2921.32(A)(4) are criminal acts, indeed misdemeanors and felonies, under § 2921.12(B).

683.     Defendants Ursuline High School, Sammartino, and Damore, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another (Reardon, McGlynn, and Syrianoudis) for crime or to assist another to benefit from the commission of a crime, destroyed or concealed physical evidence of the crime or act (they destroyed/concealed the posts/photos from the camp trip from the Ursuline Facebook account and other social media accounts, and deleted the football team's social media account).

684.     Defendants Ursuline High School, Sammartino, and Damore, with purpose to hinder the discovery, apprehension, prosecution, adjudication as a delinquent child (football players), or disposition of a child for an act that if committed by an adult would be a crime or to assist a child to benefit from the commission of an act that if committed by an adult would be a crime, destroyed or concealed physical evidence of the crime or act (they destroyed/concealed the posts/photos from the camp trip from the Ursuline Facebook account and other social media accounts, and deleted the football team's social-media account).

685.     The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

686.     The conduct complained of above constitutes criminal acts by Defendants Sammartino and Damore individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

687. The crimes include, but are not limited to,

    (a) hazing under Ohio Rev. Code § 2901.31;

    (b) hazing under Alabama Code § 16-1-23(c);

    (c) hazing under Florida Statute Title XLVIII Chapter 1006.135;

    (d) hazing under Tennessee Code § 49-2-120;

    (e) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

    (f) reporting of child abuse under Florida Statute Title V Chapter 39.205;

    (g) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

    (h) tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

    (i) tampering with records under Ohio Rev. Code § 2913.42(A)(1);

    (j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

    (k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

    (l) tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

    (m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

    (n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

688. Defendants Sammartino and Damore were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

689. Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

690.    Defendants Sammartino and Damore were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b) They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

691.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

692.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 14
### CIVIL LIABILITY FOR CRIMINAL ACTS (TAMPERING WITH EVIDENCE) UNDER OHIO REV. CODE §§ 2307.60 AND 2921.12(A)(2)

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL AND MATTHEW SAMMARTINO)

693.    Plaintiffs incorporate all previous allegations.

694.    Under Ohio Rev. Code § 2921.12(A)(2), "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall… Make, present, or use any record, document, or thing, knowing it to be false and with purpose to

mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation."

695.     Under Ohio Rev. Code § 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

696.     Under Ohio Rev. Code § 2901.22(A), "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

697.     Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2921.12(A)(2) are criminal acts, indeed felonies, under § 2921.12(B).

698.     Defendants Ursuline High School and Sammartino, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted (Sammartino reported the matter to children services and Youngstown Police were/about to/likely to investigate the matter), made, presented, or used records, documents, or things (Ursuline and Sammartino authored and issued the first false and fraudulent email-letter to Ursuline parents and the media), knowing them to be false with purpose to corrupt the outcome of any such proceeding or investigation.

699.     The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

700.     The conduct complained of above constitutes criminal acts by Defendant Sammartino, individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

701.     The crimes include, but are not limited to,

(a) hazing under Ohio Rev. Code § 2901.31;

(b) hazing under Alabama Code § 16-1-23(c);

(c) hazing under Florida Statute Title XLVIII Chapter 1006.135;

(d) hazing under Tennessee Code § 49-2-120;

(e) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(f) reporting of child abuse under Florida Statute Title V Chapter 39.205;

(g) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h) tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i) tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l) tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

702.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

703.    Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

704.    Defendant Sammartino was an agent and employee of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

    (a)  In the name of the organization or on its behalf, he engaged in conduct constituting the offense; and

    (b)  He had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

705.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

706.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 15
### CIVIL LIABILITY FOR CRIMINAL ACTS (TAMPERING WITH RECORDS) UNDER OHIO REV. CODE §§ 2307.60 AND 2913.42(A)(1)(2)

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL AND MATTHEW SAMMARTINO)

707.    Plaintiffs incorporate all previous allegations.

708.    Under Ohio Rev. Code § 2913.42(A)(1), "No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall… Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record."

709.    Under Ohio Rev. Code § 2913.42(A)(2), "No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall… Utter any writing or record, knowing it to have been tampered with…"

710.    Under Ohio Rev. Code § 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

711.    Under Ohio Rev. Code § 2901.22(A), "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

712.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2921.12(A)(1) are criminal acts, indeed felonies, under § 2921.12(B).

713.    Defendants Ursuline High School and Sammartino, knowing they had no privilege to do so, and with purpose to defraud or knowing they were facilitating a fraud (they were covering-up what occurred on the trip), falsified writings, computer software, data, or records (Ursuline and Sammartino authored and issued the first false and fraudulent email-letter to Ursuline parents and the media).

714.    Defendants Ursuline High School and Sammartino, knowing they had no privilege to do so, and with purpose to defraud or knowing they were facilitating a fraud (they were covering-up what occurred on the trip), uttered writings or records (Ursuline and Sammartino authored and issued the first false and fraudulent email-letter to Ursuline parents and the media), knowing it to have been tampered with (falsified).

715.    The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

716.    The conduct complained of above constitutes criminal acts by Defendant Sammartino, individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

717.    The crimes include, but are not limited to,

(a)  hazing under Ohio Rev. Code § 2901.31;

(b)  hazing under Alabama Code § 16-1-23(c);

(c)  hazing under Florida Statute Title XLVIII Chapter 1006.135;

(d) hazing under Tennessee Code § 49-2-120;

(e) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(f) reporting of child abuse under Florida Statute Title V Chapter 39.205;

(g) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h) tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i) tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l) tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

718.    Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

719.    Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

720.    Defendant Sammartino was an agent and employee of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, he engaged in conduct constituting the offense; and

(b) He had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

721.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

722.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 16
### CIVIL LIABILITY FOR CRIMINAL ACTS (OBSTRUCTING JUSTICE) UNDER OHIO REV. CODE §§ 2307.60 AND 2921.32(A)(5)

**(BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL, MATTHEW SAMMARTINO, AND MARGARET DAMORE)**

723.    Plaintiffs incorporate all previous allegations.

724.    Under Ohio Rev. Code § 2921.32(A)(4), "No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime, and no person, with purpose to hinder the discovery, apprehension, prosecution, adjudication as a delinquent child, or disposition of a child for an act that if committed by an adult would be a crime or to assist a child to benefit from the commission of an act that if committed by an adult would be a crime, shall… Communicate false information to any person."

725.    Under Ohio Rev. Code § 2901.22(A), "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

726.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2921.32(A)(4) are criminal acts, indeed misdemeanors and felonies, under § 2921.12(B).

727.    Defendants Ursuline High School, Sammartino, and Damore, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another (Reardon, McGlynn, and Syrianoudis) for crime or to assist another to benefit from the commission of a crime communicated false information to another person (Ursuline and Sammartino authored and issued the first false and fraudulent email-letter to Ursuline parents and the media).

728.    Defendants Ursuline High School, Sammartino, and Damore with purpose to hinder the discovery, apprehension, prosecution, adjudication as a delinquent child (football players), or disposition of a child for an act that if committed by an adult would be a crime or to assist a child to benefit from the commission of an act that if committed by an adult would be a crime, communicated false information to another person (Ursuline and Sammartino authored and issued the first false and fraudulent email-letter to Ursuline parents and the media).

729.    The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

730.    The conduct complained of above constitutes criminal acts by Defendants Sammartino, and Damore individually and through personal accountability for organizational conduct under

Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational

criminal liability under Ohio Rev. Code § 2901.23.

731.    The crimes include, but are not limited to,

(a)  hazing under Ohio Rev. Code § 2901.31;

(b)  hazing under Alabama Code § 16-1-23(c);

(c)  hazing under Florida Statute Title XLVIII Chapter 1006.135;

(d)  hazing under Tennessee Code § 49-2-120;

(e)  reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(f)  reporting of child abuse under Florida Statute Title V Chapter 39.205;

(g)  culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h)  tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i)  tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j)  obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k)  tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l)  tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n)  obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

732.    Defendants Sammartino and Damore were agents and employees of Defendant Ursuline

High School acting on its behalf and within the scope of their office or employment.

733.    Acting with the kind of culpability otherwise required for the commission of the offense,

its commission was also authorized, requested, commanded, and tolerated by Defendant

Ursuline High School's administration acting on behalf of the organization and within the scope

of the administrator's office or employment.

734.    Defendants Sammartino and Damore were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b) They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

735.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

736.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 17
### CIVIL LIABILITY FOR CRIMINAL ACTS (TAMPERING WITH EVIDENCE) UNDER OHIO REV. CODE §§ 2307.60 AND 2921.12(A)(2)

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL AND MATTHEW SAMMARTINO)

737.    Plaintiffs incorporate all previous allegations.

738.    Under Ohio Rev. Code § 2921.12(A)(2), "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall… Make, present, or use any record, document, or thing, knowing it to be false and with purpose to

mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation."

739. Under Ohio Rev. Code § 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

740. Under Ohio Rev. Code § 2901.22(A), "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

741. Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2921.12(A)(2) are criminal acts, indeed felonies, under § 2921.12(B).

742. Defendants Ursuline High School and Sammartino, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted (Sammartino reported the matter to children services and Youngstown Police were/about to/likely to investigating the matter), made, presented, or used records, documents, or things (Ursuline and Sammartino authored and issued the second false and fraudulent email-letter to Ursuline parents and the media), knowing it to be false with purpose to corrupt the outcome of any such proceeding or investigation.

743.    The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

744.    The conduct complained of above constitutes criminal acts by Defendant Sammartino, individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

745.    The crimes include, but are not limited to,

(a) hazing under Ohio Rev. Code § 2901.31;

(b) hazing under Alabama Code § 16-1-23(c);

(c) hazing under Florida Statute Title XLVIII Chapter 1006.135;

(d) hazing under Tennessee Code § 49-2-120;

(e) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(f) reporting of child abuse under Florida Statute Title V Chapter 39.205;

(g) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h) tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i) tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l) tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

746. Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

747. Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

748. Defendant Sammartino was an agent and employee of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

    (a) In the name of the organization or on its behalf, he engaged in conduct constituting the offense; and

    (b) He had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

749. As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

750. Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 18
### CIVIL LIABILITY FOR CRIMINAL ACTS (TAMPERING WITH RECORDS) UNDER OHIO REV. CODE §§ 2307.60 AND 2913.42(A)(1)(2)

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL AND MATTHEW SAMMARTINO)

751.    Plaintiffs incorporate all previous allegations.

752.    Under Ohio Rev. Code § 2913.42(A)(1), "No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall… Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record."

753.    Under Ohio Rev. Code § 2913.42(A)(2), "No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall… Utter any writing or record, knowing it to have been tampered with…"

754.    Under Ohio Rev. Code § 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

755.    Under Ohio Rev. Code § 2901.22(A), "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

756.   Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2921.12(A)(1) are criminal acts, indeed felonies, under § 2921.12(B).

757.   Defendants Ursuline High School and Sammartino, knowing they had no privilege to do so, and with purpose to defraud or knowing they were facilitating a fraud (they were covering-up what occurred on the trip), falsified writings, computer software, data, or records (Ursuline and Sammartino authored and issued the second false and fraudulent email-letter to Ursuline parents and the media).

758.   Defendants Ursuline High School and Sammartino, knowing they had no privilege to do so, and with purpose to defraud or knowing they were facilitating a fraud (they were covering-up what occurred on the trip), uttered writings or records (Ursuline and Sammartino authored and issued the second false and fraudulent email-letter to Ursuline parents and the media), knowing it to have been tampered with (falsified).

759.   The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

760.   The conduct complained of above constitutes criminal acts by Defendant Sammartino, individually and through personal accountability for organizational conduct under Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

761.   The crimes include, but are not limited to,

   (a)  hazing under Ohio Rev. Code § 2901.31;

   (b)  hazing under Alabama Code § 16-1-23(c);

   (c)  hazing under Florida Statute Title XLVIII Chapter 1006.135;

(d) hazing under Tennessee Code § 49-2-120;

(e) reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(f) reporting of child abuse under Florida Statute Title V Chapter 39.205;

(g) culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h) tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i) tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j) obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k) tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l) tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n) obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

762. Defendants Sammartino, Damore, Reardon, McGlynn, and Syrianoudis were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

763. Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

764. Defendant Sammartino was an agent and employee of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, he engaged in conduct constituting the offense; and

(b) He had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

765.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

766.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 19
### CIVIL LIABILITY FOR CRIMINAL ACTS (OBSTRUCTING JUSTICE) UNDER OHIO REV. CODE §§ 2307.60 AND 2921.32(A)(5)

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL, MATTHEW SAMMARTINO, AND MARGARET DAMORE)

767.    Plaintiffs incorporate all previous allegations.

768.    Under Ohio Rev. Code § 2921.32(A)(4), "No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime, and no person, with purpose to hinder the discovery, apprehension, prosecution, adjudication as a delinquent child, or disposition of a child for an act that if committed by an adult would be a crime or to assist a child to benefit from the commission of an act that if committed by an adult would be a crime, shall… Communicate false information to any person."

769.     Under Ohio Rev. Code § 2901.22(A), "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

770.     Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of Ohio Rev. Code §§ 2921.32(A)(4) are criminal acts, indeed misdemeanors and felonies, under § 2921.12(B).

771.     Defendants Ursuline High School, Sammartino, and Damore, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another (Reardon, McGlynn, and Syrianoudis) for crime or to assist another to benefit from the commission of a crime communicated false information to another person (Ursuline and Sammartino authored and issued the second false and fraudulent email-letter to Ursuline parents and the media).

772.     Defendants Ursuline High School, Sammartino, and Damore, with purpose to hinder the discovery, apprehension, prosecution, adjudication as a delinquent child (football players), or disposition of a child for an act that if committed by an adult would be a crime or to assist a child to benefit from the commission of an act that if committed by an adult would be a crime, communicated false information to another person (Ursuline and Sammartino authored and issued the second false and fraudulent email-letter to Ursuline parents and the media).

773.     The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

774.     The conduct complained of above constitutes criminal acts by Defendants Sammartino, and Damore individually and through personal accountability for organizational conduct under

Ohio Rev. Code § 2901.24, and, by other Defendants, through vicarious and organizational criminal liability under Ohio Rev. Code § 2901.23.

775.    The crimes include, but are not limited to,

(a)  hazing under Ohio Rev. Code § 2901.31;

(b)  hazing under Alabama Code § 16-1-23(c);

(c)  hazing under Florida Statute Title XLVIII Chapter 1006.135;

(d)  hazing under Tennessee Code § 49-2-120;

(e)  reporting of child abuse, abandonment, or neglect under Alabama Code § 26-14-3;

(f)  reporting of child abuse under Florida Statute Title V Chapter 39.205;

(g)  culpable negligence under Florida Statute Title XLVI Chapter 784.05;

(h)  tampering with evidence under Ohio Rev. Code § 2921.12(A)(1);

(i)  tampering with records under Ohio Rev. Code § 2913.42(A)(1);

(j)  obstructing justice under Ohio Rev. Code § 2921.32(A)(4);

(k)  tampering with evidence under Ohio Rev. Code § 2921.12(A)(2);

(l)  tampering with records under Ohio Rev. Code § 2913.42(A)(1)(2);

(m) obstructing justice under Ohio Rev. Code § 2921.32(A)(5); and

(n)  obstructing justice under Ohio Rev. Code § 2921.32(A)(5).

776.    Defendants Sammartino and Damore were agents and employees of Defendant Ursuline High School acting on its behalf and within the scope of their office or employment.

777.    Acting with the kind of culpability otherwise required for the commission of the offense, its commission was also authorized, requested, commanded, and tolerated by Defendant Ursuline High School's administration acting on behalf of the organization and within the scope of the administrator's office or employment.

778.    Defendants Sammartino and Damore were agents and employees of Defendant Ursuline High School as defined in Ohio Rev. Code § 2901.24 and acted with the kind of culpability required for the commission of the offense. At least one of the following apply:

(a) In the name of the organization or on its behalf, they engaged in conduct constituting the offense; and

(b) They had the primary responsibility to discharge a duty imposed on the organization by law—namely the duty to protect the students whose safety was entrusted to them—and did not discharge that duty.

779.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

780.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 20
### NEGLIGENT AND RECKLESS HIRING, TRAINING, SUPERVISION, DISCIPLINE, STAFFING, AND RETENTION UNDER OHIO LAW

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL AND THE CATHOLIC DIOCESE OF YOUNGSTOWN)

781.    Plaintiffs incorporate all previous allegations.

782.    Defendants Ursuline and the Diocese failed to exercise due care and acted in both a negligent and reckless manner in hiring, training, supervising, disciplining, staffing, and retaining the individual Defendants—especially Defendants Reardon and McGlynn.

783.     The individual Defendants were unfit for their positions and duties, as was obvious from their previous, harmful misconduct.

784.     Defendants Ursuline and the Diocese's negligent and reckless conduct in this regard proximately caused Son the injuries.

785.     As a direct and proximate result of these actions, Son, has suffered and will continue to suffer damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

786.     Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 21
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER OHIO LAW

### (BY PLAINTIFFS SON KING AND MOTHER KING AGAINST DEFENDANTS MATTHEW SAMMARTINO, MARGARET DAMORE, DANIEL REARDON, TIMOTHY MCGLYNN, AND CHRISTIAN SYRIANOUDIS)

787.     Plaintiffs incorporate all previous allegations.

788.     Named Defendants' conduct was so extreme and outrageous as to go beyond the bounds of decency–conduct that can be considered utterly intolerable in a civilized society.

789.     Defendants and their actions caused severe emotional distress to Son and Mother.

790.     At all material times, Defendants acted intentionally; to cause emotional distress to Son and Mother; and knew with substantial certainty that their acts would cause severe emotional distress to Son and Mother.

791.     The mental anguish suffered by Son and Mother is so serious and of a nature that no reasonable person could be expected to endure it.

792.     The unreasonable, improper, and unlawful acts of Defendants were made with willful and reckless disregard of the consequences, with callous disregard for Son and Mother's rights and physical and mental well-being, with legal malice, and with substantial certainty that the consequences thereof would cause serious personal injury to Son and Mother.

793.     As a direct and proximate result of these actions, Son and Mother have suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

794.     Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 22
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS UNDER OHIO LAW

**(BY PLAINTIFFS SON KING, MOTHER KING, AND DAUGHTER KING AGAINST DEFENDANTS URSULINE HIGH SCHOOL, MATTHEW SAMMARTINO, MARGARET DAMORE, DANIEL REARDON, TIMOTHY MCGLYNN, AND CHRISTIAN SYRIANOUDIS)**

795.     Plaintiffs incorporate all previous allegations.

796.     Defendants had duties to, and breached those duties, acting negligently and causing harm to Mother, Son, and Daughter.

797.     As a direct and proximate result of Defendants' negligence, Mother, Son and Daughter suffered severe emotional distress.

798.     The severe emotional distress caused by Defendants' negligence was reasonably foreseeable by Defendants at all relevant times.

799.    As a direct and proximate result of these actions, Mother, Son, and Daughter have suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

800.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 23
### SPOLIATION UNDER OHIO LAW

### (BY PLAINTIFF SON KING DEFENDANTS URSULINE HIGH SCHOOL, MATTHEW SAMMARTINO, AND MARGARET DAMORE)

801.    Plaintiffs incorporate all previous allegations.

802.    Ohio recognizes a cause of action for destruction of evidence. To succeed, a plaintiff must show that (1) there was pending or probable litigation involving the plaintiff, (2) knowledge on the part of the defendant that litigation exists or is probable, (3) defendant's willful destruction of evidence was designed to disrupt the plaintiff's case, (4) the plaintiff's case was disrupted, and (5) the defendant caused damages by destroying evidence. Smith v. Howard Johnson Co., Inc., 615 N.E.2d 1037, 1038.

803.    Ursuline, Sammartino, and Damore failed to preserve evidence, including the Ursuline High School Facebook account pages containing post from the football trip and other Ursuline football social media accounts.

804.    Ursuline, Sammartino, and Damore knew that litigation involving Plaintiff Son King was probable and willfully destroyed the evidence to disrupt Son's case.

805.    Son's case was disrupted.

806.   Son suffered damages from Ursuline, Sammartino, and Damore's destruction of the evidence.

807.   As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, betrayal, and emotional distress.

808.   Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 24
### CIVIL ACTION RELATING TO DISCLOSURE OF INTIMATE IMAGES FOR DAMAGES AND INJUNCTIVE RELIEF, UNDER 15 U.S.C. § 6851

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS PLAYER-4, PLAYER-12, PLAYER- 20, AND PLAYER-25)

809.   Plaintiff incorporates all previous allegations.

810.   Title 15 U.S.C. § 6851(b)(1)(A) establishes a federal civil cause of action by

an individual whose intimate visual depiction is disclosed, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, without the consent of the individual, where such disclosure was made by a person who knows that, or recklessly disregards whether, the individual has not consented to such disclosure, may bring a civil action against that person in an appropriate district court of the United States

for actual damages or liquidated damages of $150,000 and injunctive relief, along with the costs of the action including reasonable attorney fees and litigation costs.

811.   Title 15 U.S.C. 6851(a) defines key terms in the statute that apply here:

**(2) Consent**

The term "consent" means an affirmative, conscious, and voluntary authorization made by the individual free from force, fraud, misrepresentation, or coercion.

**(3) Depicted individual**

The term "depicted individual" means an individual whose body appears in whole or in part in an intimate visual depiction and who is identifiable by virtue of the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature, or from information displayed in connection with the visual depiction.

**(4) Disclose**

The term "disclose" means to transfer, publish, distribute, or make accessible.

**(5) Intimate visual depiction**

The term "intimate visual depiction"—

> **(A)** means a visual depiction, as that term is defined in section 2256(5) of title 18, that depicts—
>
> > **(i)** the uncovered genitals, pubic area, anus, or post-pubescent female nipple of an identifiable individual; …

\*\*\*

812.    Title 15 U.S.C. § 6851(b)(2) clarifies that "the fact that the individual consented to the creation of the depiction shall not establish that the person consented to its distribution" (15 U.S.C. § 6851(b)(2)(A)) and "the fact that the individual disclosed the intimate visual depiction to someone else shall not establish that the person consented to the further disclosure of the intimate visual depiction by the person alleged to have violated paragraph (1)." (15 U.S.C. § 6851(b)(2)(B).)

813.    Defendant Player-4 videorecorded and captured intimate visual depictions of Plaintiff Son King on his phone and posted the videos to the team's group Snapchat.

814.    Player-12, Player-20, and Player-25 saved and transferred the videos in Snapchat.

815.    The videos were disseminated over state lines to other Ursuline football players and students in Ohio. The videos were further disseminated throughout the surrounding community.

816.    The named Defendants violated 15 U.S.C. § 6851(b)(1)(A)'s prohibition against disclosing these intimate visual depictions of a depicted individual by disclosing—that is transferring from his cellphone and publishing the photos to Snapchat, in or affecting interstate or foreign commerce, and using a means or facility of interstate or foreign commerce, without Plaintiff Son King's consent, and knowing that, and recklessly disregarding whether, Son had not consented to his disclosure.

817.    The named Defendants are liable to Son for actual damages or liquidated damages of $150,000 and equitable relief.

818.    The named Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct. His acts also merit injunctive relief.

### CLAIM 25
### CIVIL LIABILITY OF PARENTS FOR WILLFUL AND MALICIOUS ASSAULTS BY THEIR CHILDREN UNDER OHIO REV. CODE § 3109.10

### (PLAINTIFF SON KING AGAINST DEFENDANTS PARENTS OF PLAYER-1, PLAYER-4, PLAYER-5, PLAYER-8, PLAYER-9, PLAYER-11, PLAYER-12, PLAYER-13, PLAYER-20, AND PLAYER-21)

819.    Plaintiffs incorporate all previous allegations.

820.    Under Ohio Rev. Code § 3109.10, in relevant part, "Any person is entitled to maintain an action to recover compensatory damages in a civil action, in an amount not to exceed ten thousand dollars and costs of suit in a court of competent jurisdiction, from the parent of a child

under the age of eighteen if the child willfully and maliciously assaults the person by a means or force likely to produce great bodily harm."

821.    Player-1, Player-4, Player-5, Player-8, Player-9, Player-11, Player-12, Player-13, Player-20, and Player-21 willfully and maliciously assaulted Son by means or force likely to produce great bodily injured.

822.    Son suffered, or was assaulted in such a manner as to likely produce, great bodily injury.

823.    The named-Defendant Parents are liable for the actions of their named children.

824.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, and emotional distress.

825.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 26
### CIVIL LIABILITY FOR CRIMINAL ACTS (MULTIPLE CRIMES, INCLUDING HAZING; ASSAULT IN THE THIRD DEGREE; AND SEXUAL ASSAULT IN THE FIRST DEGREE) UNDER OHIO REV. CODE §§ 2307.60 AND MULTIPLE ALABAMA CODE SECTIONS

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS PLAYER-1, PLAYER-4, AND PLAYER-5)

826.    Plaintiffs incorporate all previous allegations.

827.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of the following Alabama Code Sections are criminal acts, indeed misdemeanors and felonies.

828.    The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

829.    The named Defendants committed the following crimes/criminal acts against Son, including, but are not limited to:

(a) **Player-4, Player-5, and Player-6 committed Hazing**, in violation of Alabama Code § 16-1-23(b), which provides, "No person shall engage in what is commonly known and recognized as hazing, or encourage, aid, or assist any other person thus offending." Under subsection (c), "No person shall knowingly permit, encourage, aid, or assist any person in committing the offense of hazing, or willfully acquiesce in the commission of such offense, or fail to report promptly his knowledge or any reasonable information within his knowledge of the presence and practice of hazing in this state to the chief executive officer of the appropriate school, college, university, or other educational institution in this state. Any act of omission or commission shall be deemed hazing under the provisions of this section."[34] Hazing is a Class C misdemeanor.

---

[34] Hazing, under Alabama Code Title 16 Chapter 1 § 16-1-23(a), is defined as:

(1) Any willful action taken or situation created, whether on or off any school, college, university, or other educational premises, which recklessly or intentionally endangers the mental or physical health of any student, or

(2) Any willful act on or off any school, college, university, or other educational premises by any person alone or acting with others in striking, beating, bruising, or maiming; or seriously offering, threatening, or attempting to strike, beat, bruise, or maim, or to do or seriously offer, threaten, or attempt to do physical violence to any student of any such educational institution or any assault upon any such students made for the purpose of committing any of the acts, or producing any of the results to such student as defined in this section.

(3) The term hazing as defined in this section does not include customary athletic events or similar contests or competitions, and is limited to those actions taken and situations created in connection with initiation into or affiliation with any organization. The term hazing does not include corporal punishment administered by officials or employees of public schools when in accordance with policies adopted by local boards of education.

(b) **Player-4 and Player-5 committed Assault in the third degree**, in violation of Alabama
Code § 13A-6-22(a), which provides, in relevant part, "A person commits the crime of
assault in the third degree if: (1) With intent to cause physical injury to another person,
he causes physical injury to any person; or (2) He recklessly causes physical injury to
another person…" Assault in the third degree is a Class A misdemeanor.

(c) **Player-4 committed Sexual abuse in the first degree**, in violation of Alabama Code §
13A-6-66(a), which provides, in relevant part, "A person commits the crime of sexual
abuse in the first degree if he or she… (1) Subjects another person to sexual contact by
forcible compulsion."[35] Sexual abuse in the first degree is a Class C felony.

830.    As a direct and proximate result of these actions, Son has suffered and will continue to
suffer economic and non-economic damages for which the named Defendants are liable,
including, but not limited to, pain and suffering, reputational harm, and emotional distress.

831.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless
manner, willful, egregious, and worthy of substantial sanction to punish and deter them and
others from engaging in this type of unlawful conduct.

### CLAIM 27
### CIVIL LIABILITY FOR CIVIL ASSAULT AND BATTERY UNDER ALABAMA LAW
### (BY PLAINTIFF SON KING AGAINST DEFENDANTS PLAYER-4 AND PLAYER-5)

832.    Plaintiffs incorporate all previous allegations.

833.    Under Alabama law, the elements of civil assault and battery are: (1) the defendant
touched the plaintiff; (2) the defendant intended to touch the plaintiff; and (3) the touching was

---

[35] Alabama Code § 13A-6-60 defines "sexual contact" as "Any touching of the sexual or other
intimate parts of a person done for the purpose of gratifying the sexual desire of either party. The
term does not require skin to skin contact."

conducted in a harmful or offensive manner. *Dolgencorp, LLC v. Spence*, 224 So.3d 171, 180 (Ala. 2016).

834. The named Defendants committed an assault-and-battery against Son, by their touching, and intending to touch, Son in a harmful or offensive manner constituting assault and battery.

835. As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, and emotional distress.

836. Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

CLAIM 28
CIVIL LIABILITY FOR CRIMINAL ACTS (MULTIPLE CRIMES INCLUDING

HAZING;

KIDNAPPING;

FALSE IMPRISONMENT;

ASSAULT;

AGGRAVATED ASSAULT;

BATTERY;

STALKING;

SEXUAL CYBERHARASSMENT;

CHILD PORNOGRAPHY;

PROHIBITION OF CERTAIN ACTS IN CONNECTION WITH OBSCENE, LEWD, ETC.,
MATERIALS;

PROTECTION OF MINORS, PROHIBITION OF CERTAIN ACTS IN CONNECTION WITH
OBSCENITY;

TRANSMISSION OF PORNOGRAPHY BY ELECTRONIC DEVICE OR EQUIPMENT
PROHIBITED;

TRANSMISSION OF MATERIAL HARMFUL TO MINORS TO A MINOR BY ELECTRONIC
DEVICE OR EQUIPMENT PROHIBITED;

SEXTING; AND

BREACH OF THE PEACE, DISORDERLY CONDUCT)

UNDER OHIO REV. CODE §§ 2307.60 AND MULTIPLE FLORIDA STATUTES

(AGAINST DEFENDANTS PLAYER-4, PLAYER-8, PLAYER-9, PLAYER-11, PLAYER-12,
PLAYER-13, AND PLAYER-20)

837.    Plaintiffs incorporate all previous allegations.

838.     Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of the following Florida Statutes are criminal acts, indeed misdemeanors and felonies.

839.     The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

840.     The named-Defendants committed the following crimes/criminal acts against Son, including, but are not limited to:

(a)  **Player-4, Player-8, Player-9, Player-11, Player-12, Player-13, and Player-20 committed Hazing**, in violation of Florida Statute Title XLVIII Chapter 1006.135, which means any action or situation that endangers the mental or physical health or safety of a student at a school with any of grades 6 through 12 for purposes including, but not limited to, initiation or admission into or affiliation with any organization operating under the sanction of a school with any of grades 6 through 12. 'Hazing' includes, but is not limited to:

(a) Pressuring, coercing, or forcing a student into:

4.   Violating state or federal law;

5.   Consuming any food, liquor, or other substance; or

6.   Participating in physical activity that could adversely affect the health or safety of the student.

(b) Any brutality of a physical nature, such as whipping, beating, branding, or exposure to the elements. Hazing does not include customary athletic events or other similar contests or competitions or any activity or conduct that furthers a legal and legitimate objective.

Hazing is a misdemeanor of the first degree but could be elevated to a third-degree felony under certain circumstances.

(b) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Kidnapping**, in violation of Florida Statute Title XLVI Chapter 787.01(1)(a), which "means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to…(2) Commit or facilitate commission of any felony; (3) Inflict bodily harm upon or terrorize the victim of another person." Kidnapping is a felony of first degree.

(c) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed False imprisonment**, in violation of Florida Statute Title XLVI Chapter 787.02(1)(a), which "means forcibly, by threat, or secretly confining, abducting, imprisoning, or restraining another person without lawful authority and against her or his will." False imprisonment is a felony of third degree.

(d) **Player-4, Player-8, Player-9, Player-11, Player-12, Player-13, and Player-20 committed Assault**, in violation of Florida Statute Title XLVI Chapter 784.011(1), which "is an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Assault is a misdemeanor of second degree.

(e) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Aggravated assault**, in violation of Florida Statute Title XLVI Chapter 784.021(1), which "is an assault…(b) With intent to commit a felony." Aggravated assault is a felony of third degree.

(f) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Battery**, in violation of Florida Statute Title XLVI Chapter 784.03(1)(a), which "occur when a person: 1. Actually and intentionally touches or strikes another person against the will of the other; or 2. Intentionally causes bodily harm to another person." Battery is a misdemeanor of first degree.

(g) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Stalking**, in violation of Florida Statute Title XLVI Chapter 784.048(2), which occurs when "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking, a misdemeanor of the first degree." **Stalking**, under Florida Statute Title XVLI Chapter 784.048(3), occurs when "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person and makes a credible threat to that person commits the offense of aggravated stalking, a felony of the third degree." **Stalking**, under Florida Statute Title XVLI Chapter 784.048(5), occurs when "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks a child under 16 years of age commits the offense of aggravated stalking, a felony of the third degree."

(h) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Sexual cyberharassment**, in violation of Florida Statute Title XLVI Chapter 784.049(3)(a), which occurs when "a person who willfully and maliciously sexually cyberharasses another person commits a misdemeanor of the first degree."[36]

---

[36] Florida Statute XLVI Chapter 784.049 [Sexual cyberharassment] provides:

(2)   As used in this section, the term:

(i) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Child pornography**, in violation of Florida Statute Title XLVI Chapter 827.071(4), which provides, in relevant part, "It is unlawful for any person to possess with the intent to promote any photograph, motion picture, exhibition, show, representation, or other presentation which, in whole or in part, includes child pornography… A person who violates this subsection commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."

(j) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Child pornography**, in violation of Florida Statute Title XLVI Chapter 827.071(5), which provides, in relevant part, "It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation,

---

(c) "Image" includes, but is not limited to, any photograph, picture, motion picture, film, video, or representation.

(b) "Personal identification information" means any information that identifies an individual, and includes, but is not limited to, any name, postal or electronic mail address, telephone number, social security number, date of birth, or any unique physical representation.

(d) "Sexually cyberharass" means to publish to an Internet website or disseminate through electronic means to another person a sexually explicit image of a person that contains or conveys the personal identification information of the depicted person without the depicted person's consent, contrary to the depicted person's reasonable expectation that the image would remain private, for no legitimate purpose, with the intent of causing substantial emotional distress to the depicted person. Evidence that the depicted person sent a sexually explicit image to another person does not, on its own, remove his or her reasonable expectation of privacy for that image.

(d) "Sexually explicit image" means any image depicting nudity, as defined in s. 847.001, or depicting a person engaging in sexual conduct, as defined in s. 847.001.

image, data, computer depiction, or other presentation which, in whole or in part, he or she knows to include child pornography… A person who violates this paragraph commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(k) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Prohibition of certain acts in connection with obscene, lewd, etc., materials**, in violation of Florida Statute Title XLVI Chapter 847.011(1)(a), which provides, "any person who knowingly sells, lends, gives away, distributes, transmits, shows, or transmutes, or offers to sell, lend, give away, distribute, transmit, show, or transmute, or has in his or her possession, custody, or control with intent to sell, lend, give away, distribute, transmit, show, transmute, or advertise in any manner, any obscene book, magazine, periodical, pamphlet, newspaper, comic book, story paper, written or printed story or article, writing, paper, card, picture, drawing, photograph, motion picture film, figure, image, phonograph record, or wire or tape or other recording, or any written, printed, or recorded matter of any such character which may or may not require mechanical or other means to be transmuted into auditory, visual, or sensory representations of such character, or any article or instrument for obscene use, or purporting to be for obscene use or purpose; or who knowingly designs, copies, draws, photographs, poses for, writes, prints, publishes, or in any manner whatsoever manufactures or prepares any such material, matter, article, or thing of any such character; or who knowingly writes, prints, publishes, or utters, or causes to be written, printed, published, or uttered, any advertisement or notice of any kind, giving information, directly or indirectly, stating, or purporting to state, where, how, of

whom, or by what means any, or what purports to be any, such material, matter, article, or thing of any such character can be purchased, obtained, or had; or who in any manner knowingly hires, employs, uses, or permits any person knowingly to do or assist in doing any act or thing mentioned above, commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083."[37] Under subsection (1)(c), if the violation "is based on materials that depict a minor engaged in any act or conduct that is harmful to minors commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."

---

[37] Florida Statute Title XLVI Chapter 847.001 provides:

(12)    "Obscene" means the status of material which:

(c)    The average person, applying contemporary community standards, would find, taken as a whole, appeals to the prurient interest;

(d)    Depicts or describes, in a patently offensive way, sexual conduct as specifically defined herein; and

(c)    Taken as a whole, lacks serious literary, artistic, political, or scientific value.

A mother's breastfeeding of her baby is not under any circumstance "obscene."

***

(19)    "Sexual conduct" means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed. A mother's breastfeeding of her baby does not under any circumstance constitute "sexual conduct."

(l) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Prohibition of certain acts in connection with obscene, lewd, etc., materials**, in violation of Florida Statute Title XLVI Chapter 847.011(2), which provides, "a person who knowingly has in his or her possession, custody, or control any obscene book, magazine, periodical, pamphlet, newspaper, comic book, story paper, written or printed story or article, writing, paper, card, picture, drawing, photograph, motion picture film, film, any sticker, decal, emblem or other device attached to a motor vehicle containing obscene descriptions, photographs, or depictions, any figure, image, phonograph record, or wire or tape or other recording, or any written, printed, or recorded matter of any such character which may or may not require mechanical or other means to be transmuted into auditory, visual, or sensory representations of such character, or any article or instrument for obscene use, or purporting to be for obscene use or purpose, without intent to sell, lend, give away, distribute, transmit, show, transmute, or advertise the same, commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083." Under subsection (1)(c), if the violation "is based on materials that depict a minor engaged in any act or conduct that is harmful to minors commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."[38]

(m) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Protection of minors; prohibition of certain acts in connection with obscenity**, in violation of Florida Statute Title XLVI Chapter 847.0133(1), which provides, in

---

[38] *Id.*

relevant part, "A person may not knowingly sell, rent, loan, give away, distribute, transmit, or show any obscene material to a minor."[39] Protection of minors; prohibition of certain acts in connection with obscenity is a felony of third degree.

(n) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Transmission of pornography by electronic device or equipment prohibited**, in violation of Florida Statute Title XLVI Chapter 847.0137(2), which provides, in relevant part, "any person in this state who knew or reasonably should have known that he or she was transmitting child pornography, as defined in s. 847.001, to another person in this state or in another jurisdiction commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."[40] Under subsection (1), "the term 'transmit' means the act of sending and causing to be delivered, including the act of providing access for receiving and causing to be delivered, any image, information, or data over or through any medium, including the

---

[39] *Id.*

[40] Florida Statute Title XLVI Chapter 874.001 provides:

  (3) "Child pornography" means:
    (a) Any image depicting a minor engaged in sexual conduct; or
    (b) Any image that has been created, altered, adapted, or modified by electronic, mechanical, or other means, to portray an identifiable minor engaged in sexual conduct.
  (19) "Sexual conduct" means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed. A mother's breastfeeding of her baby does not under any circumstance constitute "sexual conduct."

Internet or an interconnected network, by use of any electronic equipment or other device."

(o) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Transmission of material harmful to minors to a minor by electronic device or equipment prohibited**, in violation of Florida Statute Title XLVI Chapter 847.0138(2), which provides, in relevant part, "any person who knew or believed that he or she was transmitting an image, information, or data that is harmful to minors, as defined in s. 847.001, to a specific individual known by the defendant to be a minor commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."[41] Transmission of material harmful to minors to a minor by electronic device or equipment prohibited is a misdemeanor of first degree.

(p) **Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Sexting**, in violation of Florida Statute Title XLVI Chapter 847.0141(1), which provides, "A minor commits the offense of sexting if he or she knowingly: (a) Uses a computer, or any other device capable of electronic data transmission or distribution, to transmit or distribute to another minor any photograph or video of any person

---

[41] Florida Statute Title XLVI Chapter 874.001 provides:

(7) "Harmful to minors" means any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:
    (a)   Predominantly appeals to a prurient, shameful, or morbid interest;
    (b)   Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; and
    (c)   Taken as a whole, is without serious literary, artistic, political, or scientific value for minors.
    A mother's breastfeeding of her baby is not under any circumstance "harmful to minors."

which depicts nudity, as defined in s. 847.001, and is harmful to minors, as defined in
s. 847.001 Uses a computer, or any other device capable of electronic data
transmission or distribution, to transmit or distribute to another minor any
photograph or video of any person which depicts nudity, as defined in s. 847.001, and
is harmful to minors, as defined in s. 847.001. (b) Possesses a photograph or video of
any person that was transmitted or distributed by another minor which depicts
nudity, as defined in s. 847.001, and is harmful to minors, as defined in s. 847.001. A
minor does not violate this paragraph if all of the following apply: 1. The minor did
not solicit the photograph or video. 2. The minor took reasonable steps to report the
photograph or video to the minor's legal guardian or to a school or law enforcement
official. 3. The minor did not transmit or distribute the photograph or video to a
third party."[42] Under subsection (3)(a) sexting is a noncriminal violation for a first
violation.

(q) **Player-4, Player-8, Player-9, Player-11, Player-12, Player-13, and Player-20
committed Breach of the peace; disorderly conduct**, in violation of Florida Statute
Title XLVI Chapter 877.03, which provides, "Whoever commits such acts as are of a
nature to corrupt the public morals, or outrage the sense of public decency, or affect

---

[42] Florida Statute Title XLVI Chapter 874.001 provides:

(11)  "Nudity" means the showing of the human male or female genitals, pubic area, or
buttocks with less than a fully opaque covering; or the showing of the female breast
with less than a fully opaque covering of any portion thereof below the top of the
nipple; or the depiction of covered male genitals in a discernibly turgid state. A
mother's breastfeeding of her baby does not under any circumstance constitute
"nudity," irrespective of whether or not the nipple is covered during or incidental
to feeding.

the peace and quiet of persons who may witness them, or engages in brawling or

fighting, or engages in such conduct as to constitute a breach of the peace or

disorderly conduct, shall be guilty of a misdemeanor of the second degree, punishable

as provided in s. 775.082 or s. 775.083."

841.    As a direct and proximate result of these actions, Son has suffered and will continue to

suffer economic and non-economic damages for which the named Defendants are liable,

including, but not limited to, pain and suffering, reputational harm, and emotional distress.

842.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless

manner, willful, egregious, and worthy of substantial sanction to punish and deter them and

others from engaging in this type of unlawful conduct.

### CLAIM 29
### CIVIL LIABILITY FOR CIVIL BATTERY UNDER FLORIDA LAW

### (BY PLAINTIFF SON KING AGAINST DEFENDANTS PLAYER-4, PLAYER-8, PLAYER-9, PLAYER-11, PLAYER-12, PLAYER-13, AND PLAYER-20)

843.    Plaintiffs incorporate all previous allegations.

844.    Under Florida law, civil battery "consists of the infliction of a harmful or offensive contact

upon another with intent to cause such contact or the apprehension that such contact is

imminent." *Paul v. Holbrook*, 696 So.2d 1311, 1312 (Fla. 5th DCA 1997), citing *Sullivan v.

Atlantic Fed. Sav. & Loan Ass'n*, 454 So.2d 52, 54 (Fla. 4th DCA 1984), *review denied*, 461 So.2d

116 (Fla. 1985) (other citations omitted).

845.    The named Defendants committed a battery against Son, by their infliction of a harmful

or offensive contact of Son with intent to cause such contact or the apprehension of such contact

was imminent.

846.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, and emotional distress.

847.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 30
### CIVIL LIABILITY FOR CRIMINAL ACTS (MULTIPLE CRIMES INCLUDING HAZING AND ASSAULT) UNDER OHIO REV. CODE §§ 2307.60 AND MULTIPLE TENNESSEE CODE SECTIONS

### (BY PLAINTIFF SON KING AGAINST DEFENDANT PLAYER-21)

848.    Plaintiffs incorporate all previous allegations.

849.    Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of the following Florida Statutes are criminal acts, indeed misdemeanors and felonies.

850.    The named Defendants are culpable as principal offenders, complicitors, and/or conspirators for the criminal act and are civilly liable.

851.    The named-Defendants committed the following crimes/criminal acts against Son, including, but are not limited to:

(a) **Player-21 committed Hazing**, in violation of Tennessee Code § 49-2-120, which "means any intentional or reckless act in this state, on or off LEA property, by one (1) student acting alone or with others, that is directed against any other student, that endangers the mental or physical health or safety of that student or that induces or coerces a student to endanger that student's mental or physical health or safety.

'Hazing' does not include customary athletic events or similar contests or competitions and is limited to those actions taken and situations created in connection with initiation into or affiliation with any organization." Hazing may be a criminal offense in Tennessee under certain circumstances.

(b) **Player-21 committed Assault**, in violation of Tennessee Code § 39-13-101(a), which provides, in relevant part, "A person commits assault who… (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury…" Assault is a Class A misdemeanor.

852.    As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, and emotional distress.

853.    Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 31
### CIVIL LIABILITY FOR CIVIL BATTERY UNDER TENNESSEE LAW
### (BY PLAINTIFF SON KING AGAINST DEFENDANT PLAYER-21)

854.    Plaintiffs incorporate all previous allegations.

855.    Under Tennessee law, civil assault has the name elements as criminal assault under Tennessee Code § 39-13-101(a), which provides, in relevant part, "A person commits assault who… (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury…." *Hughes v. Metro. Gov. of Nashville and Davidson Cty.*, 240 S.W.3rd 352, 370–71 (Tenn. 2011).

856. The named Defendant committed an assault against Son, by intentionally to knowingly causing Son to reasonably fear imminent bodily injury.

857. As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, and emotional distress.

858. Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 32
### CIVIL LIABILITY FOR CRIMINAL ACTS (MULTIPLE CRIMES INCLUDING

### HAZING;

### ILLEGAL USE OF MINOR OR IMPAIRED PERSON IN NUDITY-ORIENTED MATERIAL OR PERFORMANCE; AND

### TELECOMMUNICATIONS HARASSMENT)

### UNDER OHIO REV. CODE §§ 2307.60 AND MULTIPLE OHIO REV. CODE SECTIONS

### (BY PLAINTIFF SON KING AGAINST DEFENDANT PLAYER-1, PLAYER-4, PLAYER-5, PLAYER-8, PLAYER-9, PLAYER-11, PLAYER-12, PLAYER-13, PLAYER-20, PLAYER-21)

859. Plaintiffs incorporate all previous allegations.

860. Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action. Violations of the following Florida Statutes are criminal acts, indeed misdemeanors and felonies.

861. The named Defendants are culpable as principal offenders, compliciters, and/or conspirators for the criminal act and are civilly liable.

862.    The named-Defendants committed the following crimes/criminal acts against Son, including, but are not limited to:

(a) **Player-1, Player-4, Player-8, Player-9, Player-11, Player-12, Player-13, Player-20, and Player-21 committed Hazing**, in violation of Ohio Rev. Code § 2903.31(B)(1), which provides, "No person shall recklessly participate in the hazing of another."[43] The violation of which is a misdemeanor of the second degree.

(b) **Player-1, Player-4, Player-8, Player-9, Player-11, Player-12, and Player-13 committed Illegal use of minor or impaired person in nudity-oriented material or performance**, in violation of Ohio Rev. Code § 2907.323(A), which provides, in relevant part, "No person shall do any of the following: (1) Photograph any minor or impaired person who is not the person's child or ward in a state of nudity, or create, direct, produce, or transfer any material or performance that shows the minor or impaired person in a state of nudity… (3) Possess or view any material or performance that shows a minor or impaired person who is not the person's child or ward in a state of nudity." Illegal use of minor or impaired person in nudity-oriented material or performance, under subsection (1), is a felony of the second degree; and, under subsection (3), a felony of the fifth degree.

(c) **Player-1, Player-4, Player-8, Player-9, Player-11, Player-12, Player-13, and Player-20 committed Telecommunications harassment**, in violation of Ohio Rev. Code

---

[43] **Hazing**, under Ohio Rev. Code § 2903.31(A)(1), "means doing any act or coercing another, including the victim, to do any act of initiation into any student or other organization or any act to continue or reinstate membership in or affiliation with any student or other organization that causes or creates a substantial risk of causing mental or physical harm to any person, including coercing another to consume alcohol or a drug of abuse, as defined in section 3719.0111 of the Revised Code.

§ 2917.21(B)(1), which provides, "No person shall make or cause to be made a telecommunication, or permit a telecommunication to be made from a telecommunications device under the person's control, with purpose to abuse, threaten, or harass another person." Under subsection (2), "No person shall knowingly post a text or audio statement or an image on an internet web site or web page for the purpose of abusing, threatening, or harassing another person." Telecommunications harassment, under subsection (B), is a misdemeanor of the first degree.

863. The named-Defendants committed the following crimes/criminal acts against Son, Daughter, and Mother, including, but are not limited to:

(a) **Player-9 committed Intimidation of attorney, victim or witness in criminal action or delinquent child action proceedings**, in violation of Ohio Rev. Code § 2921.04(A), which provides, "No person shall knowingly attempt to intimidate or hinder the victim of a crime or delinquent act in the filing or prosecution of criminal charges or a delinquent child action or proceeding, and no person shall knowingly attempt to intimidate a witness to a criminal or delinquent act by reason of the person being a witness to that act." Intimidation of attorney, victim or witness in criminal action or delinquent child action proceedings, as stated in subsection (A) is a misdemeanor of the first degree.

864. As a direct and proximate result of these actions, Son has suffered and will continue to suffer economic and non-economic damages for which the named Defendants are liable, including, but not limited to, pain and suffering, reputational harm, and emotional distress.

865. Defendants' acts were malicious, in bad faith, performed in a wanton and reckless manner, willful, egregious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## PRAYER FOR RELIEF

For the above reasons, Plaintiff respectfully requests the following relief from the Court:

(a)     Declare that Defendants' acts and conduct constitute violations of federal and state law and the United States Constitution;

(b)     Enjoin Defendants from retaliating against Mother, Son, and Daughter King;

(c)     Enter judgment in Mother, Son, and Daughter King's favor on all claims for relief;

(d)     Award Mother, Son, and Daughter King full compensatory damages, economic and non-economic, including, but not limited to, pain and suffering, mental anguish, emotional distress, reputational harm, sense of betrayal, and trauma that they have suffered and are reasonably certain to suffer in the future;

(e)     Award Mother, Son, and Daughter King punitive damages as appropriate for all intentional and malicious violations of federal and state law and constitutional rights;

(f)     Award prejudgment and post-judgment interest at the highest lawful rate;

(g)     Award Mother, Son, and Daughter King their reasonable attorney fees, expert fees, and all other costs and expenses of this suit;

(h)     Award all other relief in law or equity to which Mother, Son, and Daughter King is entitled and that the Court deems equitable, just, or proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues within this complaint.

Dated: September 2, 2025

Respectfully submitted,

/s/ Subodh Chandra
Subodh Chandra (0069233)
Alexandra Day Lavelle (0099601)
Ethan Dawson (0103801)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 West 6th Street, Suite 400
Cleveland, Ohio 44113
888.500.5025 Phone
Subodh.Chandra@ChandraLaw.com
Alexandra.Lavelle@ChandraLaw.com
Ethan.Dawson@ChandraLaw.com

Per consent
Martin P. Desmond (0077377)
Attorney at law
P.O. Box 14052
Youngstown, OH 44514
330.559.4505 (p)
Mpmd4@hotmail.com

Attorneys for Plaintiffs
Mother, Son, and Daughter King
(Pseudonyms)